# EXHIBIT "A"

Electronically Filed
05/29/2014 12:42:09 PM

*[signature]*

**CLERK OF THE COURT**

1    Suvinder S. Ahluwalia, Esq.
     Nevada Bar No. 3944
2    410 South Rampart Boulevard, Suite 350
     Las Vegas, Nevada  89145
3    Telephone: (702) 360-6000
     Facsimile: (702) 360-0000
4    Email: sahluwalia@sklar-law.com
5    Attorneys for Plaintiffs

6

                    **DISTRICT COURT**
7
                 **CLARK COUNTY, NEVADA**
8

9    RONALD D. SLOAN; ROBIN SCHWARZ;        | Case No.:  A-14-701465-B
     GARY COLLINS; JILL BROWN; LARK         |                 XI
10   TERRELL; NANCY HERBOLD; DANIEL R.       | Dept. No.:
     SLOAN; BETTY ANN SLOAN; PEARL KIRK;    |
11   JAMES BOAN; N O WAIT; LARRY ORWICK;    |
     PATRICIA LA SALLE; BRIAN WOLFE;        |
12   STUART R. CAMERON; ROBERT WEBSTER;     |
     HUGO BONDI; JOAN BRATSETH; P A         |
13   BRATSETH; DEREK MILANI; DEAN           |
     RACHEY; SAM BROUNSTEIN; SANDRA         |
14   JANSEN; BRIAN JANSEN; RHONDA KIM       |
     NICHOLS; SCOTT NICHOLS; CARMEN         |
15   ADAIR; KRISTA SCHOFIELD; MARK          |      **VERIFIED DERIVATIVE**
     BRATSETH; ROSE TRUST 11; CLIFF OLSON;  |   **SHAREHOLDER COMPLAINT**
16   DON COLLINS; ROYCE NORDSTROM;          |        **AND JURY DEMAND**
     NATALIE MAYZEL; DAVID JESSKE;          |
17   THORNTON D. BARNES; JAMES HASON        |
     SANDRA HASON; EDDIE GUILLET;           |
18   RYAN GUILLET;                          |

19   ON BEHALF OF CAN-CAL
     RESOURCES, LTD
20
                    Plaintiffs,              | **Business Court Requested:**
21                                           | **NRS Chapters 79 – 92A**
           vs.
22                                           | **Arbitration Exemptions:**
     CAN-CAL RESOURCES, LTD., a Nevada      | **Declaratory Relief**
23   corporation; WILLIAM J. HOGAN; THOMPSON | **Equitable Relief**
     MACDONALD; RONALD SCHINNOUR;           |
24   MICHAEL HOGAN; CANDEO LAVA             |
     PRODUCTS, INC., a Canadian Corporation, and |
25   FUTUREWORTH CAPITAL CORP., a Canadian  |
     Corporation,                          |
26
                    Defendants.            |
27

28

**<u>TABLE OF CONTENTS</u>**

Page

I.   Introduction .......................................................................................... 1

II.  Summary of Claims ............................................................................. 1

     A.   Self Dealing by William Hogan ................................................ 1

     B.   Conversion ................................................................................. 2

     C.   Breaches of Fiduciary Duties .................................................... 2

     D.   Aiding and Abetting Breaches of Fiduciary Duties .................. 4

     E.   Civil Conspiracy ....................................................................... 4

     F.   Fraud and Deceit ....................................................................... 4

     G.   Unjust Enrichment .................................................................... 4

III. Parties, Jurisdiction, and Venue ........................................................ 4

     A.   Plaintiffs ................................................................................... 4

     B.   Can-Cal Resources, Ltd. ........................................................... 6

     C.   Defendants ................................................................................. 7

     D.   Jurisdiction and Venue .............................................................. 7

IV.  Plaintiffs Have Fulfilled The Requirement of Making A Demand       8
    Pursuant to N.R.C.P. 23.1

V.   General Allegations ............................................................................. 10

     A.   The Hogans Take Control of Can-Cal and Vote Themselves     10
        Excessive Employment Contracts

        i.    William Hogan's Contract ............................................. 12

        ii.   Michael Hogan's Contract ............................................. 12

     B.   Can-Cal's Directors Learn That Can-Cal's Pisgah Property      14
        Is Extremely Valuable As A Source of Organic Fertilizer
        Which Compares Favorably With Any Fertilizer In The
        World

     C.   The Individual Defendants Steal The Value of Can-Cal's         16
        Pisgah Property

     D.   Candeo is Raising Capital By Touting the Value of                 21
        Can-Cal's Pisgah Material

i

| | | | | |
|---|---|---|---|---|
| | | i. | The April 26, 2013 Candeo Solicitation | 21 |
| | | ii. | The November 26, 2013 Candeo Solicitation | 21 |
| | E. | | The Individual Defendants Make Fraudulent SEC Filings | 24 |
| | F. | | William Hogan Calls Ron Sloan to Get Sloan to Support The Fraudulent Sale of Can-Cal's Pisgah Property to Candeo | 27 |
| | | i. | The August 2013 Telephone Call | 28 |
| | | ii. | The November 2013 Telephone Call | 28 |
| | | iii. | The December 6, 2013 Telephone Call | 30 |
| | G. | | Michael Hogan Reveals His Concerns About His Brothers and MacDonald's Misconduct | 31 |
| | H. | | The Individual Defendants Caused Can-Cal to Enter an Amended and Restated MSA Which is Effectively a Sale of Can-Cal's Pisgah Property to Candeo For No Consideration | 32 |
| | I. | | The Individual Defendants Fraudulently Concealed and Omitted Material Information From Can-Cal's Warrant Holders and Permit Those Warrants to Expire While Extending the Exercise Period of Warrants Held By Themselves | 35 |
| | J. | | William Hogan Remains in Control of Can-Cal and Remains a Fiduciary to Can-Cal and Its Shareholders | 38 |
| | K. | | The Hogan Brothers Intentionally Damaged Can-Cal By Entering Into the GoodCorp. Contract | 38 |
| VI. | Causes of Action | | | 40 |
| | | | First Cause of Action – Breach of Fiduciary Duty | 40 |
| | | | Second Cause of Action – Conversion by William Hogan and Candeo | 41 |
| | | | Third Cause of Action – Breaches of Fiduciary Duties Against William Hogan, Thompson MacDonald, Ronald Schinnour and Michael Hogan | 41 |
| | | | Fourth Cause of Action – Aiding and Abiding Breach of Fiduciary Duties Against Michael Hogan, MacDonald and Schinnour | 44 |
| | | | Fifth Cause of Action – Civil Conspiracy Against All Defendants | 44 |

ii

Sixth Cause of Action – Fraud and Deceit Against    45
Defendants William Hogan, Thompson MacDonald,
Michael Hogan, Ronald Schinnour and Candeo
Lava Products, Inc.

Seventh Cause of Action – Unjust Enrichment Against    47
William Hogan, Futureworth Capital Corp.,
Michael Hogan and Candeo Lava Products, Inc.

VII.    Prayer For Relief    48

VIII.    Jury Demand    50

iii

Plaintiffs, though their attorneys, complain of Defendants as follows:

## I.   INTRODUCTION

1.     Can-Cal Resources, Ltd ("Can-Cal") is a company with one significant asset. That asset is known as the "Pigsah Property." Can-Cal is a mining company. Most shareholders had come to think that the company had no value. Unknown to the shareholders, the directors, officers, and controlling persons of Can-Cal discovered that the Pigsah Property contains millions of tons of volcanic basalt material that is extremely valuable as a fertilizer. With the expectation that the material is worth BILLIONS of dollars, the defendants schemed and conspired to take the value of the Pigsah Property away from Can-Cal for the benefit of William Hogan and his companies. As further detailed in this complaint, there have been many ways in which the defendants have used their positions as insiders have looted Can-Cal.

## II.   SUMMARY OF CLAIMS

2.     Pursuant to N.R.C.P. 23.1 this action is brought by shareholders of Can-Cal to enforce the rights of Can-Cal against each of the Directors and Officers of Can-Cal and two Canadian companies formed by Defendant William Hogan. The Claims are:

**A.     Self Dealing by William Hogan**

3.     Knowing the value of Can-Cal's Pisgah Property, which he estimated to be at least $2,000,000,000 (TWO BILLION DOLLARS), William Hogan formed Candeo, and appropriated and took the value of the Pisgah Property from Can-Cal and its shareholders for the benefit of Candeo by causing Can-Cal to enter into material supply agreements with Candeo. Meanwhile the information regarding the value of Can-Cal's Pisgah Property has been consciously hidden from Can-Cal's shareholders and warrant holders. As part of his scheme, Hogan has filed false and misleading reports with the U.S. Securities and Exchange Commission ("SEC"). While hiding the value of the Pisgah Property from Can-Cal's shareholders, Hogan has been raising money for Candeo by touting the value of the property and the profits to be made from the agreements between Candeo and Can-Cal.

1

**B.     Conversion**

4.     The agreements by which Candeo takes the value of the Pisgah Property away from Can-Cal amount to conversion.

**C.     Breaches of Fiduciary Duties**

5.     Michael Hogan, Thompson MacDonald ('MacDonald") and Ronald Schinnour ("Schinnour") and William Hogan collectively (the "Individual Defendants")were at all times relevant hereto, Directors and/or Officers and/or controlling persons of Can-Cal and owed fiduciary duties. None of them had any experience in mining. Michael Hogan is William Hogan's brother. MacDonald and Schinnour are directors and shareholders of another Canadian company controlled by William Hogan.  They are controlled by William Hogan and have done nothing to protect Can-Cal's interests or the interests of Can-Cal's shareholders. They have looted Can-Cal for the benefit of William Hogan and Michael Hogan. They have wrongfully permitted William Hogan to usurp Can-Cal's corporate opportunity and permitted William Hogan and Michael Hogan to become Can-Cal's largest creditors.

6.     The Individual Defendants caused Can-Cal to enter into a Material Supply Agreement ("MSA") with Candeo which permitted Candeo to realize 66 2/3% of all profits from Can-Cal's Pisgah Property, which was the usurpation of Can-Cal's corporate opportunity to realize hundreds of millions and possibly billions of dollars in profits for Can-Cal and its shareholders.

7.     The Individual Defendants permitted Candeo to default on its obligations pursuant to the MSA and then entered into an Amended Material Supply Agreement (the "Amended MSA") which gave Candeo a 50 year lease on the Pisgah Property, which amounts essentially to a sale of Can-Cal's Pisgah Property, from which Can-Cal may not receive any monies for up to 20 years if ever.

8.      When the Hogans were Can-Cal's only Directors, they each entered into "employment contracts" with Can-Cal that provided for excessive compensation and constituted a waste of corporate assets.  The result is that they have become Can-Cal's largest "creditors". MacDonald and Schinnour permitted those contracts and took no action to abrogate or rescind them.  William Hogan's benefits from these contracts go through his company Futureworth.

9.      Each of the Individual Defendants concealed material information from Can-Cal's shareholders and filed intentionally false and misleading reports with the SEC, concealing all information with respect to the value of Can-Cal's Pisgah Property in violation of federal securities laws and falsely certifying those reports in violation of the Sarbanes –Oxley Act of 2002.

10.     While warrants to purchase Can-Cal stock were outstanding the Individual Defendants wrongfully concealed material information, including the value of Can-Cal's Pisgah Property, from those persons owning warrants to purchase Can-Cal shares who, had they known of the value of the Pisgah Property, would have exercised those warrants and purchased Can-Cal's shares resulting in Can-Cal, which would have provided Can-Cal with a much-needed cash infusion of $800,000 or more.

11.     When the Hogans were the only Directors of Can-Cal they, through intentional misconduct, caused Can-Cal to enter into a mineral lease agreement with GoodCorp, Inc., which caused Can-Cal significant damage.

**D.   <u>Aiding and Abetting Breaches of Fiduciary Duties by Candeo and Futureworth</u>**

12.     William Hogan's scheme to loot Can-Cal depended upon and was aided and abetted by the other defendants.

**E.   <u>Civil Conspiracy</u>**

13.     The Defendants conspired among themselves to defraud Can-Cal and its shareholders by converting the value of Can-Cal's Pisgah Property to Candeo, by concealing

3

material information from Can-Cal's shareholders, and by permitting the Hogans to become Can-Cal's largest creditors.

**F.**     **Fraud and Deceit**

14.     Each of the Defendants participated in the plan and scheme to defraud Can-Cal and its shareholders by making false statements to and concealing material information from Can-Cal shareholders in SEC filings.

**G.**     **Unjust Enrichment**

15.     William Hogan, Michael Hogan, Candeo and Futureworth have been and will be unjustly enriched as a result of taking the benefit of the Pigsah Property from Can-Cal and the "employment" contracts.

### III.     PARTIES, JURISDICTION, AND VENUE

**A.**     **Plaintiffs**

16.     Each Plaintiff owns the following number of common shares of Can-Cal and resides in the Country or State listed:

| Name | Shares | Residence |
|------|--------|-----------|
| Ronald D. Sloan 349,000 warrants to purchase shares | 760,785 | Canada |
| Robin Schwarz | 235,095 | Colorado |
| Daniel R. Sloan | 28,000 | Canada |
| BettyAnn Sloan | 968,000 | Canada |
| Pearl Kirk | 70,000 | Canada |
| James Boan | 117,500 | Canada |
| N O Wait 5000 warrants to purchase shares | 58,000 | Canada |
| Larry Orwick 4000 warrants to purchase shares | 23,900 | Canada |

| # | Name | Amount | Location |
|---|------|--------|----------|
| 1 | Stuart R. Cameron | 327,400 | Canada |
| 2 | Robert Webster | 38,200 | Canada |
| 3 | Patricia LaSalle | 2,360 | Canada |
| 4 | Hugo Bondi | 361,000 | Canada |
| 5 | Joan Bratseth | 13,734 | Canada |
| 6 | P A Bratseth | 47,648 | Canada |
| 7 | Derek Milani | 150,000 | Canada |
| 8 | Dean Rachey | 36,600 | Canada |
| 9 | Sam Brounstein | 43,500 | Canada |
| 10 | Gary Collins | 7,100 | New Mexico |
| 11 | Jill Brown | 36,742 | Utah |
| 12 | Lark Terrel | 45,992 | Utah |
| 13 | Nancy Herbold | 53,742 | California |
| 14 | Thornton D. Barnes | 250,000 | Nevada |
| 15 | Rose Trust II | 750,000 | Nevada |
| 16 | Carman Adair | 900,000 | Canada |
| 17 | Sandra Jansen | 16,638 | Canada |
| 18 | Brian Jansen | 884 | Canada |
| 19 | Rhonda Kim Nichols | 11,500 | Canada |
| 20 | Scott Nichols | 206,431 | Canada |
| 21 | Mark Bratseth | 5,000 | Canada |
| 22 | Krista Schofield | 6,000 | Canada |
| 23 | David Schofield | 5,000 | Canada |
| 24 | Don Collins | 127,000 | Canada |
| 25 | Royce Nordstrom | 5,000 | Canada |
| 26 | Natalie Mayzel | 12,000 | Canada |
| 27 | Eddie Guillet | 211,426 | Canada |
| 28 | Ryan Guillet | 60,000 | Canada |

| | | |
|---|---|---|
| James Hason | 54,000 | Canada |
| Sandra Hason | 6,000 | Canada |
| Brian Wolfe | 700,000 | Canada |
| David Jesske | 50,000 | Canada |
| Cliff Olson | 220,400 | Canada |

17.    Plaintiffs collectively own 7,022,577 shares of Can-Cal stock, which is approximately 17% of all the outstanding shares of Can-Cal. Each of the Plaintiffs was a shareholder at the time of the transactions of which they complain. The Plaintiffs herein will fairly and adequately represent the interests of all the shareholders of Can-Cal.

18.    Ronald D. Sloan ("Sloan"), the verifying Plaintiff, was President and a Director of Can-Cal from 1996 through November 2009. His family, friends and associates own approximately 50% of all the outstanding shares of Can-Cal.

**B.    Can-Cal Resources, Ltd**

19.    Nominal Defendant Can-Cal Resources, Ltd. is a Nevada corporation and maintains its offices in Clark County, at 8205 Aqua Spray Avenue, Las Vegas, Nevada, 89128. Can-Cal is a small publicly held, exploration stage mining company and is a reporting company with the SEC. Can-Cal owns, leases, or has mining interests in four non-producing mineral properties in the southwest United States. Throughout its corporate existence Can-Cal has been attempting to determine whether any of its mining properties contain commercially mineable reserves of precious metals. Those efforts include contracting with geologists and others who sampled, assayed and assessed the mining viability of its properties. To date, none of Can-Cal's properties has any known proven reserves of any precious metals.

20.    Can-Cal is, and has for many years, been insolvent, with its liabilities exceeding its assets, and is able to pay expenses and other obligations through the continuous private sales of its common stock and/or debentures or loans. As of September 30, 2013, Can-Cal had cash of

$1388 and current liabilities of $950,172.  It had an accumulated deficit of $10,692,541.  The only income that Can-Cal has had for the past several years is the annual pre-payment of a royalty in the amount of $27,500 pursuant to a contract on its Pisgah Property that was entered into in 1998 and terminates in 2018.  It had no mining operations and has always operated at a loss.  As a result, there is very little for the officers and directors to do other than attempt to interest others to pursue exploration of its properties and to raise money to continue the operations of the company.  This has required only a small amount of their time and they also utilized finders to raise funds.  As of December 31, 2013 Can-Cal had 42,027,060 common shares outstanding and has hundreds of shareholders but its shares rarely trade.  The last reported trade was approximately $.025 per share.

**C.**    **Defendants**

21.    William Hogan, Thompson MacDonald, Ronald Schinnour and Michael Hogan collectively referred to as the ("Individual Defendants"), were at all times relevant hereto, or are, Directors and/or Officers or controlling persons of Can-Cal.  Candeo Lava Products, Inc. is a Canadian Corporation formed by William Hogan for the purpose of usurping a corporate opportunity that belongs to Can-Cal.  Futureworth Capital Corporation is a Canadian Corporation formed by William Hogan to receive compensation pursuant to an employment contract with Can-Cal.  Each Defendant is believed to be a citizen of Canada. William Hogan and Michael Hogan are brothers.

**D.**    **Jurisdiction and Venue**

22.    The Defendants in conspiracy and individuals transacted business in Nevada and committed wrongful acts and practices.  The Defendants and each of them, in conspiracy and individually, transacted business in Nevada and committed wrongful acts and practices that were directed to harm Can-Cal, a Nevada corporation, and its shareholders, including residents of Nevada.  The events, acts and omissions giving rise to Plaintiffs claims occurred in Clark

7

County.  This court has jurisdiction of this matter pursuant to N.R.S. 14.065 and venue is proper pursuant to N.R.S. 13.010.

## IV.   PLAINTIFFS HAVE FULFILLED THE REQUIREMENT OF MAKING A DEMAND PURSUANT TO N.R.C.P. 23.1

23.    In essence, Plaintiffs allege that the three current directors of Can-Cal, Thompson MacDonald, Michael Hogan and Ronald Schinnour, along with former officer and Director William Hogan, since at least early 2013 have knowingly and deliberately breached their fiduciary duties and defrauded Can-Cal and its shareholders by usurping Can-Cal's corporate opportunity to produce and sell its volcanic basalt material from its Pisgah Property (the "Pisgah Material") as an organic fertilizer, which is in great demand and very valuable.  Instead on April 9, 2013, they caused Can-Cal to enter into a Material Supply Agreement (the "MSA") with Candeo Lava Products, Inc. ("Candeo"), a Canadian corporation formed and owned by William Hogan and former Chairman of the Board of Can-Cal, which gave 66 2/3% of all the profits from the sale of Can-Cal's Material to Candeo and prohibited Can-Cal from selling any of its Pisgah Material as an organic fertilizer or for agricultural uses by itself. Although each of the directors was fully aware of the use and value of Can-Cal's Pisgah Material as an organic fertilizer and for other agricultural uses and the demand for organic fertilizers, they fraudulently concealed that information from Can-Cal's shareholders and warrant holders and filed false and misleading reports with the SEC in violation of federal securities laws and have falsely certified those reports in violation of Sections 302 and 906 of the Sarbanes-Oxley Act of 2002.

24.    When Sloan first learned of the use of Can-Cal's Material as an organic fertilizer in about August, 2013 he had, and caused others to have, several discussions with William Hogan and/or Michael Hogan, from about August 2013 through early February, 2014 informing them that any profits  from the sale of Can-Cal's Pisgah Material belonged 100% to Can-Cal and its shareholders; that William Hogan, who was a Director and Officer of Can-Cal, cannot usurp Can-Cal's corporate opportunity and obtain any of the profits from the sale of Can-Cal's Pisgah

Material for himself and Candeo; that each of the Directors of Can-Cal had breached his fiduciary duty by entering into the MSA and giving away 66 2/3%, or any of the profits from the sale of Can-Cal's Pisgah Material, including a non-compete provision which gave Candeo control of Can-Cal's Pisgah Property and that their conduct operated as a fraud and deceit on Can-Cal and its shareholders; that the MSA should be immediately abrogated; that the Directors had wrongfully failed to publicly disclose any of the information regarding the use and value of the Pisgah Material as an organic fertilizer which was included in the soliciting documents that William Hogan was furnishing prospective investors in Candeo; that Can-Cal's SEC filings were false and misleading; and that the Directors should immediately make a full and complete disclosure of all relevant facts in the appropriate filing with the SEC; that the employment contracts that the Hogans had caused Can-Cal to enter into with them , which provided for combined annual compensation of $180,000 when Can- Cal had virtually no income and was insolvent were completely excessive and a breach of fiduciary duty  and should be abrogated *ab initio*; that the $630,000 purportedly owing the Hogans as of September 30, 2013 pursuant to those contracts should be declared null and void; and that a contract with GoodCorp, Inc. improperly entered into by the Hogans which caused Can-Cal significant damage.

25.     In about late January 2014, William Hogan telephoned Sloan and attempted to persuade him to support the MSA indicating the he might agree to minor changes.  Sloan again told William Hogan that he and the other Directors had breached their fiduciary duties and that 100% of the profits from Can-Cal's material belonged to Can-Cal and its shareholders, not to Candeo.  A few days later, William Hogan had an intermediary call with Sloan and again asked him to support the MSA.  When Sloan again refused, William Hogan's intermediary threatened Sloan that William Hogan could cause him serious personal problems.

26.     The Individual Defendants have refused to abrogate the MSA or to rescind the Hogans' employment contracts.  Indeed, to the contrary, on or about March 3, 2014 the

1  Individual Defendants caused Can-Cal enter into an Amended MSA which was more onerous on

2  Can-Cal and far more beneficial for Candeo, effectively giving Candeo a 50 year lease on Can-

3  Cal's Pisgah Property, which is tantamount to a sale of Can-Cal's Pisgah Property to Candeo

4  without any consideration to Can-Cal.

5       27.     On or about December 20, 2013 William Hogan represented that Can-Cal would

6  forthwith make an appropriate filing with the SEC containing disclosure of all relevant facts

7  regarding the use of Can-Cal's Material as an organic fertilizer and Can-Cal's Pisgah Property.

8  On January 23, 2014, the promised public disclosure not having been made, Plaintiffs' counsel

9  sent the Directors of Can-Cal a letter demanding the public disclosure of all relevant information.

10 A copy of that letter is Exhibit 1 hereto.   By letter dated March 10, 2014, the Individual

11 Defendants informed Plaintiffs' counsel that they would not make any such disclosures.

12

13      28.     Any further demand pursuant to N.R.C.P. 23.1 would be futile.   Defendants

14 MacDonald, Michael Hogan and Schinnour are currently the only members of Can-Cal's Board

15 of Directors, Thompson MacDonald and Ronald Schinnour are shareholders in and Directors of a

16 Canadian food company controlled by William Hogan and are his long-time friends and business

17 associates and were, and are controlled by William Hogan.   There are no independent Directors.

18 Any demand would require the Defendants Thompson MacDonald, Ronald Schinnour and

19 Michael Hogan to authorize Can-Cal to file a lawsuit against themselves in their individual

20 capacities and against William Hogan and Candeo and Futureworth Capital and seek damages

21 from each of them individually.   Can-Cal does not have any Directors and Officers liability

22 insurance so any judgment obtained would have to be satisfied by their personal assets.

23

24              **V.     GENERAL ALLEGATIONS**

25 **A.     THE HOGANS TAKE CONTROL OF CAN-CAL AND VOTE THEMSELVES**
   **EXCESSIVE EMPLOYMENT CONTRACTS.**
26

27      29.     In 2009, William Hogan and Michael Hogan took over control of Can-Cal and

28 became Officers and Directors. Michael Hogan has been a Director and Chief Executive Officer

since November 17, 2009 and continues in those positions.  William Hogan has been Chairman of the Board of Directors and Secretary of Can-Cal from July 31, 2009 until February 27, 2013 when he resigned both positions. Thompson MacDonald ("MacDonald") was a member of the Board of Directors of Can-Cal from June 4, 2009 through November 13, 2009 when he resigned. He was again appointed to the Board of Directors of Can-Cal on January 30, 2012 and is currently Chairman of the Board of Directors of Can-Cal having replaced William Hogan. Ronald Schinnour ("Schinnour") was appointed to the Board of Directors of Can-Cal on November 17, 2012 and is currently a Director of Can-Cal. William Hogan arranged for the appointment of MacDonald and Schinnour to Can-Cal's Board of Directors and at all times relevant hereto he controlled, and continues to control, Can-Cal.

30.     William Hogan is the principal shareholder and the President of a Canadian food company. Michael Hogan is a retired engineer and financial advisor. MacDonald is a long time personal friend and business associate of William Hogan and Schinnour is a business associate and on information and belief, is a personal friend of William Hogan and they are both Directors of, and shareholders in William Hogan's food company.  Each Individual Defendant is experienced in business and is fully aware of his obligations and fiduciary duties as Directors and Officers of a publicly held company.

31.     However, none of the Individual Defendants has any experience or background in mining and none of them is competent to negotiate or approve the terms and conditions of any contract regarding the exploration, development or mining of or otherwise deal with, any of Can-Cal's properties.

32.     At all times relevant hereto each of the Individual Defendants had a fiduciary relationship with Can-Cal and its shareholders which imparted duties of care and loyalty to each of them and each of them was required to exercise their powers as Directors and Officers in good faith, honestly, and with a view to the best interests of Can-Cal.  A duty of care consists of an

obligation to act on an informed basis in the best interests of Can-Cal and the duty of loyalty required each of them to maintain in good faith Can-Cal's shareholders best interest over the interests of anyone else.  Each of them had a duty to make prompt disclosure of all relevant facts regarding Can-Cal's properties and business to its shareholders. They were not permitted to engage in self-dealing or prefer their own interests over the interests of Can-Cal and its other shareholders or to usurp a corporate opportunity belonging to Can-Cal.

33.     Although Can-Cal has no active operations and operates at a significant loss and has a widely negative cash flow, in June and July, 2010 when William Hogan and Michael Hogan were the only Directors of Can-Cal, notwithstanding their lack of competence in mining matters, they caused Can-Cal to enter into employment contracts with each of them, wherein Can-Cal agreed to pay Michael Hogan $120,000 and Futureworth, a company owned by William Hogan, $60,000 respectively, annually As of December 31, 2013, Can-Cal's balance sheet reflected payables to Michael Hogan in the amount of $480,000 and $180,000 to Futureworth pursuant to those contracts, which are approximately 69 % of its total current liabilities of $950,172.  In addition, Michael Hogan's "compensation" continues to accrue at $10,000 per month and as of April 30, 2014 the total amounts "payable" to the Hogans is approximately $700,000.

i.     **WILLIAM HOGAN'S CONTRACT**

34.     William Hogan's employment contract purports to be an "Independent Contractor Agreement" with his Canadian company, Futureworth.  However William Hogan was Chairman of Can-Cal's Board of Directors and he agreed among other things, to be a full-time officeholder who typically leads the Board; also takes a hands-on role in the company's day-to-day management; has overall responsibility for the company which involves engineering and controlling the company's current growth in and future expansion into international markets; has responsibility for overseeing the raising of financial capital necessary for corporate operational

needs to meet company objectives and initiating and developing financial vehicles when necessary. Can-Cal is obligated to pay Futureworth $5,000 per month (the "Base Fee") for William Hogan's services. The contract provides that the Base Fee accrued but not paid shall be paid "<u>regardless of the Company's cash flow</u>" not later than the earlier of June 30, 2011 or six months after his employment is terminated. (Emphasis added) Can-Cal agreed not to withhold any FICA, FUTA or any other amounts as taxes. Apparently this was the reason for referring to his employment contract as Independent Contractor Agreement. In any event, William Hogan, as a matter of law, was at all times an employee and controlling person of Can-Cal. (Michael Hogan signed William Hogan's contract on behalf of Can-Cal.) A copy of that employment contract is attached as Exhibit 2 hereto.

ii.     **MICHAEL HOGAN'S CONTRACT**

35.     Michael Hogan's contract provides that he is employed as President and Chief Executive Officer for twelve (12) months and that his contract is automatically renewed for successive one (1) month periods unless either party decides to terminate the agreement. His "base salary" is $120,000 per year and the contract provides that any amounts of salary accrued but not paid shall be paid, "<u>regardless of the company's cash flow</u>" not later than June 30, 2011 or six (6) months after his employment is terminated. (Emphasis added). Mr. Hogan is also entitled to a cash bonus entitlement during each calendar year. In addition, Can-Cal is required to reimburse his expenses up to $5,000 per month. William Hogan signed Michael Hogan's contract on behalf of Can-Cal. A copy of that employment contract is attached as Exhibit 3 hereto.

36.     Both contracts were not filed with the SEC in 2010, as required by law since they were material contracts. They were not filed until March 5, 2014, after it was demanded that they be publicly filed. These contracts could not be fully analyzed until they were filed. They both provide that the Hogans may elect to satisfy payment of those salaries in shares of common

stock at a price of $.10 above current market price.  If shares of Can-Cal's common stock were issued to the Hogans pursuant to those contracts as Can-Cal would be obligated to issue to them, at the current market price of $.025 per share, approximately 5,440,000 shares of its common stock, or approximately 13% of the total number of common shares presently outstanding.

37.    Those contracts are completely unjustified and excessive and a waste of corporate assets and in breach of the Hogans' fiduciary duties to Can-Cal and its shareholders. The Hogans knew that Can-Cal had no income to pay those salaries, had no reasonable expectation of any such income, and could not justify the salaries inasmuch as there was very little to be done with respect to Can-Cal's four properties.  The Hogans, as a result of their inexperience and lack of competence in mining, did not and could not perform any meaningful services with respect to Can-Cal's properties.  William Hogan lives in Calgary, Canada, and Michael Hogan lives in Toronto, Canada.   Neither of the Hogans spent significant amounts of time on Can-Cal's business. The Hogans' plan was either to become Can-Cal's largest creditors with a claim on all its assets or to increase their percentage of ownership of Can-Cal on a thoroughly unjustified basis, diluting the public shareholders ownership of Can-Cal.   Those contracts should be abrogated *ab initio*.  Because of

the severe breaches of their duty or loyalty, the Hogans are not entitled to any compensation, and any compensation received by them should be returned.

38.    Defendants MacDonald and Schinnour knew that those contracts were excessive and a waste of corporate assets and, in breach of their fiduciary duties, intentionally failed to take the action to abrogate those contracts because of the influence or the Hogans.

**B.    CAN-CAL'S DIRECTORS LEARN THAT CAN-CAL'S PISGAH PROPERTY IS EXTREMELY VALUABLE AS A SOURCE OF ORGANIC FERTILIZER WHICH COMPARES FAVORABLY WITH ANY FERTILIZER IN THE WORLD**

39.    The Pisgah Property, which Can-Cal owns in fee simple, is a 120 acre parcel in San Bernardino County, California which contains approximately thirteen million tons of

volcanic basalt material (the "Pisgah Material") above ground with 3,500,000 tons in a stock pile of finely ground material, and likely many more tons below the surface. Can-Cal acquired the Pisgah Property in 1997 for in excess of $550,000 in cash.

40.     The Pisgah Property is Can-Cal's biggest and only income producing asset (royalty payment of $27,500 per year) and its sole asset of any marketable value. Can-Cal has for years tested material from the Pisgah Property for precious metals but, although it was able to extract and produce numerous gold beads, it had failed to establish any known reserves of, or basis for, any commercial production of precious metals. Its shareholders had invested the vast majority of Can-Cal's $10,692,541 accumulated deficit pursuing analysis, testing and development of its Pisgah Property and Can-Cal had an expectation of some commercial use for its Pisgah Material. Can-Cal worked in conjunction with another party in obtaining San Bernardino County's approval of a mining plan for its Pisgah Property and obtaining the requisite approvals and permits for mining its Pisgah Property. Can-Cal arranged for a reclamation bond to be posted for the property and has paid for a portion of the reclamation bond. Can-Cal has taken all necessary actions to preserve its Pisgah Property for the benefit of its shareholders and for the opportunity to exploit the use of its Pisgah Property belonged to Can-Cal and its shareholders.

41.     However, pursuant to a non-compete provision in a mining lease agreement entered into in 1998 with an unaffiliated third party, Can-Cal was prohibited from the mining, production and sale of its Material for sale or use in connection with construction materials, block products, landscaping and snow control within a 500 mile radius of the Pisgah Property. Therefore Can-Cal has pursued, and has been looking for, opportunities for other uses for its Material which does not violate those non-compete provisions.

42.     In 2011 Can –Cal entered into an agreement with GoodCorp. which represented that it intended to use Can-Cal's Material for agricultural purposes. GoodCorp has failed to

15

1   perform as expected but Can-Cal had an interest and expectation in pursuing the use of its Pisgah

2   Material for agricultural purposes.

3        43.    Sometime during 2012, there were performed lengthy and detailed analytical

4   studies and testing of the Can-Cal's "Pisgah Material" for use as an organic fertilizer for the

5   agricultural market. That testing determined that the Pisgah Material contained elements and

6   properties that were highly desirable and valuable as an organic fertilizer and favorably

7   compared to, and could compete with, any existing fertilizer on the market anywhere in the

8   world. The demand for organic fertilizer for agricultural use around the world is very high and

9   will likely continue in the foreseeable future. Therefore, Can-Cal's Pisgah Property likely had a

10   very significant value as an organic fertilizer. Moreover, this use of Can-Cal's Material for

11   agricultural purposes would not violate the non-compete provisions in the 1998 mining lease

12   agreement and was an aspect of its business Can-Cal wished to pursue.

13        44.    Sometime during 2012, William Hogan, in his capacity of Chairman of the Board

14   of Directors of Can-Cal, learned of the results of the analysis and testing of the composition of

15   the Pisgah Material and how valuable the Material could be as an organic fertilizer. William

16   Hogan then caused Can-Cal to test its Pisgah Material on its own and caused independent and

17   other testing in Canada and the United States to be performed growing vegetables and plants.

18   Those tests confirmed the presence of extremely favorable level of macro and micro nutrients

19   and an excellent pH level and a very high silica level which is crucial for essential plant

20   development and resulted in the development of highly developed root structure for plants. The

21   testing confirmed the very significant value of Can-Cal's Pisgah Material as an organic fertilizer.

22   One additional test was performed for Can-Cal by Spectrum Analytic, Inc. based in Ohio which

23   sent a report of their findings dated January 17, 2013 to Can-Cal.

**C.    THE INDIVIDUAL DEFENDANTS STEAL THE VALUE OF CAN-CAL'S PISGAH PROPERTY**

     45.    William Hogan, as he was legally obligated to, informed MacDonald, and

16

Schinnour and Michael Hogan about the analytical studies and testing and the elements of the composition of the Pisgah fertilizer and results of testing, and they knew that Can-Cal's Pisgah Material was likely extremely valuable as an organic fertilizer or agricultural product. Given the information known to William Hogan and the additional test results, it would have been a simple matter for Can-Cal to finance any necessary further analysis, testing, promotion and all other required activities to realize all the economic and financial benefits from its Pisgah Property for its shareholders.

46.     In violation of their duty as directors and officers of Can-Cal to make full and prompt public disclosure of all facts relevant to Can-Cal's Pisgah Property they conspired and made intentionally false and misleading filings with the SEC to keep those facts secret from the shareholders and warrant holders of Can-Cal.

47.     As of March 31, 2013, based on filings by Can-Cal:

(a)     William Hogan owned approximately 945,656 shares of Can-Cal which was approximately 2.25% of all the outstanding shares.  In addition, William Hogan had warrants to buy an additional 1,321,312 shares at an exercise price of $.15 per share which would have cost him $198,196.

(b)     Michael Hogan owned 2,503,859 shares of Can-Cal which was approximately 5.95% of the all the outstanding shares.  In addition, Michael Hogan had warrants to buy an additional 2,439,920 shares at an exercise price of $.15 per share which would have cost him $365,988.

(c)     Thompson MacDonald, who was the Chairman of Can-Cal's Board of Directors, owned 850,579 shares which were approximately 2% of all the outstanding shares.  In addition, MacDonald had warrants to buy an additional 1,284,491 shares at an exercise price of $.15 per share which would have cost him $192,673.

17

(d)     Ronald Schinnour owned 426,634 shares which was approximately 1% of all the outstanding shares of Can-Cal.  In addition, Schinnour had warrants to buy an additional 416,666 shares of Can-Cal at an exercise price of $.15 per share which would have cost him $62,500.

48.     If the Individual Defendants exercised their warrants, Can-Cal would have received $819,357, which is far more than Can-Cal needed to pursue development of its Pisgah Material.

49.     The Individual Defendants were aware that it would take additional funds to complete testing of Can-Cal's Pisgah Material and verify the analytic work already done and to make arrangements for crushing, transportation, packaging and sale of the material to wholesale or retail outlets.  While such financing was readily available to Can-Cal in view of the analytical and test results, they knew that their percentage ownership of Can-Cal would be reduced as a result of such additional financing and they did not want to have to exercise their options and have to pay the exercise price to keep their percentage ownership. Instead they conspired to divert the majority of the profits realized from the sale of Can-Cal's Pisgah Material to William Hogan –  via his forming a new Canadian corporation to contract with Can-Cal to obtain the "exclusive" rights to mine and sell Can-Cal's Pisgah Material for agricultural purposes.

50.     In furtherance of this conspiracy, William Hogan resigned as Chairman of the Board of Directors and as an officer of Can-Cal on February 27, 2013—ostensibly to make it appear that he could operate as an independent third party in his dealings with Can-Cal – and on April 3, 2013 William Hogan formed a corporation in Alberta, Canada named Candeo Lava Products, Inc. ("Candeo") of which he was initially the sole shareholder.  On information and belief, Sloan alleges that the Canadian law firm, Davis LLP, which had long represented William Hogan and his food company, represented William Hogan and/or Candeo in incorporating Candeo and/or prepared documents for the incorporation of Candeo.  A copy of the Certificate of

Incorporation of Candeo is Exhibit 4, herein.

51.     On April 9, 2013, Defendants Michael Hogan, MacDonald and Schinnour, as the only Directors of Can-Cal caused Can-Cal to enter into a Material Supply Agreement ("MSA") with Candeo, the terms of which were dictated by William Hogan.  William Hogan signed the agreement on behalf of Candeo and MacDonald signed it on behalf of Can-Cal.  At the request of William Hogan and/or MacDonald, Can-Cal was represented in this agreement by Roy Hudson of Davis, LLP as "Canadian counsel".  A copy of Davis LLP's engagement letter with Can-Cal, signed by Roy Hudson is attached hereto as Exhibit 5, dated April 2, 2013.  On information and belief, neither Mr. Hudson nor any other attorney employed by Davis LLP was admitted to practice law in Nevada.

52.     The MSA was not an arm's length contract but was heavily skewed in favor of Candeo and was detrimental to Can-Cal and its shareholders.  The MSA gives Candeo the "exclusive right and privilege" to purchase and remove 1,000,000 tons of Pisgah's Material for "use in earth mineralization, both organic and inorganic, for rural and urban distribution in various industry sectors, including but not limited to construction, landscaping, gardening, lawns and fields, agriculture and other uses to be determined by Candeo in accordance with market demand,"; that if Candeo removed 1,000,000 tons during a 10 year period; it could remove an additional 1,000,000 tons and extend the term of the contract for three (3) additional five (5) year periods. Candeo agreed to pay Can-Cal for its Pisgah volcanic basalt material $15 per ton or 33-1/3% of the Net Sales Margin, whichever proved greater.  Candeo also agreed to purchase 13,335 tons of the material during the first year of the agreement for a total of $225,000.  There was no provision in the MSA for periodic payments by Candeo to enable Can-Cal to meet its obligations since it had no income other than the royalty of $27,500.  Any payments would then be determined at the discretion of Candeo and William Hogan.  This placed Can-Cal in the position of being wholly dependent of Candeo and William Hogan and put Candeo and William

Hogan in control of Can-Cal.

53.    Therefore, **William Hogan and Candeo and its other shareholders would receive 66-2/3% of all profits realized from the sale of Can-Cal's Pisgah Material and Can-Cal and its shareholders would receive only 33-1/3 percent of the profits from the sale of its own Material.**

54.    Moreover, Paragraph 9(b) and 12(c) of the MSA provide that Can-Cal cannot compete with Candeo in the sale of its Material for up to 25 years, although its Pisgah Property has approximately 13,000,000 tons above ground and only 2,000,000 tons are covered by the MSA. **This means that Can-Cal cannot sell its own Material for agricultural or mineralization purposes, which is its greatest value, for up to 25 years and realize the value of its Pisgah Property for its shareholders. In addition Candeo had the unilateral right to determine "other uses" for the Material which Can-Cal could not compete with.**  These provisions put Candeo in effective control of Can-Cal since only Candeo will be able to sell Can-Cal's Pisgah Material for mineralization and agricultural uses while Can-Cal is prohibited from selling its own Pisgah Material for those purposes.

55.    Although all information obtained regarding Can-Cal's Pisgah Material as use as an organic fertilizer or for other agricultural purposes belonged to Can-Cal, the MSA did not contain any provision requiring Candeo to promptly furnish all such information to Can-Cal, including test results, contacts with potential buyers and all other relevant information.

56.    In addition, Paragraph 22 of the MSA provides that the terms, provisions and conditions of the MSA are binding upon Can-Cal's successors and assigns. Therefore Can-Cal is effectively precluded from selling its Pisgah Property to any purchaser which intends to utilize or sell the Pisgah Material for any agricultural or mineralization purpose.  A copy of the MSA is attached as Exhibit 6, herein.

57.    The formation of Candeo was a sham.  There was no legitimate business reason

20

for Can-Cal to give 66 2/3% of the profits or any other amount, from the sale of its Pisgah Material to anyone or destroy the value of its Pisgah Property. The purpose of forming Candeo (and causing Can-Cal to enter into the MSA) was to enable William Hogan and others to obtain control of Can-Cal's Pisgah Property and reap 66-2/3% of the profits to be realized from the production and sale of Can-Cal's Pisgah Material and to acquire its Pisgah Property, knowing full well that the MSA operated as a fraud and deceit on Can-Cal and its shareholders.

58.     Moreover, William Hogan and Candeo had no intention of honoring their obligation to pay Can-Cal the $225,000 provided for in the MSA. They paid only $64,750 and defaulted on the balance due. Even the $64,750 was not paid directly to Can-Cal, but William Hogan determined which of Can-Cal's obligations he chose to pay and paid them directly.

59.     On or about July 15, 2013, pursuant to their plan and conspiracy to obtain Can-Cal's Pisgah Property for Candeo, McDonald, Michael Hogan and Schinnour held a Board of Director's meeting of Can-Cal which, was initiated by William Hogan, who was not then a Director of Can-Cal but still controlled Can-Cal, and approved a resolution regarding a reorganization of Candeo and Can-Cal which, on information and belief, would result in a takeover or acquisition of Can-Cal by Candeo. They wrongfully failed to advise Can-Cal's shareholders of this resolution and their plan. Roy Hudson of Davis, LLP was acting on behalf of Candeo in obtaining Can-Cal's shareholders list to approve the proposed reorganization from Can-Cal's transfer agent which is located in Clark County, Nevada.

**D.     CANDEO IS RAISING CAPITAL BY TOUTING THE VALUE OF CAN-CAL's PISGAH MATERIAL**

**i.     THE APRIL 26, 2013 CANDEO SOLICITATION**

60.     William Hogan sent a Corporate Update to prospective Candeo investors on April 26, 2013, less than 60 days after he resigned as Chairman of the Board of Can-Cal, which he recapped in his Corporate Update along with a cover letter, of August 29, 2013.   In the cover letter and Corporate Update he stated, among other things:

- Candeo Lava Products.  The Company has come along (sic) way this summer and we are very impressed and encouraged with the Pisgah Material laboratory analysis, together with the outstanding results from our first in-house Beta project.

- We are now moving forward with "White Paper" validations on the Pisgah "Volcanic Basalt" material with universities and commercial greenhouses and are very confident that the product will fully demonstrate the its (sic) impressive benefits for the remineralization of soils.  The potential market for organic crops of vegetables and fruits has skyrocketed and is extremely lucrative financially. This will bode very well for Candeo and the potential demand of the Pisgah Material, being a completely all natural green product. (Emphasis added)

- We are also commencing our second private placement for US$225,000 at US$0.15 totaling 1,500,000 shares and expect to sell out quickly on a first come, first serve basis.  This will be ample funds to get us to complete our near term initiatives and get Candeo to the next phase, which will include putting the product into a strong position to begin courting major North American distribution companies that are buyers for the national box stores such as Walmart, Home Depot. Lowe's Home Improvements, etc.  It is endless the retailer outlets we could approach for such an impressive organic garden area product. But not until the final valuations are completed.  (Emphasis added)

- "Candeo's business will be essentially taking the Pisgah volcanic basalt material (the Pisgah Material) and turning it into a finished remineralization product for residential and commercial sold for use in the flower beds, gardens, trees, shrubs, lawns, organic vegetables, grain crops, etc. (the "Garden Areas"). The Pisgah Material is intended to be crushed into powder form and subsequently bagged and labeled into what we believe will be an exciting all natural product to remineralize

the soil in the Garden Areas. The product will have no added chemicals and will be promoted as a "totally environmentally green" and "organic" product."

- "It is expected that the Pisgah Material product for the Garden Areas when put into 1,3,10 or 20 kilogram containers will be <u>very profitable</u> and will benefit both Candeo and Can-Cal simultaneously. <u>Other currently similar powder products can range in price from $250 to $1,500 of gross revenue per ton.</u>" (Emphasis added)

- "Chemical analysis by independent laboratories in Canada and the United States has confirmed the presence of extremely favorable levels of macro and micro nutrients as well an excellent pH level in the Pisgah Material. Additionally, there is a very high Silica level in the material, which is crucial for essential plant development."

- The Corporate Update contained photographs of onion plants grown with and without Can-Cal's Pisgah Material which shows far greater growth using Can-Cal's Material and based on those tests William Hogan stated "There is superior growth in the Pisgah Material over its comparable equivalent. Although this Beta Valuation is "non-arm's length", it gives management a great deal of confidence that the Pisgah Material has the potential to <u>be an outstanding and lucrative world class product.</u>" <u>(Emphasis added)</u>

Appendix A to that Update continues to describe the exceptional properties and uses of Can-Cal's Pisgah Material and states, among other things:

- "...Candeo is excited about its viability as a world class soil remineralization product."

- "Candeo's Volcanic Basalt contains the broadest spectrum of elements, in proper balance with the highest count of silica, an often forgotten but key soil mineral element."

- "Volcanic Basalt enables healthy crops that require less water and are better able to resist pest attacks. The result is a healthy, dense, high yield crop that reduces the erosion of the soils."

- "Volcanic Basalt is very hydroscopic. With the addition of the plan matter and living microbes, this type of soils situation holds and needs a lot less watering than conventional chemical farming methods."

- "Organic crops command more money and are desirable for their superior nutritional contents and lack of undesirable agents such as pesticides and herbicides. The combination of these factors, with the increase in yield and added unique flavor, results in greater profits for the producer."

- "Candeo's Volcanic Basalt has a 9.8 pH reading which is very good. Our product will act as a very good liming agent for highly acidic soils, and our application quantities should prove to be less than that of competitive products."

- A copy of the cover letter, Corporate Update and Appendix and related documentation are attached as Exhibit 7, herein. As indicated in the subscription documents, Roy Hudson of Davis LLP represented Candeo in the offering of shares of Candeo.

## ii.    THE NOVEMBER 26, 2013 CANDEO SOLICITATION

61.    William Hogan sent another Corporate Update of November 6, 2013 to prospective investors, and in a cover letter and that Corporate Update, William Hogan among other things stated:

- Candeo has now commenced the validation on the Pisgah "Volcanic Basalt" material with a California Research center, namely Holden Research that specializes in applied science and answers for production agriculture.

24

- As we have previously mentioned, the potential market for organic crops of vegetables and fruits has skyrocketed, especially in California. That and the majority of organic crops/plants are extremely lucrative financially. This bodes well for all stakeholders of Candeo and the future potential demand of the Pisgah Materials as a completely all natural green product.

- Candeo's second private placement for US$225,000 at US$0.15 totaling 1,500,000 shares has commenced with approximately 1/3 committed to date. These funds will be sufficient to complete our near term initiatives and get Candeo to the next phase of commercialization hopefully beginning in the summer of 2014.

- Once the first round of plan matrices have been completed and validated (e.g. corn and squash) by Holden Research, Candeo will begin discussions with several major North American distribution companies that are buyers for national box stores such as Walmart, Home Depot, Lowe's Home Improvement, etc. On that note, we have commenced conversations with several, who have indicated strong interest in our potential "green organic product".

- "Since our last Corporate Update of August 29, 2013 Candeo Lava Products, Inc. ("Candeo") has significantly moved forward in the objective of supplying the North American market place with our outstanding the value-added soil remineralization product."

- "The Pisgah Material is intended to be crushed into power form and subsequently bagged and labeled into what we believe will be an exciting all natural product to remineralize the soil in the Garden Areas."

- "The product will have no added chemicals and will be promoted as a "totally environmentally green" and "organic" product."

25

- Candeo undertook an internal 'Validation Project' on August 10, 2013 to evaluate the value-added organic soil remineralization properties of the Pisgah Material. This "in-house project" consisted of growing 6 green onions from seed in each of two individual pots, with the same environmental conditions including outdoor conditions of light, water and potting soil.   To one pot was added a 3.7% concentration by volume of the Pisgah Material.   The Pisgah Material was screened to a mesh size of approximately 100, which is approximately half of the ideal powder mesh size of 200.  We are extremely pleased to report the final results below, which are very impressive to say the least.  In pictures A & B you will see that there is superior growth using the Pisgah Material over its comparable equivalent after 18 days.

- The two pictures below show the onions pulled on day 49, with measurements of all the onions grown with Pisgah Material resulting in far superior size and the roots showing staggering growth in comparison.  Summed up, when comparing the onions grown with Pisgah Material against the control onions, it is like a "Forest versus a Tree".  This in-house valuation has given management a huge burst of confidence that the <u>Pisgah Material is extremely good and we are on to something very special</u>. (Emphasis added)

- "Management is pleased to report that after several discussions with David Holden, an agreement to proceed on Candeo's required third Party Validation Program is now underway.  On November 13, 2013 several seed beds were planted with our initial matrixes of corn and squash.  The Pisgah Material was mixed volumetrically at 2.5% and 5.0% of the total volume, representing a mixture of 25 and 50 ml per liter of soil.  Results should indicate emergence in 5 to 7 days depending on outside temperature variance in California.  The

experiments consist of specific protocols and procedures, with collection of the date and running statistical analysis on that date to make-up the final report. The analysis will compare a control soil versus the soils with the two varying concentrations of Pisgah Material (at 2.5% and 5.0% respectively). Since this is fall-winter program, the final report will be written +/- 30 days after completing the tests. We expect to have the report completed by mid-QTR 1, 2014."

62.   A copy of the November 6, 2013 cover letter and corporate update is Exhibit 8 hereto.

E.   **THE INDIVIDUAL DEFENDANTS MAKE FRAUDULENT SEC FILINGS**

63.   The Individual Defendants caused Can-Cal to file a copy of the MSA with the SEC, but they intentionally and willfully omitted and failed to disclose any information about the use of Can-Cal's Material as an organic fertilizer or agricultural uses or anything about its properties and elements or the results of all the testing or any of the information William Hogan was disclosing to investors in Candeo.

64.   The Form 10-Q filings made by Can-Cal filed with the SEC pursuant to the requirements of the Securities Exchange Act of 1934, for the quarters ending March 30 , June 30, and September, 2013, and the 10-K annual report for 2013 were materially false and misleading, and were part of the conspiracy entered into by the Individual Defendants to keep that information secret from Can-Cal's shareholders.

65.   Michael Hogan, with full knowledge of William Hogan, MacDonald and Schinnour knowingly and falsely certified, among other things that there were no omissions of material facts in those 10-Q and 10-K reports in violation of Sections 302 and 906 of the Sarbanes-Oxley Act of 2002.

F.   **WILLIAM HOGAN CALLS RON SLOAN TO GET SLOAN TO SUPPORT THE FRAUDULENT SALE OF CAN-CAL'S PISGAH PROPERTY TO CANDEO**

   i.   **The August 2013 Telephone Call**

66.   In late August 2013, William Hogan called Sloan and asked him to again become President and a Director of Can-Cal. He stated that Thompson MacDonald wanted to resign as Director and that he could arrange for Sloan to select others to serve as officers and directors of Can-Cal and in effect take over Can-Cal. William Hogan stated that he had had a dispute with Michael Hogan, his brother and was not speaking to him; that Michael Hogan was mismanaging Can-Cal and wanted him to resign as a Director but that he had refused to resign; that he wanted to close the Las Vegas office and move the company to Calgary.

67.   William Hogan also told Sloan of the great success he had in testing the Pisgah Material as an organic fertilizer and that he wanted to dedicate his time and efforts to Candeo. Sloan had never before heard about William Hogan testing usage of the Pisgah Material as an organic fertilizer, and he asked William Hogan to elaborate. William Hogan did so, describing the wonderful test results and how valuable the Pisgah Material was. He said that it was probably the best organic fertilizer in the world; that they had done testing growing onion plants with the Pisgah Material and without it and the results were tremendous; that the material as an organic fertilizer would sell for $9.99 per kilogram, (2.27 pounds); that a ton obtained by just taking the material off the property in a front end loader to a waiting truck would sell for $2,000 per ton. **This valuation would indicate that the 1,000,000 tons Candeo could initially remove would be worth $2,000,000,000.** He said Wal-Mart, Home Depot and Lowes would all have interest in a green organic fertilizer product. He also said that Candeo could give Can-Cal $2,000,000-$2,500,000 for about 72% of the Pisgah Property.

   ii.   **The November 2013 Telephone Call**

68.   In a telephone conversation on or about November 5, 2013 (which was initiated

28

by William Hogan), William Hogan represented as follows:

- That he received a report from Clear Motive, a company that did testing on Can-Cal's Material with exciting positive news.

- That the Material has a special seed element that could increase the price of a ton to $10,000.

- That the micro minerals such as silica are outstanding and the water retention is phenomenal.

- That some of the fertilizer companies he was dealing with are billion dollar firms.

- That he thinks the organic fertilizer is better than his food company and with the seeds as an organic dream.

- That Candeo would be willing to pay Can-Cal $2-3 million dollars for ownership of about 72% of its Pisgah Property.

- That he believes that Can-Cal's Pisgah Material could be worth a minimum of $2,000 per ton.

- That a one kilogram bag of Can-Cal's Pisgah Material (2.27 pounds) should sell retail for $9.99.

- That Can-Cal had a board meeting in August with a signed resolution and everyone agreed and how Mike is reneging; they want to have this done by February 15, 2014.

- That Candeo has a facility in Reno, NV all ready to crush and bag Can-Cal's Pisgah Material.

- That they have been in touch with Monsanto Fertilizer through Ron Schinnour.

- Candeo has markets for the fertilizer in some of the major chains—they have considered a sale to one of the major companies.

29

- That Candeo has commenced conversations with several major North American distribution companies who have indicated strong interest in the Pisgah volcanic basalt material.

- That Candeo has considered a possible sale of the Pisgah Property to a major company.

- That he had raised $50,000 that morning for Candeo.

69.     He asked Sloan to support the MSA or a sale of Can-Cal's Pisgah Property to Candeo. Sloan refused to support the MSA or a sale of Pisgah Property to Candeo stating that Can-Cal and its shareholders were entitled to 100% of any profits and that all of this information should be disclosed to Can-Cal shareholders.

### iii.     The December 6, 2013 Telephone Call

70.     On December 6, 2013 William Hogan again called Sloan to solicit his support for a sale by Can-Cal of approximately 72% of its Pisgah Property to Candeo for $2,000,000 to $3,000,000. During that phone call William Hogan stated:

- That Roy Hudson of Davis, LLP thinks the purchase of about 72% of Can-Cal's Pisgah Property by Candeo can be done without the necessity of approval of Can-Cal's shareholders.

- Candeo is currently continuing its test program which should be completed within six months.

- Cando has contacted Monsanto and Scott in addition to other fertilizer companies

- That Candeo has tested the Material on several vegetables including onions, squash and corn with fabulous results.

- That a Charlie Maier is on the advisory board of Monsanto and is very close to the CEO.

- That they plan on testing tomatoes, radishes, strawberries and blueberries during nature's natural growing season.

- That Candeo plans on selling Can-Cal's Pisgah Property to a major when they confirm the value.

- That Candeo sends all monies due to Can-Cal to Davis LLP (the law firm that represented Can-Cal in drafting the MSA) and tells them which Can-Cal bills to pay.

71.    All information disclosed to Sloan by William Hogan was material.   The Individual Defendants were obligated to disclose all information furnished to Sloan to Can-Cal shareholders including the proposal to purchase 72% of Can-Cal's Pisgah Property for $2,000,000 to $3,000,000.  They intentionally concealed and failed to disclose that information.

**G.    MICHAEL HOGAN REVEALS HIS CONCERNS ABOUT HIS BROTHERS AND MACDONALD'S MISCONDUCT**

72.    On October 25, 2013 in a document that Michael Hogan spent all night preparing that he intended to send to MacDonald, he stated some of his concerns about what was occurring. Those concerns included:

- That William Hogan called a secretary employed by Can-Cal on October 23, 2013 and told her that he was going to cut her salary from $5,000 per month to $2,000 per month; and that William Hogan was no longer associated with Can-Cal and what right did he have to tell her that. William Hogan told her that she is to have no further contact with me; that he has no right to be coming in and dictating future actions.

- That William Hogan's actions as well as your actions, of having Candeo take over Can-Cal or take over Can-Cal's Pisgah Property is illegal and will not be approved by shareholders; that legal action will be taken

1    against both of you.

2    • That injecting funds into the company just to pay certain payables, and not

3    the secretary's salary is illegal, as well as ethically and morally wrong.

4    • That another area of concern was that William Hogan was using Roy

5    Hudson of Davis LLP to act as solicitors for both Cal-Cal and Candeo.

6    • That he has sought out legal counsel in both Canada and the U.S. to ensure

7    that previous and future actions fall within the law and the purview of

8    transparency.

9

10   73.   A copy of Michael Hogan's document is Exhibit 9 hereto.

11   74.   On November 6, 2013, Michael Hogan stated: MacDonald told him that anyone

12   helping Candeo will be well rewarded and that he feels that William Hogan and MacDonald

13   want to take over the Pisgah property for themselves.

14   **H.   THE INDIVIDUAL DEFENDANTS CAUSED CAN-CAL TO ENTER INTO
     AN AMENDED AND RESTATED MSA WHICH IS EFFECTIVELY A
15   SALE OF CAN-CAL'S PISGAH PROPERTY TO CANDEO FOR NO
     CONSIDERATION**

16

17   75.   After Sloan informed William Hogan that he objected to the MSA and any sale of

18   the Pisgah Property to Candeo, William Hogan and, Michael Hogan, MacDonald and Schinnour,

19   the only Directors of Can-Cal, devised another plan and scheme of obtaining ownership and

20   control of Can-Cal's Pisgah Property for Candeo. Pursuant to this new plan and scheme Candeo

21   defaulted on its payment obligation pursuant to the MSA and as of March 3, 2014 the Individual

22   Defendants caused Can-Cal to enter into an the Amended MSA.

23   76.   In the MSA Candeo was obligated to pay Can-Cal a total of $225,000 by April

24   2014 in payment for 13,335 tons of Pisgah Material. However, Candeo failed to make this

25   payment and defaulted on its contractual obligations, paying Can-Cal only $64,750.  Can-Cal

26   should have declared an event of default and obtain the necessary funds by itself or deal with

27   others who were more financially responsible and on more favorable terms.  Instead MacDonald,

28

Schinnour and Michael Hogan caused Can-Cal to enter into the Amended MSA with Candeo and William Hogan.  The Amended MSA is even more favorable to Candeo and detrimental to Can-Cal than the original MSA was and effectively amounts to a sale of the Pisgah Property to Candeo for effectively no consideration.

77.     In the Amended MSA, Candeo is given the "exclusive" right to mine all Material not included in an Agreement with Good Corp., for agricultural and other uses as determined by Candeo, for a Initial Term of twenty (20) years and, if it removes 1,000,000 tons during the twenty (20) year period, Candeo can extend the term at any time for an additional thirty (30) years, **totaling a term of 50 years.**  Candeo has the "exclusive" and continuing right to remove additional amounts of Material from the Pisgah Property during that 50 year period.

78.     The Amended MSA requires Candeo to purchase 10,000 tons of Pisgah Material a year for three (3) years for $15 per ton, for $150,000 per year, or a total of $450,000 with a credit of $64,750 for the amount paid under the MSA so the total amount payable pursuant to the Amended MSA is $385,250 over three (3) years.  Can-Cal will likely not receive any of those monies since the amounts payable to William Hogan and Michael Hogan pursuant to their employment contracts as of April 30, 2014, is $700,000 and Michael Hogan is entitled to a continuous salary of $120,000 per year plus an expense allowance of up to $60,000 per year.

79.     In the Amended MSA Candeo has agreed to pay Can-Cal the greater of $15 per ton or 35% of the net sales margins per ton of Pisgah Material removed from the Property, during the first year of mining and 50% thereafter but will not remove any Material until at least the second year of the initial term and there is no obligation to remove any Material from the property for up to 20 years.  Therefore Can-Cal may never receive any monies whatsoever from its Pisgah Property pursuant to the Amended MSA for up to 20 years. This is meant to, and does, effectively deprive Can-Cal of all ownership rights to its Pisgah Property since Can-Cal is still barred from competing with Candeo and cannot sell its Pisgah Material to any one or otherwise

deal with its property since all rights to its Pisgah Property are now in Candeo's control. As a result of the Amended MSA the Pisgah Property has essentially become valueless to Can-Cal and it is wholly dependent on William Hogan and Candeo.

80. Further the Amended MSA:

a. Does not contain a schedule for the payment of any monies by Candeo so the determination of when to pay any monies to Can-Cal is within the sole discretion of William Hogan and Candeo. As the Individual Defendants well know, Can-Cal cannot pay its current obligations, and as a result of the Individual Defendants continuing concealment of material information from Can-Cal shareholders and the conspiracy entered into by the Individual Defendants, Can-Cal cannot obtain other financing and is at Candeo's mercy. Its purpose is to compel Can-Cal to sell its Pisgah Property to Candeo, or, as alleged *infra*, its assignee.

b. The Amended MSA also did not contain a provision requiring Candeo to promptly furnish all material information regarding the testing, use or value of Can-Cal's Pisgah Material and all relevant information to Can-Cal which the Directors of Can-Cal should have insisted upon. In any event all that information belongs to Can-Cal and is Can-Cal's "proprietary information" and Can-Cal and its shareholders are entitled to all of that information.

c. In addition, Paragraph 3(g) of the Amended MSA gives Candeo the exclusive right to require Can-Cal to mine and deliver to Candeo such Pisgah Material as Candeo directs. As Candeo and each of the Individual Defendants well know, Can-Cal does not have any personnel, equipment or funding necessary to mine and deliver any Pisgah Material. The purpose of including that provision was to make it impossible for Can-Cal to perform the onerous obligations imposed on it so Candeo can declare a default and take the necessary action to seek damages, the result of which will

34

1    be the transfer of the Pisgah Property to Candeo.

2            d.    Candeo added provisions to the Amended MSA which were not in

3    the original MSA which are detrimental to Can-Cal.  Those provisions give Candeo the

4    right to freely assign its rights under the Amended MSA without Can-Cal's consent.  In

5    the original MSA Candeo agreed, in Paragraph 21, not to assign the MSA without Can-

6    Cal's written consent.  In Paragraph 22 of the Amended MSA Candeo has the unlimited

7    right to assign the Amended MSA to whomever it wants and Can-Cal has no right to

8    object to any assignment.  Further, in the definition of "Net Sales Margin" on page 2 of

9    the Amended MSA, adds the words Candeo or its "Assignee or Assignees".  As a result

10   Candeo can chose who Can-Cal is in business with and Can-Cal is deprived of its ability

11   to determine who it wants to be associated with.

12

13   81.    A copy of the Amended MSA is attached as Exhibit 10 hereto.

14   **I.    THE INDIVIDUAL DEFENDANTS FRAUDULENTLY CONCEALED
     AND OMITTED MATERIAL INFORMATION FROM CAN-CAL'S
15   WARRANT HOLDERS AND PERMIT THEIR WARRANTS TO EXPIRE
     WHILE EXTENDING THE EXERCISE PERIOD OF WARRANTS HELD
16   BY THEMSELVES**

17   82.    As of March 31, 2013, according to Form 10-K filed by Can-Cal with the SEC on

18   May 15, 2013, Can-Cal had outstanding warrants to purchase 15,280,394 shares of Can-Cal at

19   prices from $.08 to $.15 per share at a weighted average price of $.14 per share. The Individual

20   Defendants held 5,462,389 of the 15,280,394 warrants or approximately 36% of the total number

21   of warrants outstanding.  At least 5,824,584 of those warrants were held by Can-Cal shareholders

22

23   and were scheduled to expire on December 31, 2013.

24   83.    During 2013 Can-Cal had approximately 42 million common shares outstanding

25   and at the reported market price of about $.03-.04 per share.  The market capitalization, or total

26   market value, of Can-Cal was then approximately $1,260,000-$1,680,000.

27   84.    During the period from at least early April 2013 through December 31, 2013

28

35

while the Individual Defendants were in possession of critical and material information regarding Can-Cal's Pisgah Material and Pisgah Property, they knowingly and intentionally concealed and failed to disclose that information to Can-Cal shareholders including those shareholders who held those warrants to purchase Can-Cal shares. Instead the Individual Defendants permitted warrants to purchase 5,824,584 shares of Can-Cal held by Can-Cal's public shareholders to expire on or before December 31, 2013, thereby depriving them of the opportunity to purchase Can-Cal shares while concealing material information from them, including all information Candeo and William Hogan furnished to prospective investors in Candeo as alleged herein.

85.     Among the information concealed, was that William Hogan offered to purchase approximately 72% of Can-Cal's Pisgah Property for Candeo for about $2,000,000 to $2,500,000; that he represented to Candeo shareholders that products similar to Can-Cal's Pisgah Material would sell from $250 to $1,500 per ton and Can-Cal has approximately 3,500,000 tons of finely ground Material at its Pisgah Property with a total estimate above ground of approximately 13 million tons. Those prospective values, billions of dollars as represented by William Hogan, far exceed the market price of Can-Cal stock and exercise price of the warrants outstanding.

86.     The concealed information was and is material to the market valuation and market price for Can-Cal shares and to shareholders and warrant holders in deciding whether to purchase additional shares of Can-Cal. Can-Cal warrant holders had known this information may very likely have purchased those 5,824,854 shares at an average price of $.14 per share and if those warrants were exercised Can-Cal would have received $814,005 as the purchase price of those shares. This amount is in addition to $819,357 Can-Cal would receive from the exercise of warrants by the Individual Defendants. If the Individual Defendants had publicly disclosed all material information that it disclosed to Candeo investors, Can-Cal would have had sufficient funds to develop its Pisgah Property without any external financing.

36

87.     On information and belief, although Can-Cal was in dire need of funds for operations during 2013, the Individual Defendants did not want the market price for Can-Cal share to take into consideration the material information they had or the warrants held by Can-Cal shareholders to be exercised since it would demonstrate that Can-Cal had no need to enter into any arrangement with Candeo or anyone else to obtain funds to develop its Pisgah Property.

88.     The Individual Defendants breached their fiduciary duties to Can-Cal and its shareholders and warrant holders by concealing material information from them regarding Can-Cal's Pisgah Material and Pisgah Property while allowing those warrants to expire.

89.     The concealment by the Individual Defendants of material information from Can-Cal shareholders of the market place and Can-Cal's warrant holders was part of their plan and conspiracy to obtain the majority of the profits from Can-Cal's Pisgah Property and ownership of the Pisgah Property for Candeo.

90.     William Hogan has asserted that the only reason he formed Candeo was that he could not raise any more money for Can-Cal to develop its Pisgah Property and its Pisgah Material.  Plaintiffs deny that assertion.  If a separate company was required to raise additional funds, it would have been a simple matter for Can-Cal to form a subsidiary called Candeo and raise funds.  The only difference is that Can-Cal and its shareholders would own its subsidiary, Candeo, and not William Hogan.

91.     Warrants held by the Individual Defendants to purchase 5,512,389 shares of Can-Cal were due to expire on September 30, 2012 but were extended by the Individual Defendants for an additional 21 months until June 30, 2014.   As a result of the extension of the warrants held by the Individual Defendants and the expiration of the 5,474,584 warrants held by other Can-Cal shareholders the total number of warrants as of September 30, 2013 was reduced to 9,455,810. The Individual Defendants still hold warrants to purchase 5,462,389 shares which then constituted more than 57% of all warrants outstanding.

37

**J.   WILLIAM HOGAN REMAINS IN CONTROL OF CAN-CAL AND REMAINS A FIDUCIARY TO CAN-CAL AND ITS SHAREHOLDERS**

92.   Notwithstanding the fact that William Hogan resigned as a Director of Can-Cal on February 27, 2013, he nonetheless still controls Can-Cal and has fiduciary duties.  Instead of paying Can-Cal directly for the Pisgah Material as the MSA and the Amended MSA provide, at William Hogan's direction Candeo is depositing monies with Davis LLP, and William Hogan is instructing that law firm which of Can-Cal's obligations pursuant to the MSA it should pay. The law firm then pays those obligations directly.  The MSA does not contain any payment schedule for the purchase of the Pisgah Material as it would have contained had the contract been done at arm's length.  Therefore, William Hogan and Candeo has complete control over the timing of when and if it pays Can-Cal for the Pisgah Material and which liabilities it chooses to pay which gives him control of Can-Cal.  Michael Hogan, MacDonald and Schinnour are under the control of William Hogan and in breach of their fiduciary duties, have acquiesced to William Hogan's control.

**K.   THE HOGAN BROTHERS INTENTIONALLY DAMAGED CAN-CAL BY ENTERING INTO THE GOODCORP. CONTRACT**

93.   On January 25, 2012, while William Hogan and Michael Hogan were the only Officers and Directors of Can-Cal, they caused Can-Cal to enter into a mineral lease agreement with GoodCorp. That mineral lease agreement provided, among other things, that GoodCorp. had the "exclusive" right and privilege to mine a specific type of material from Can-Cal's Pisgah Property for a period of 10 years with the right to extend the lease for another 5 year period.

94.   It is normal, standard and prudent in the mining industry that mineral lease agreements such as this one contain provisions for payment of advance royalties or provide that a pre-determined amount of material be taken each year at a specified price so that the company owning the property will receive some income during the period of the agreement and not tie up a property for any extended period without any income.

38

95.     The mineral lease agreement with GoodCorp. failed to include any provision that GoodCorp. make any prepayment of any royalty or any requirement that it take any of that material, and pay for it, within any specific time period, such as so many tons per year. Therefore this Mineral Lease Agreement did nothing more than give GoodCorp. an exclusive 10 -15 year option to mine that material which may never be exercised and Can-Cal may never receive any money from that agreement. In addition, it tied the property up for 10-15 years since Can-Cal could no longer deal with that specific type of material on its Pisgah Property with any other mining company for 10-15 years.

96.     The mineral lease agreement also provides that Good Corp. can remove 100,000 tons of that specific material.  However, Can-Cal's Pisgah Property contains in excess of 3,500,000 tons of that Material.  As a result, Can-Cal cannot deal with any of the remaining 3,400,000 tons of that Material for the duration of that agreement.

97.     On information and belief, Can-Cal's attorneys responsible for drafting the mineral lease agreement included a provision requiring GoodCorp. to purchase a specific amount of material each year but the Hogans through intentional misconduct and in breach of their fiduciary duties, failed to include that provision in the Agreement and failed to obtain any financial and other information from GoodCorp. to determine if the company had the financial ability to actually mine the material from the Property and obtain all required permits to do so. GoodCorp. has not removed any material and Can-Cal has not received any monies pursuant to that Agreement and is unable to deal with the specific type of material specified in this Agreement with any other company or person and has tied up that specific type of material for 10-15 years, which has caused Can-Cal significant damage.

98.     As a direct and proximate result of the acts, actions, breach of duties, and omissions of the Defendants, as alleged herein Can-Cal and it shareholders have sustained significant damages in excess of $10,000.

## VI.  CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## (BREACH OF FIDUCIARY DUTY BY WILLIAM HOGAN)

99.    Plaintiffs repeat and reallege all other allegations contained in this complaint and by this reference incorporate the same herein as though set forth in full.

100.    At all times relevant hereto, William Hogan was an Officer, Director and/or controlling person of Ca-Cal owed fiduciary duties to Can-Cal and its shareholders. William Hogan intentionally breached his fiduciary duties:

A.    By wrongfully taking the value of Can-Cal's Pisgah Property and Can-Cal's Pisgah Material and usurping Can-Cal's corporate opportunity from Can-Cal for himself and Candeo pursuant to the MSA and the Amended MSA.

B.    By wrongfully causing Can-Cal to enter into an Employment Contracts with his company Futureworth Capital Corp., and Michael Hogan, providing for wildly excessive compensation which was a waste of Can-Cal's corporate assets.

C.    Through intentional misconduct by causing Can-Cal to enter into the Mineral Lease Agreement with GoodCorp., Inc.

D.    By making false and misleading filings with the SEC in violation of the Securities Exchange Act of 1934 and the Sarbanes-Oxley Act of 2002 for the purpose of concealing material facts from Can-Cal shareholders and warrant holders.

101.    As a direct and proximate result of William Hogan's acts, actions and omissions, Can-Cal and its shareholders and warrant holders sustained significant damage in excess of $10,000.

102.    The acts, action, omissions and course of conduct engaged in by William Hogan are willful and wanton and designed to defraud Can-Cal and its shareholders and were purposely committed by him heedlessly and recklessly without regard to the rights of Can-Cal and its

shareholders. Can-Cal is entitled to an award of punitive damages against William Hogan.

## SECOND CAUSE OF ACTION

### (CONVERSION BY WILLIAM HOGAN AND CANDEO)

103.    Plaintiffs repeat and reallege all other allegations contained in this complaint and by this reference incorporate the same herein as though set forth in full.

104.    William Hogan breached his fiduciary duties to Can Cal and its shareholders by forming Candeo and causing Can-Cal to enter into the MSA and the Amended MSA usurping the corporate opportunity and its Pisgah Property which belonged to Can-Cal and its shareholders.

105.    William Hogan and Candeo intentionally, wrongfully and fraudulently converted Can-Cal's Pisgah Property and its Pisgah Material for their own use and benefit.

106.    As a direct and proximate result of the acts, actions and omissions,Defendants William Hogan and Candeo, Can-Cal and its shareholders and warrant holders sustained significant damage in excess of $10,000.

107.    The acts, action, omissions and course of conduct engaged in by the Defendants William Hogan and Candeo's conduct are willful and wanton and designed to defraud Can-Cal and it shareholders and were purposely committed by them heedlessly and recklessly without regard to the rights of Can-Cal and its shareholders. Can-Cal is entitled to an award of punitive damages against William Hogan, and Candeo.

## THIRD CAUSE OF ACTION

### (BREACHS OF FIDUCIARY DUTIES AGAINST WILLIAM HOGAN, THOMPSON MACDONALD, RONALD SCHINNOUR AND MICHAEL HOGAN)

108.    Plaintiffs repeat and reallege the allegations contained in this complaint and by this reference incorporate the same herein as though set forth in full.

109.    Michael Hogan, Thompson MacDonald ("MacDonald") and Ronald Schinnour ("Schinnour") and William Hogan (the "Individual Defendants") were at all times relevant

41

hereto, Directors and/or Officers and/or controlling persons of Can-Cal and owed fiduciary duties. Michael Hogan is William Hogan's brother. MacDonald and Schinnour are directors and shareholders of another Canadian company controlled by William Hogan. They are controlled by William Hogan and have done nothing to protect Can-Cal's interest or the interests of Can-Cal's shareholders. They have looted Can-Cal for the benefit of William Hogan, Candeo and Michael Hogan. They have wrongfully permitted William Hogan to usurp Can-Cal's corporate opportunity and permitted William Hogan and Michael Hogan to become Can-Cal's largest creditors.

110.   They caused Can-Cal to enter into a Material Supply Agreement ("MSA") with Candeo which permitted Candeo to realize 66 2/3% of all profits from Can-Cal's Pisgah Property which was the usurpation of Can-Cal's corporate opportunity to realize hundreds of millions of dollars in profits for Can-Cal and its shareholders and operated as a fraud and deceit on Can-Cal and its shareholders.

111.   They permitted Candeo to default on its obligations pursuant to the MSA and then entered into an Amended MSA which gave Candeo a 50 year lease on the Pisgah Property, which amounted to a sale of Can-Cal's Pisgah Property, from which Can-Cal may not receive any monies for up to 20 years, or at all, which deprived Can-Cal and its shareholders of the value of its Pisgah Property.

112.   When the Hogans were Can-Cal's only Directors they each entered into "employment contracts". (William Hogan's contract was nominally through Futureworth Capital Corp., another Canadian company formed by him) with Can-Cal which provided by completely excessive compensation and constituted a waste of corporate assets, resulting in them becoming Can-Cal's largest creditors and Michael Hogan, MacDonald and Schinnour permitted those contracts to continue and took no action to abrogate or rescind those employment contracts.

113.   The Individual Defendants concealed material information from Can-Cal's shareholders and filed intentionally false and misleading reports with the SEC, concealing all information with respect to the value of Can-Cal's Pisgah Property in violation of the Securities Exchange Act of 1934 and falsely certified those reports in violation of the Sarbanes-Oxley Act of 2002.

114.   When Michael Hogan and William Hogan were the only Directors of Can-Cal they, through intentional misconduct, caused Can-Cal to enter into a mineral lease agreement with GoodCorp., which caused Can-Cal significant damage in excess of $10,000.

115.   While warrants to purchase Can-Cal stock were outstanding the Individual Defendants wrongfully concealed material information, including the value of Can-Cal's Pisgah Property, from those persons owning warrants to purchase Can-Cal shares who, had they known of the value of the Pisgah Property – which resulted in a value of Can-Cal far in excess of the exercise price of warrants – would have exercised those warrants and purchased Can-Cal's shares resulting in Can-Cal receiving in excess of $800,000.  Instead they permitted those warrants to expire worthless on December 31, 2013 while still concealing all that material information.

116.   As a direct and proximate result of the acts, actions and omissions of the Individual Defendants, Can-Cal and its shareholders and warrant holders have sustained significant damage.

117.   The acts, action, omissions and course of conduct engaged in by the Individual Defendants are willful and wanton and designed to defraud Can-Cal and it shareholders and were purposely committed by them heedlessly and recklessly without regard to the rights of Can-Cal and its shareholders. Can-Cal is entitled to an award of punitive damages against each of them.

**FOURTH CAUSE OF ACTION**

**(AGAINST MICHAEL HOGAN, MACDONALD AND SCHINNOUR FOR AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES)**

118.    Plaintiffs repeat and reallege all the allegations contained in this complaint and by this reference incorporate the same herein as though set forth in full.

119.    Michael Hogan, MacDonald and Schinnour aided and abetted William Hogan, Candeo and Futureworth by permitting the value of Can-Cal's Pisgah Property to be transferred to Candeo and permitting Futureworth to be entitled to the "compensation" allegedly due to William Hogan and to become, along with Michael Hogan, Can-Cal's largest creditors.

120.    As a direct and proximate result of the acts, actions and omissions of Michael Hogan, MacDonald and Schinnour, Can-Cal and its shareholders and warrant holders have sustained significant damage in excess of $10,000.

121.    The acts, action, omissions and course of conduct engaged in by the Individual Defendants, Michael Hogan, MacDoanld and Schinnour are willful and wanton and designed to defraud Can-Cal and its shareholders and were purposely committed by them heedlessly and recklessly without regard to the rights of Can-Cal and its shareholders.  Can-Cal is entitled to an award of punitive damages against each of the Defendants.

**FIFTH CAUSE OF ACTION**

**(CIVIL CONSPIRACY AGAINST ALL DEFENDANTS)**

122.    Plaintiffs repeat and reallege all the allegations contained in this complaint and by this reference incorporate the same herein as though set forth in full.

123.    Willam Hogan, MacDonald, Michael Hogan and Schinnour were aware of the value of Can-Cal's Pisgah Property and Pisgah Material and they planned and conspired that they would unlawfully and wrongfully steal the value of Can-Cal's Pisgah Property for Candeo and William Hogan.  They did so by:

a.    Causing Can-Cal to enter into the MSA and the Amended MSA with

44

Candeo which effectively transferred, appropriated and stole the value of Can-Cal's Pisgah Property to Candeo, depriving Can-Cal and its shareholders of the value of the Pisgah Property.

        b.     By wrongfully and unlawfully concealing material information from Can-Cal's shareholders and warrant holders and by making and certifying false and misleading filings with the with the SEC in violation of the Securities Exchange Act of 1934 and the Sarbanes-Oxley Act of 2002.

        124.    As a direct and proximate result of the Defendants conspiracy and plan, Can-Cal and its shareholders and warrant holders have sustained significant damage in excess of $10,000.

        125.    The acts, action, omissions and course of conduct engaged in by all Defendants, is willful and wanton and designed to defraud Can-Cal and its shareholders and were purposely committed by them heedlessly and recklessly without regard to the rights of Can-Cal and its shareholders. Can-Cal is entitled to an award of punitive damages against all Defendants.

## SIXTH CAUSE OF ACTION

**(FRAUD AND DECEIT)**
**(AGAINST DEFENDANTS, WILLIAM HOGAN, THOMPSON**
**MACDONALD, MICHAEL HOGAN, RONALD SCHINNOUR**
**AND CANDEO LAVA PRODUCTS, INC.)**

        126.    Plaintiffs repeat and reallege all the allegations contained in the complaint and by this reference incorporate the same as if fully set forth herein.

        127.    The Individual Defendants, as fiduciaries to Can-Cal and its shareholders, had duties of loyalty, care, utmost good faith and fair dealing and to disclose to Can-Cal and its shareholders and warrant holders all material facts known to them with respect to the uses and value of Can-Cal's Pisgah Material and to protect Can-Cal's Pisgah Property for the benefit of its shareholders.

        128.    Instead of disclosing all facts known to them and protecting Can-Cal's Property for the benefit of Can-Cal and its shareholders, the Individual Defendants fraudulently intended to and did, steal the value of Can-Cal's Pisgah Property for Candeo and defraud Can-Cal and is

shareholders. They caused Can-Cal to enter into the MSA and Amended MSA with Candeo which was tantamount to a sale of the Pisgah Property to Candeo for no consideration.   They made intentionally false and misleading filings with the SEC and falsely certified those filings and concealed material facts with respect to the Pisgah Material from Can-Cal's shareholders and warrant holders in violation of the Securities Exchange Act of 1934 and falsely certified those statements in violation of the Sarbanes-Oxley Act of 2002 including, but not limited to, the testing that had been done with respect to the use of that Material as an organic fertilizer, the properties of that Material which made it so valuable as an organic fertilizer, the market for that Material, the prices that other materials commanded in the market place, the significance of the Pisgah Material and the Pisgah Property. All of this information was made available to investors in Candeo.

129.   The Individual Defendants knew that Can-Cal and its shareholders and warrant holders did not have the information that they kept secret and that Can-Cal and its shareholders and warrant holders were not in a position to discover those facts for themselves, and they knew that Can-Cal's shareholders would rely on publicly available information which was in the control of the Individual Defendants.

130.   The Individual Defendants knew that if Can-Cal's shareholders and warrant holders had the information that they kept secret Can-Cal would never have permitted Can- Cal to enter into the MSA or the Amended MSA;  that if they had disclosed that information to its shareholders and warrant holders the shareholders and warrant holders would have taken legal action to enjoin Can-Cal and Candeo from entering into the MSA or the Amended MSA, or taken legal action to cause it to be abrogated *ab initio* and declared null and void; or to compel the Individual Defendants to make an appropriate filing with the SEC disclosing all material facts.

131.   This intentional concealment of material information from warrant holders

deprived them of the opportunity of exercising their warrants with full and complete information which Individual Defendants have permitted to expire.  Can-Cal was deprived of from receiving the exercise price of the warrants which was in the hundreds of thousands of dollars.

132.    In causing Can-Cal to enter into the MSA and Amended MSA while keeping that entire information secret, the acts, actions, omissions, breaches of duties, conduct and conspiracy of the Individual Defendants to steal the value of Can-Cal's Pisgah Property operated as a fraud and deceit on Can-Cal and its shareholders and deprived Can-Cal of the value of its Pisgah Property by transferring the value of its Pisgah Property and Pisgah Material to Candeo.

133.    As a direct and proximate result of the acts, actions and omissions of these Defendants, Can-Cal and its shareholders and warrant holders sustained significant damages in excess of $10,000.

134.    The acts, action, omissions and course of conduct engaged in by the Defendants are willful and wanton and designed to defraud Can-Cal and it shareholders and were purposely committed by them heedlessly and recklessly without regard to the rights of Can-Cal and its shareholders. Can-Cal is entitled to an award of punitive damages against William Hogan, Thompson MacDonald, Ronald Schinnour and Michael Hogan.

**SEVENTH CAUSE OF ACTION**

**(UNJUST ENRICHMENT)**
**(AGAINST WILLIAM HOGAN, FUTUREWORTH CAPITAL CORP.,**
**THOMPSON MACDONALD, MICHAEL HOGAN AND CANDEO LAVA**
**PRODUCTS, INC.)**

135.    Plaintiffs repeat and reallege all the allegations contained in the complaint and by this reference incorporate the same as if fully set forth herein.

136.    Defendants Candeo, William Hogan, Futureworth Capital Corp. and Michael Hogan, have been unjustly enriched at Can-Cal's expense under circumstances which make it unjust for any of said Defendants to retain any benefit from Can-Cal's Pisgah Property or Pisgah Material and/or the employment contracts between Can-Cal, William Hogan, Futureworth

47

Capital Corp., and Michael Hogan.

137.   As a direct and proximate result of the acts, actions and omissions of these Defendants Can-Cal, and its shareholders and warrant holders have sustained significant damage in excess of $10,000.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against William Hogan, Thompson MacDonald, Ronald Schinnour, Michael Hogan, Candeo Lava Products, Inc. and Futureworth Capital Corp. jointly and severally as follows:

1.   That this Court order Defendants make Can-Cal whole by paying compensatory damages in excess of $10,000.

2.   That this Court forthwith order William Hogan, Thompson MacDonald, Ronald Schinnour and Michael Hogan and Candeo Lava Products, Inc. to cause an appropriate filing to be made with the SEC containing all material facts regarding Can-Cal's Pisgah Property including, but not limited to the uses of that material for agricultural purposes, test results, marketing plans, and all other relevant information

3.   That this Court issue a declaratory judgment holding that the Material Supply Agreement between Can-Cal Resources, Ltd. and Candeo Lava Products, Inc. dated April 9, 2013, and the Amended Material Supply Agreement dated as of March 3, 2014, are abrogated *ab initio* and are of no effect.  These agreements effectively took the value of the Pisgah Material away from Can-Cal, estimated by Defendants to be in excess of $2,000,000,000.

4.   That this Court impose constructive trusts in favor of Can-Cal on all monies, profits and benefits received or to be received by each of the Defendants from the sale of Can-Cal's Material and that Defendants be ordered to pay and turn over to Can-Cal all such monies, profits and benefits.

5.   That this Court impose a constructive trust in favor of Can-Cal on all information,

and documents including writings, charts, graphs, emails, and electronically stored information and transmissions relating to testing, test results, marketing, bagging, crushing, elements, composition, uses, sale, valuations and all other facts and all actions and activities taken with respect to Can-Cal's Pisgah Material and Can-Cal's Pisgah Property including but not limited to communications with all other persons, contacts with prospective users, purchasers, vendors and documents furnished or sent to prospective investors in, or shareholders of Candeo, and that all such documents and information in the possession of the Defendants  or other persons to whom they have furnished such information  and documents should be forthwith turned over to Can-Cal by each of the Defendants and that the Defendants not retain any copies of any of these documents.

6.      That this Court issue a permanent injunction against each of the Defendants and all other persons acting on their behalf enjoining them from utilizing any information or, documentation regarding Can-Cal's Pisgah Property or its Pisgah Material for their own benefit.

7.      That this Court issue a permanent injunction against William Hogan and Candeo from assigning the MSA or the Amended MSA to any person, firm or corporation, abrogate any such assignment, and/or impose a constructive trust in favor of Can-Cal on any proceeds or consideration received by them for any such assignment.

8.      That this Court issue a declaratory judgment holding that the employment contracts between Can-Cal and Michael Hogan and Can-Cal and William Hogan. through his company Future Worth Capital Corp., be declared abrogated *ab initio* and that any amounts shown as liabilities pursuant to those contracts be declared to be null and void and order William Hogan, Futureworth Capital Corp., and Michael Hogan to return all compensation back to Can-Cal.

9.      That this Court order that the warrants that the Individual Defendants permitted to expire as of September 30, 2013 or any time thereafter be reinstated for a period of time that

permits the warrant holders adequate time to determine whether to exercise their warrants while in possession of all material information regarding Can-Cal's Pisgah Property and Pisgah Material.

10.     That this Court order a monetary or other award to Ronald D. Sloan, the verifying Plaintiff for his efforts in determining these facts and bringing this action.

11.     Reasonable attorney's fees and costs of this suit.

12.     Interest.

13.     For such other and relief as this Court may deed just and proper.

## VIII.   JURY DEMAND

Pursuant to NRCP 38, Platintiffs hereby demand a trial by jury for all issues triable by jury in the above-entitled action.

SKLAR WILLIAMS PLLC

Suvinder S. Ahluwalia
Nevada Bar No. 3944
410 S. Rampart Boulevard, Ste. 350
Las Vegas, NV  89145
Telephone: (702) 360-6000
Facsimile: (702) 360-0000
Attorneys for Plaintiffs

50

1

**<u>VERIFICATION</u>**

2

Plaintiff Ronald  Sloan , by and through his attorneys, derivatively on behalf of Can-Cal

3

Resources, Ltd, alleges upon personal knowledge as to himself and his own acts, and upon

4

information and belief as to all other matters, based upon, *inter alia,* being a shareholder of Can-

5

Cal, the investigation conducted by and through his attorneys, which included, among other

6

things, a review of the emails and documents from Can-Cal and its Officers and Directors and

7

conversations with William Hogan and Michael Hogan and others, Securities and Exchange

8

Commission filings, reports, press releases and other publically available documents regarding

9

the parties, the facts contained in the Verified Complaint are true and correct to the best of my

10

knowledge, information and belief, except those made on information and belief which I believe

11

are true.

12

13

Date: *May 27, 2014*

14

Ronald D. Sloan

15

16

STATE OF *Nevada*        )

17

COUNTY OF *Clark*        ) ss
                         )

18

Subscribed  and  sworn  to  before  me  by  RONALD  D.  SLOAN  this 27th day of

19

*May* , 2014.

20

*7 - 21 - 2015*

My Commission Expires                    Notary Public

21

[SEAL]

22

23

MONICA CHAVEZ
Notary Public State of Nevada
No. 99-56993-1
My appt. exp. July 21, 2015

24

25

26

27

EXHIBIT 1

**WILLIAM R. FISHMAN**
ATTORNEY AT LAW

2000 S. COLORADO BLVD.
TOWER 1, SUITE 9000
DENVER, COLORADO 80222
(303) 861-1000
FAX (303) 894-0857
EMAIL: wfishman@colorado-law.net

January 23, 2014

**Via Email mike.hogan@sympatico.ca; mining@lvcoxmail.com and U.S. Mail**

G. Michael Hogan
Thompson MacDonald
Ron Schinnour
Can-Cal Resources, Ltd
8205 Aqua Spray Avenue
Las Vegas, Nevada 89128-7430

Gentlemen,

I am writing to you in your capacities as Officers and/or Directors of Can-Cal Resources, Ltd (Can-Cal).

First, I have read Can-Cal's SEC filings describing the employment contracts that it has with G. Michael Hogan and William J. Hogan, but I have been unable to find the actual contracts. They are clearly material since as of September 30, 2013 the amount purportedly payable pursuant to those contracts is $630,000, which was approximately 72% of Can-Cal's current liabilities. If those contracts have been filed with the SEC and I have missed them please advise of the date of such filing and identify the form to which they were exhibits. If they have not been filed please email me a copy of the executed contracts and file them as soon as possible with the SEC.

Second, in reviewing Can-Cal's SEC filings, it appears that Can-Cal has failed to make any public disclosure with respect to the uses of its Pisgah volcanic basalt material as an organic fertilizer. We understand that a third party informed William J. Hogan in 2012 that Can-Cal's Pisgah material was an excellent organic fertilizer and had a very significant value as a fertilizer; that Can-Cal had its material tested by a laboratory for properties relevant to its use as a fertilizer as early as January 2013 with very favorable results; that Can-Cal and its officers and directors conducted additional testing utilizing the material on various plants which resulted in significant growth, far exceeding that of other fertilizers; that the Pisgah material could be extremely valuable as an organic fertilizer; that it was the value of Can-Cal's volcanic basalt material and the opportunity to exploit that use of the material and to realize the significant prospective profits therefrom that caused William J. Hogan to resign from Can-Cal on February 27, 2013 and form Candeo on April 3, 2013; that he caused Can-Cal to enter into the Material Supply Agreement with Candeo on April 9, 2013, which gave Candeo two thirds of the profits from the sale of Can-Cal's material.

G. Michael Hogan
Thompson MacDonald
Ron Schinnour
Can-Cal Resources, Ltd
January 23, 2014
Page 2

We have been furnished documents prepared by Mr. Hogan soliciting persons to invest in Candeo in which, among other things, he represented that the sale of Can-Cal's volcanic basalt material will be very profitable and that "Other currently similar powder products can range in price from $250 to $1,500 of gross revenue per ton." We refer each of you to all of those documents for all representations made.

In addition, Mr. Hogan has represented to others, among other things, that Can-Cal's Pisgah material could be worth a minimum of $2,000 per ton; that a one kilogram bag, (2.27 pounds) should retail for $9.99; that the testing done on onion plants showed superior growth in the root structure compared to other organic fertilizers; that chemical analysis by independent laboratories in both Canada and the United States confirmed the presence of extremely favorable levels of macro and micro nutrients as well as an excellent PH level and there is a very high silica level in the material which is crucial for plant development; that both Mr. MacDonald and Mr. Schinnour were involved in, and working with, Candeo; that the water retention in the root structure was phenomenal; that Candeo wanted to purchase 72% of Can-Cal's Pisgah property for $2,000,000 to $2,500,000 (Mr. Hogan personally solicited persons to support such an offer by Candeo); that he has commenced conversations with several major North American distribution companies who have indicated strong interest in Can-Cal's material; that Can-Cal's volcanic basalt material has the potential to be an outstanding and lucrative world class product; and that Candeo has considered a possible sale of the Pisgah Property to a major company.

Of course, these facts are material to Can-Cal's shareholders and have been concealed from them. As fiduciaries you should be aware of your obligations to the shareholders. As a result all filings by Can-Cal for an extended period of time omit material facts and are likely false and misleading. Can-Cal should immediately make appropriate filings with the SEC and make proper disclosure to its shareholders, disclosing all material and relevant facts with respect to Can-Cal's Pisgah material including all test results, marketing efforts, the value or prospective value of that material, and all other material information as of a current date.

Sincerely,

William R. Fishman

WJF/tmc

EXHIBIT 2

EX-10.1 2 cancal_8k-ex1001.htm INDEPENDENT CONTRACTOR AGREEMENT
EXHIBIT 10.1

## INDEPENDENT CONTRACTOR AGREEMENT

This Independent Contractor Agreement ("Agreement") is between FUTUREWORTH CAPITAL CORP., (the "Contractor") and Can-Cal Resources Ltd. (the "Company"), each individually a "Party", and collectively the "Parties", and shall be effective as of the 30th day of June, 2010 (the "Effective Date").

1.    Services.

(a)       Company hereby engages Contractor to perform the services described in Schedule A to this Agreement (the "Services"). Contractor shall perform all of the Services promptly, in a professional and workmanlike manner.

(b)       Upon Company's request, Contractor shall submit work progress reports. All reports and other written work product generated by Contractor shall be set forth on a form designated by Company, unless Company agrees, in advance, to Contractor's use of different forms.

2.    Payment for Services, Expenses and Audit.

(a)       As compensation for the performance of the Services, Company shall pay Contractor the compensation specified in Schedule B to this Agreement.

(b)       Company shall reimburse Contractor for all travel, lodging and meal expenses reasonably and necessarily incurred by Contractor in connection with Contractor's performance of the Services, including automobile mileage. Company shall reimburse Contractor for expenses for each job after presentation of an itemized statement detailing the amount of such expenses and their relationship to Contractor's performance of the Services. Contractor shall keep complete records of the expenses incurred in performing the Services, and shall endeavor to provide receipts for all such expenses exceeding $50.00. Contractor shall be responsible for providing his own equipment and materials including computer, software, fax machine, office space in his home jurisdiction, cellular phone or other office supplies necessary for the performance of the Services.

(c)       Except as otherwise provided in Schedule B, Contractor shall submit expense invoices to Company at such times as Company may reasonably require. All such invoices shall reflect actual mileage driven, expenses (segregated by type of expense) incurred, and disposition of any funds advanced by Company. Company shall pay each such invoice within 15 days.

(d)       Company, through the Board of Directors or the Chairman of the Audit Committee, shall have the right, at any time prior to or within six (6) months after making payment hereunder, to audit any and all records, books and invoices related thereto.

1

3.   <u>Term and Termination.</u>

(a)      The "Term" of this Agreement shall commence on the Effective Date for a period of twelve months (12) months until the 30th day of June, 2011 and continue until the earlier of the completion of the Services or the termination of this Agreement as provided in this Paragraph. The Company may terminate this Agreement for any reason or no reason upon three (3) months written notice ("Notice Period"). The Company may, in its sole discretion, request Contractor to cease performing Services at any time during the Notice Period. Regardless of whether or not the Company requests that the Contractor continue to perform Services during the Notice Period, the Company shall continue to pay Compensation (as outlined in Schedule B) during the Notice Period on the same schedule as outlined in Schedule B. The Contractor may terminate this Agreement for any reason or no reason upon three (3) months written notice and will fulfill his Services to the best of the Contractor's abilities during this transition period.

(b)      Within thirty (30) days after the expiration of approximately thirteen and one half (13 1/2) months term from the effective date, the Company shall have the right to review this Agreement and in its sole discretion either continue and extend this Agreement including all of its terms, terminate this Agreement by providing 3 months Notice as required in Section 3(a), or offer the Contractor a different agreement. The Compensation Committee (the "Committee") will vote on whether to so extend, terminate, and/or offer the Contractor a different agreement and will notify the Contractor of such action within said thirty-day time period mentioned above. This Agreement shall remain in effect until so terminated and/or modified by the Company. Failure of the Compensation Committee to take any action within said thirty days shall be considered as an extension of this Agreement for an additional twelve month period, including all of its terms.

(c)      If Company or Contractor terminates this Agreement as set forth in this paragraph, the Company shall pay for all Services performed, and, subject to the limitations in paragraph 2(b), above, all expenses incurred, up to the effective date of the termination (the "Termination Date"). Such termination shall not extinguish or diminish the rights and obligations of the Parties incurred prior to such termination. Any notice of termination or other notice that may be necessary in the performance of this Agreement may be served as specified below.

4.   <u>Independent Contractor Status.</u>

(a)      Contractor shall be deemed for all purposes to be an independent contractor and shall not be an employee of Company. Contractor shall report directly to the Board of Directors of Company. The Board of Directors of Company shall retain the right to establish plans, specifications and a completion schedule regarding the Services as agreed in writing by Contractor, but shall not otherwise instruct Contractor as to how the work shall be performed, or oversee Contractor's work except to monitor compliance with applicable plans, specifications and completion schedules, and/or to coordinate the performance of the Services with Company's other business needs and the work of Company's employees and, where applicable, other contractors. Except as provided in the previous sentence, Contractor shall retain the sole right to control the time and manner in which the Services are provided. Contractor acknowledges and agrees that as of the Effective Date, Contractor was fully qualified by education and/or experience to perform the Services with no more than de minimus training provided by Company.

2

(b)        Contractor understands and agrees that Contractor shall be ineligible for fringe benefits of any kind offered by Company to any of its employees, including without limitation parking, auto allowance, health care, life insurance, short term disability or long term disability. Without limiting the generality of the foregoing, Contractor acknowledges and agrees that Contractor shall be ineligible to participate in any pension plan, employee stock purchase plan, retirement plan or any other Company-sponsored plan that by its term limits plan participation to Company employees. Contractor acknowledges that this paragraph may have important legal consequences for Contractor and that before signing this Agreement, Contractor had a full and fair opportunity to consult with counsel of Contractor's own choosing concerning the meaning and legal effect of this paragraph and all other provisions of this Agreement.

(c)        Contractor acknowledges and agrees that Company shall not withhold any payroll, income or other taxes of any kind including FICA, FUTA from any sum payable to Contractor under this Agreement. Contractor shall be solely responsible for the proper calculation and payment of all taxes of any kind payable to any government relating to or arising from this Agreement. Contractor shall pay all such taxes when due.

**5.    Confidentiality.**

Company and Contractor shall hold any proprietary information with respect to the other Party acquired in connection with the negotiation of this Agreement and the performance of any obligations under this Agreement in confidence until such information otherwise becomes publicly available or until such time as such parties are legally required to disclose such information. Company and Contractor will use such information provided by the other only for purposes reasonably related to the transaction or transactions contemplated in this Agreement. Upon termination of this Agreement, either by expiration of its term or if terminated pursuant to Paragraph 3 herein, each Party shall use all reasonable efforts to return all documents, including copies, that include any information subject to this Section to the other Party.

**6.    Insurance.**

All of Contractor's activities under this Agreement shall be at Contractor's own risk, and Contractor shall not be entitled to Workers' Compensation or other insurance protection provided by Company, unless such insurance covers independent contractors of Company. During the Term, Contractor shall carry at its own expense workers' compensation insurance as required by law, disability, employment, and liability insurance.

**7.    Indemnification.**

Company shall be liable for and shall indemnify and hold harmless Contractor, its representatives, shareholders, officers, directors, employees, and agents for any loss, liability, claim, damage, expense, including but not limited to costs of defense and reasonable attorneys fees and expenses, or diminution in value, whether or not involving a third party claim, arising from or in connection with any breach or non-performance by Company of its obligations, representations, promises, warranties, or other agreements set forth in this Agreement, or for acts of Contractor constituting ordinary negligence (but not for the acts of Contractor constituting gross negligence or fraud).

3

8.   **Miscellaneous Provisions.**

    (a)    *Additional Warranty and Acknowledgment.* Each of the parties hereto warrants and represents to the other party that such party has been offered no promise or inducement except as expressly provided in this Agreement, and that this Agreement is not in violation of or in conflict with any other agreement of such party.

    (b)    *Other Agreements.* Each party hereto shall promptly execute, acknowledge and deliver any additional document or agreement that is reasonably necessary to carry out the purpose or effect of this Agreement. This agreement between Company and Contractor is deemed non-exclusive. Company acknowledges and grants Contractor's right & privilege to participate in other professional ventures simultaneous to this endeavor provided the Contractor performs the Services on behalf of Company in a timely manner and is not placed in a conflict of interest with similar services on behalf of other companies.

    (c)    *Attorneys' Fees.* In any action relating to or arising from this Agreement, or involving its application, the party substantially prevailing shall recover from the other party, and the court shall award, the expenses incurred by the prevailing party in connection with the action, including, without limitation, court costs and reasonable attorneys' fees.

    (d)    *Governing Law* The validity, interpretation, and performance of this Agreement shall be governed by and construed in accordance with the laws of the Province of Alberta, without the application of any principle that may lead to the application of the laws of any other jurisdiction.

    (e)    *Jurisdiction; Service of Process.* Any proceeding arising out of or relating to this Agreement shall be brought in the Court of Queens Bench of the Province of Alberta. Both Company and Contractor irrevocably submit to the exclusive jurisdiction of each such Court in any such proceeding, and expressly waives any objection it may now or hereafter have to venue or to convenience of form and aggress that all claims arising out of or relating to this Agreement shall be heard and determined only in any such Court. The Parties agree that either or both of them may file a copy of this paragraph with any Court as written evidence of the knowing, voluntary and bargained for agreement between the Parties to irrevocably waive any objections to venue or to convenience of forum. Process in any proceeding arising out of or relating to this Agreement may be served on any party anywhere in the world.

    (f)    *Severability.* If any provision of this Agreement is held illegal, invalid or unenforceable, in whole or in part, by any court or other authority of competent jurisdiction, the parties acknowledge and agree that each and every other provision of this Agreement shall remain valid and enforceable and that such illegal, invalid or unenforceable provision or portion thereof shall be limited so as to effect the intent of the parties hereto to the fullest extent permitted by applicable law.

    (g)    *Waiver; Remedies Cumulative.* Neither the failure of any party to insist upon strict compliance with any provision of this Agreement, nor any delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power or remedy of such nonbreaching or nondefaulting party, nor shall it be construed to be a waiver of or acquiescence to any such breach or default, or to any similar breach or default thereafter occurring, nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. All remedies, whether under this Agreement or by law or otherwise afforded to any party hereto, shall be cumulative and not alternative.

4

(h)        *Construction.* Each of the parties hereto acknowledges that such party has reviewed this Agreement in its entirety and has had a full and fair opportunity to negotiate its terms and to consult with counsel of its own choosing concerning the meaning and effect of this Agreement. Each of the parties hereto therefore waives all applicable rules of construction that any provision of this Agreement should be construed against its drafter, and agrees that all provisions of this Agreement shall be construed as a whole, according to the fair meaning of the language used.

(i)        *Notices.* All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (i) upon personal delivery to the Party to be notified; (ii) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient; (iii) three (3) days after having been sent by registered or certified mail, return receipt requested, postage prepaid; and (iv) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All notices shall be sent to the Parties at the respective addresses, facsimiles or e-mail addresses as set forth below, or at such other address, facsimile or e-mail address as a Party may designate by written notice to the other Parties hereto.

If to Company:                                If to Contractor:

Can-Cal Resources Ltd.                        FutureWorth Capital Corp.
8205 Aqua Spray Avenue                        1712 25th Street S.W.
Las Vegas, Nevada 89128                       Calgary, Alberta T3C 1J6
Attn: Mr. G. Michael Hogan                    Attn. William J. Hogan,
         Chief Executive Officer                        Director
Facsimile: (702) 243-1849                     Facsimile: (403) 457-1404
Email: mining@lvcoxmail.com                   Email: wjhogan@shaw.ca

(j)        *Entire Agreement and Modification.* This Agreement supersedes all prior agreements, whether written or oral, between the Parties with respect to its subject matter and constitutes a complete and exclusive statement of the terms of the agreement between the Parties with respect to its subject matter. This Agreement may not be amended, supplemented or otherwise modified except by a written agreement executed by the Party to be charged with the amendment, supplement or modification.

(k)        *Assignment.* Neither Party may assign or transfer its rights, interest, or obligations under this Agreement or delegate any of its duties under or in connection with this Agreement, without the prior written consent of the other. Notwithstanding the foregoing, the rights and obligations of this Agreement shall inure to the benefit of and be binding upon the legal representatives, successors and permitted assigns of both Parties.

(l)     *Counterparts; Signatures.* This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument. For purposes of this Agreement, facsimile and electronically transmitted signatures shall be deemed to be originals for all purposes.

    **IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed and delivered as of the date first written above.

Can-Cal Resources Ltd.                      FutureWorth Capital Corp.

Per: /s/ G. Michael Hogan              Per: /s/ William J. Hogan
      G. Michael Hogan                     William J. Hogan
      Chief Executive Officer               Director

6

## SCHEDULE A

Services

The Services to be performed by Contractor shall include the following services. Contractor, through its President, William Hogan, shall

1.  Act as an executive Chairman of the Board of the Corporation in the capacity of funding management and corporate services requirements (see 2 below for details); and works closely together with the Chief Executive Officer, G. Michael Hogan in operational matters;

2.  An executive Chairman of the Board is and does the following:

    - A full-time officeholder who typically leads the board and also takes a hands-on role in the company's day-to-day management.

    - Helps the CEO to oversee all the operational aspects involved in running the company, which include project planning and development delivery, retail and leasing, sales, market research and many other areas within their extensive scope.

    - Has overall responsibility for the company which involves engineering and controlling the company's current growth in and future expansion into international markets.

    - Has responsible for overseeing the raising of financial capital necessary for corporate operational needs to meet Company's objectives; and initiating and developing financial vehicles when necessary.

    - In addition, oversees all projects' development activities and related businesses of the company, generating significant financial returns for the shareholders and driving sustainable development.

Nothing herein shall require Contractor to work any set number of hours on behalf of Company, nor preclude Contractor from performing the same or similar services on behalf of other companies during the Term of this Agreement, provided the Contractor performs the Services on behalf of Company in a timely manner and is not placed in a conflict of interest with Company by performing the same or similar services on behalf of other companies.

7

SCHEDULE B

<u>Compensation</u>

In consideration of the Services provided by Contractor, Company shall pay Contractor the following base compensation and incentive compensation as hereinafter described.

In consideration for the services rendered to the Company hereunder by the Contractor, the Company shall, during the term of this Agreement pay the Contractor a total of Sixty Thousand Dollars ($60,000) USD per year (the *"Base Fee"*), which shall begin to accrue on the Effective Date but only payable to the Contractor, on a monthly basis in the amount of US$5,000, commencing on July 01, 2010. Any amount of Base Fee that has been accrued but not paid shall be paid, regardless of the Company's cash flow, not later than the earlier of June 30, 2011, or six (6) months after the Contractor's Agreement is terminated for any allowable reason as provided in this Agreement. For purposes of clarity, in no event shall Contractor's Base Fee be decreased pursuant to the preceding sentences.

<u>Common Stock Payment in Lieu of Cash.</u>

In the event the Board of Directors determines that the Company cannot afford to pay the Contractor any portion of the Base Fee, the Contractor may, at its sole option elect one of the following:

a)  Agree to defer receipt of his Base Fee until such time as the Company has the funds to pay the Contractor. In the event that Contractor elects this option, the unpaid Base Fee shall be paid with no interest as funds become available, or until such time the Contractor elects to convert accrued salary; or,

b)  Elect to convert all, or a portion of the unpaid Base Fee into Common Stock at a market value equal to $0.10 above the average closing trading price of the Common Stock for the preceding five (5) days of the date of such election. Upon election the certificates must be issued within five (5) business days, and the election cannot be revoked for any reason whatsoever without forfeiture of the unpaid salary.

http://www.sec.gov/Archives/edgar/data/1083848/000101968714000728/cancal_8k-ex100...   3/25/2014

EXHIBIT 3

EX-10.1 2 cancal_8k-ex1001.htm EMPLOYMENT AGREEMENT
Exhibit 10.1

## EMPLOYMENT AGREEMENT

This Employment Agreement *("Agreement')* is made on this 1st day of July 2010 (the *"Effective Date")* by and *between* **Can Cal Resources Ltd**, a corporation duly organized and existing under the laws of the State of Nevada (the *"Company")*, and G. Michael Hogan *("Executive")*.

### RECITALS

**WHEREAS**, the Company desires to hire Executive and Executive desires to become employed by the Company;

**WHEREAS**, the Company and Executive have determined that it is in their respective best interests to enter into this Agreement on the terms and conditions as set forth herein; and

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and promises contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.  *Nature of Agreement.*

    *1.1. Cancellation of Prior Offers.* Any and all prior oral understandings, offers, open obligations, and/or representations (if any) with respect to the employment of Executive are deemed to be superseded by this final written Agreement.

2.  *Employment Terms and Duties.*

    *2.1. Term of Employment.* The employment of Executive, and the term of this Agreement (the *"Employment Term")*, shall be commenced upon the Effective Date and shall continue for twelve (12) months, subject to automatic renewal for additional, successive one (1) month periods, unless either party provides written notice of its intent not to renew, not less than thirty (30) days prior to the proposed last date of employment and shall continue until otherwise terminated in accordance with Section 6 or Section 7.

    *2.2. Location.* Executive shall not be required to change his personal residence, but shall maintain an office at the location of the Company's principal executive offices as reasonably necessary to enable him to perform his duties.

    *2.3. Position and Primary Responsibility.*

    2.3.1. It is understood that Executive shall serve as (i) President and Chief Executive Officer of the Company.

    2.3.2. Executive, as Chief Operating Officer, shall report to the Company's Board of Directors and shall manage the operations and the implementation of the operating strategy of the Company.

1

2.3.3. Executive shall have all of the powers and duties of and Officer of the Company as prescribed by the Bylaws of the Company in effect on the date hereof; and, without limitation, shall have general supervision, direction and control of the business and affairs of the Company; and shall have power, subject to Board of Directors (the *"Board"*) approval, to legally bind the Company and its subsidiaries.

*2.4. Exclusivity.* Executive agrees to devote his full time, attention, energies, and to use his "best efforts" solely and exclusively in the performance of his duties under the terms of this Agreement. However, the expenditure of reasonable amounts of time for educational, charitable, or professional activities shall not be deemed a breach of this Agreement if those activities do not materially interfere with the services required under this Agreement, and shall not require the prior written consent of the Board. This Agreement shall not be interpreted to prohibit Executive from making passive personal investments or conducting private business affairs if those activities do not materially interfere with the services required under this Agreement and do not violate Sections 5, 9 and/or 11 of this Agreement.

3.   *Compensation.*

*3.1 Base Salary.* In consideration for the services rendered to the Company hereunder by Executive, the Company shall, during his employment, pay Executive a salary at the annual rate of One Hundred Twenty Thousand Dollars ($120,000) (the *"Base Salary"*), less statutory deductions and withholdings, which shall begin to accrue on the Effective Date but only payable to Executive, on a semi-monthly basis, commencing on July 1, 2010. Any amount of Base Salary that has been accrued but not paid shall be paid, regardless of the Company's cash flow, not later than the earlier of June 30, 2011, or six (6) months after the Executive's employment is terminated for any allowable reason as provided in this Agreement. For purposes of clarity, in no event shall Executive's Base Salary be decreased pursuant to the preceding sentences.

*3.2. Payment.* All compensation payable to Executive hereunder shall be subject to the Company's rules and regulations, and shall also be subject to all applicable state and federal employment law(s); it being understood that subject to applicable federal and state laws, Executive shall be responsible for the payment of all taxes resulting from a determination that any portion of the compensation and/or benefits paid/received hereunder is a taxable event to Executive; it being further understood that Executive shall hold the Company harmless from any governmental claim(s) for Executive's personal tax liabilities, including interest or penalties, arising from any failure by Executive to pay his individual taxes when due.

*3.2.1 Common Stock payment in lieu of cash.* In the event the Board of Directors determines that the Company cannot afford to pay the Executive any portion of his Base Salary, Executive may, at his sole option elect one of the following:

    a) Agree to defer receipt of his Base Salary until such time as the Company has the funds to pay him. In the event that Executive elects this option, the unpaid salary shall be paid with no interest as funds become available, or until such time Executive elects to convert accrued salary; or,

    b) Elect to convert all, or a portion of the unpaid salary into Common Stock at a market value equal to $0.10 above the average closing trading price of the Common Stock for the preceding five (5) days of the date of such election. Upon election the certificates must be issued within five (5) business days, and the election cannot be revoked for any reason whatsoever without forfeiture of the unpaid salary.

3.3 *Reimbursement of Expenses*. During the Employment Term, the Company shall be required to reimburse Executive for all reasonable and necessary expenses incurred by Executive, including travel expenses and other reasonable and customary expenses for up to Five thousand dollars ($5,000.00) per month connection with Executive's duties under this Agreement, without the prior majority approval of the Board. These expenses shall commence accruing to the Company upon the Effective Date.

3.4 *Cash Bonuses*. Executive shall have a bonus entitlement during each calendar year (or portion thereof) of the Employment Term (whether paid or accrued) for such year (or portion thereof), subject to the Board's performance review of the Executive and approval of the cash bonus. Within thirty (30) days of the Effective Date, the Company and Executive shall mutually concur, within their respective reasonable discretion, on the criteria and procedures applicable to establishment of Executive's entitlement to such amount for the then current calendar year; thereafter, within thirty (30) days prior to the commencement of each calendar year of the Employment Term, the Company and Executive shall mutually concur, within their respective reasonable discretion, on the criteria and procedures applicable to establishment of Executive's entitlement to such amount for the ensuing calendar year. Such criteria shall include, without limitation: (i) specified revenue targets for the Company during the applicable period; (ii) specified EBITDA targets for the Company during the applicable period (as defined pursuant to consensus between the Company and Executive); and (iii) such additional specified targets as the Company and Executive shall mutually determine. Any such cash bonuses shall be paid by the Company no later than March 15th of the taxable year commencing after the year in which the Executive's right to such payment becomes vested.

3.5 *Compensation Review*. It is understood and agreed that Executive's performance will be reviewed by the Board at the end of each calendar year during the Employment Term, and at such other times as the Board may determine to be appropriate, for the purpose of determining whether or not Executive's Base Salary and/or cash bonuses should be increased; it being further understood that the decision to increase Executive's compensation shall be at the sole and exclusive discretion of the Board. If the Executive's Base Salary is increased, the new amount shall become the Base Salary for all purposes of this Agreement. The Executive's Base Salary shall not be decreased.

4. **Benefits**.

4.1 *No Benefits Other Than Those Set Forth Herein*. Executive shall not be entitled to any benefits other than those set forth in this Section 4; provided that Executive shall be entitled to participate in any employee benefit plans or perquisites maintained by the Company on the same basis as other senior executives. It is understood that, excepting Section 4.3, all benefits provided in this Section 4 shall immediately terminate in the event of a Voluntary Termination or a Termination for Cause, as defined in Section 6.2 and Section 6.4, respectively.

3

*4.2 Vacation.* Executive shall be entitled to fifteen (15) days paid vacation per annum. Any unused vacation time may be carried forward to the following year, but must be used within such following year or be permanently forfeited.

*4.3 Indemnification.* The Company agrees to indemnify Executive to the fullest extent permitted by law and by the Company's Bylaws. The Company shall not amend its Bylaws to reduce the Company's ability to indemnify Executive after the Effective Date. The obligations of this Section 4.3 shall survive any termination of the Employment Term for any reason.

*4.4. Illness or Personal Leave.* Executive shall be entitled to five (5) days per year as sick leave or personal leave with full pay. Sick or personal leave may not be accumulated from year to year. In addition, the Company shall pay the cost of an annual physical examination for Executive.

*4.5 Paid Holidays.* Executive shall be entitled to a holiday on the following days, with full pay: New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, the Friday after Thanksgiving Day and Christmas Day with the exception that if the holiday falls on a weekend the holiday will be extended to the following Monday.

5.    *Confidential Information and Records.*

*5.1 Existing or Potential Conflict of Interest.* Executive represents that his employment with the Company under the terms of this Agreement will not conflict with any continuing duty(ies) or obligation(s) Executive has with any other person(s), firm(s) and/or entity(ies). Executive also represents that he has not brought to the Company (during the period before or after the Effective Date of this Agreement) any material(s) and/or document(s) of any former employer(s), or any confidential information or property belonging to other(s).

*5.2 Confidential Information.* Executive also represents that he will not disclose to any person(s) or entity/entities (other than to the Board, or to others as required in the performance of his duties) any confidential or secret information with respect to the business or affairs of the Company and/or its product(s).

*5.3 Corporate Related Records.* All records, files, documents, and the like, or abstracts, summaries, or copies thereof relating to the business of the Company which Executive shall prepare or use or come into contact with shall remain the sole property of the Company.

6.    *Termination.* Executive's employment and this Agreement (except as otherwise provided hereunder) shall terminate upon the occurrence of any of the following, at the time set forth therefor (the *"Termination Date"):*

*6.1 Death or Disability.* Immediately upon the death of Executive or six (6) months subsequent to a determination by the Company that Executive has ceased to be able to perform the essential functions of his duties, with or without reasonable accommodation, due to a mental or physical illness or incapacity *("Disability")* (termination pursuant to this Section 6.1 being referred to herein as termination for *"Death or Disability");*

4

*6.2 Voluntary Termination.* Thirty (30) days following Executive's written notice to the Company of voluntary termination of employment; provided, however, that the Company may waive all or a portion of the thirty (30) days' notice and accelerate the effective date of such termination (and the Termination Date) (termination pursuant to this Section 6.2 being referred to herein as *"Voluntary Termination"*).

*6.3 Resignation for Good Reason.* The date specified in a written notice given by the Executive to the Company that he is resigning for Good Reason, as hereinafter defined. For purposes of this Agreement, *"Good Reason"* shall mean (i) the Company's material breach of this Agreement not cured within thirty (30) days after written notice to the Company, or (ii) any of the following without the prior written consent of the Executive: the Company's adverse change in Executive's title from Chief Executive Officer or its equivalent or the Company's assignment of duties materially inconsistent with the Executive's executive duties. Termination pursuant to this Section 6.3 is referred to herein as "resignation for Good Reason." Resignation for Good Reason pursuant to this Section 6.3 shall be in addition to and without prejudice to any other right or remedy to which the Executive may be entitled at law, in equity, or under this Agreement.

*6.4 Termination For Cause.* The Company may terminate the Executive effective immediately following notice of Termination For Cause (as defined below), which notice shall specify such Cause (termination pursuant to this Section 6.4 being referred to herein as *"Termination For Cause"*). As used herein, Termination For Cause shall mean any of the following acts by the Executive or occurrences, and no others: (i) acts or omissions constituting willful misconduct on the part of the Executive with respect to Executive's obligations or otherwise relating to the business of the Company; (ii) Executive's breach of this Agreement that Executive has not cured within thirty (30) days after the Board has provided Executive written notice of such material breach; (iii) Executive's conviction or entry of a plea of nolo contendere for fraud, misappropriation or embezzlement, or any felony or crime of moral turpitude; and (iv) Executive's breach of fiduciary duty to the Company. For purposes of clause (i) of the definition, acts or omissions of Executive shall not be considered "willful" unless done or omitted by Executive (a) intentionally or not in good faith and (b) without reasonable belief that Executive's action or omission was in the best interests of the Company, and shall not include failure to act by reason of total or partial incapacity due to a physical or mental condition. Termination pursuant to this Section 6.4 shall be in addition to and without prejudice to any other right or remedy to which the Company may be entitled at law, in equity, or under this Agreement.

*6.5 Termination Without Cause.* Thirty (30) days following the Company's written notice during the initial twelve (12) month Employment Term, at any time for any reason or no reason, to the Executive of termination of the Executive's employment without Cause; provided, however, that the Executive may waive all or a portion of the thirty (30) days' notice and accelerate the effective date of such termination (and the Termination Date) (termination pursuant to this Section 6.5 being referred to herein as *"Termination Without Cause"*).

7. _Severance and Termination._

    _7.1 Voluntary Termination or Termination for Cause._ In the case of a termination of Executive by Voluntary Termination of employment hereunder, in accordance with Section 6.2 above, or a termination of Executive's employment hereunder through Termination For Cause in accordance with Section 6.4 above, Executive shall not be entitled to receive payment of, and the Company shall have no obligation to pay, any severance or similar compensation attributable to such termination, other than Base Salary earned but unpaid (including any amount that has been accrued pending the completion of financings pursuant to Section 3.1), accrued but unused vacation to the extent required by the Company's policies, any non-reimbursed expenses incurred by Executive as of the Termination Date that were not approved by the Board, or any amounts payable upon termination of employment under any employee benefit plan of the Company. Any expenses that are approved by the Board or are incurred in accordance with Section 3.3 shall be paid in cash in a lump sum not later than thirty (30) days after the Termination Date, except as otherwise provided in any employee benefit plan.

    _7.2 Termination for Death or Disability._ In the case of a termination of employment for Death or Disability in accordance with Section 6.1 above, the Executive (or a representative of his estate), shall receive (i) accrued but unused vacation to the extent required by the Company's policies, (ii) any non-reimbursed expenses incurred by Executive as of the Termination Date that were approved by the Board, (iii) any amounts payable upon termination of employment under any employee benefit plan of the Company, (iv) payment by the Company of any lease termination costs and expenses attendant to any residence leased by Executive pursuant to Section 2.2 (the _"Accrued Obligations"_). Accrued Obligations shall be payable in cash in a lump sum not later than thirty (30) days after the Termination Date, except as otherwise provided in any employee benefit plan. In addition, Executive shall receive an amount equal to Executive's target annual bonus for the year in which the Termination Date occurs prorated on a daily basis to the Termination Date, which shall be paid in cash within thirty (30) days of the Termination Date and all shares of Incentive Stock not yet vested shall vest in full on the Termination Date.

    _7.3 Termination Without Cause or Resignation for Good Reason._ In the case of a termination of Executive's employment hereunder without Cause pursuant to Section 6.5, or resignation for Good Reason pursuant to Section 6.3, Executive shall receive (i) the Accrued Obligations, (ii) plus the target bonus prorated to the Termination Date for the year in which the Termination Date occurs, which shall be paid in cash within thirty (30) days of the Termination Date.

    _7.4 Compliance with Code Section 409A._ To the extent required by Section 409A of the Internal Revenue Code, any amount that would otherwise be payable within six months following Executive's termination of employment shall be paid instead on the date that is six months following his termination of employment, with interest from the date on which such amount would otherwise have been paid at the prime rate of interest published in the Wall Street Journal from time to time.

8. _Release of Claims._

    _8.1_ Upon a termination of employment, other than a Termination for Cause, the Company and the Executive shall execute mutual releases of all claims against each other, except for claims for any violation of law, in a form reasonably satisfactory to both parties.

9.   *Non-competition, Non-solicitation.*

9.1 *Non-Competition.* As a stipulated condition of employment, Executive agrees that he shall not, during the Employment Term and for twelve (12) months subsequent thereto, without both the disclosure to and the written approval of the Board of the Company, directly or indirectly, engage or be interested in (whether as a principal, lender, employee, officer, director, partner, venturer, consultant or otherwise) any business(es) that is competitive with the business of the Company or any company affiliated with the Company.

9.2 *Direct Interests.* Executive also represents that during the term of this Agreement, he will promptly disclose to the Board of the Company, complete information concerning any direct or indirect interest that he holds, if any, in any business which provides service(s) and/or product(s) to the Company (whether as a principal, stockholder, lender, employee, Director, Officer, partner, venturer, consultant or otherwise).

9.3 *Non-Solicitation.* Executive agrees that he will not, for a period of twelve (12) months following the Termination Date, contact or solicit orders, sales or business from any customer of the Company.

10.   *Inventions, Discoveries and Improvements.*

Any and all invention(s), discovery(ies) and improvement(s), whether protectable or unprotectable by Patent, trademark, copyright or trade secret, made, devised, or discovered by Executive, whether by Executive alone or jointly with others, from the time of entering the Company's employ until the earlier of the Termination Date of this Agreement or the actual date of termination of employment, relating or pertaining in any way to Executive's employment with the Company, shall be promptly disclosed in writing to the Board of the Company, and become and remain the sole and exclusive property of the Company. Executive agrees to execute any assignments to the Company, or its nominee, of the Executive's entire right, title, and interest in and to any such inventions, discoveries and improvements and to execute any other instruments and documents requisite or desirable in applying for and obtaining Patents, trademarks or copyrights at the cost of the Company, with respect thereto in the United States and in all foreign countries, that may be requested by the Company. Executive further agrees, whether or not then in the employment of the Company, to cooperate to the fullest extent and in the manner that may be reasonably requested by the Company in the prosecution and/or defense of any suit(s) involving claim(s) of infringement and/or misappropriation of proprietary rights relevant to Patent(s), trademark(s), copyright(s), trade secret(s), processes, and/or discoveries involving the Company's product(s); it being understood that all reasonable costs and expenses thereof shall be paid by the Company. The Company shall have the sole right to determine the treatment of disclosures received from Executive, including the right to keep the same as a trade secret, to use and disclose the same without a prior Patent Application, to file and prosecute United States and foreign Patent Application(s) thereon, or to follow any other procedure which the Company may deem appropriate. In accordance with this provision, Executive understands and is hereby further notified that this Agreement does not apply to an invention which the employee developed entirely on his own time without using the Company's equipment, supplies, facilities, or trade secret information.

7

11. *Proprietary Information and Trade Secrets.*

*11.1 Confidential Company Property.* Executive hereby acknowledges that all trade, engineering, production, and technical data, information or "know-how" including, but not limited to, customer lists, sales and marketing techniques, vendor names, purchasing information, processes, methods, investigations, ideas, equipment, tools, programs, costs, product profitability, plans, specifications, Patent Application(s), drawings, blueprints, sketches, layouts, formulas, inventions, processes and data, whether or not reduced to writing, used in the development and manufacture of the Company's products and/or the performance of services, or in research or development, are the exclusive secret and confidential property of the Company, and shall be at all times, whether after the Effective Date or after the Termination Date, be kept strictly confidential and secret by Executive.

*11.2 Return of Property.* Executive agrees not to remove from the Company's office or copy any of the Company's confidential information, trade secrets, books, records, documents or customer or supplier lists, or any copies of such documents, without the express written permission of the Board of the Company. Executive agrees, at the Termination Date, to return any property belonging to the Company, including, but not limited to, any and all records, notes, drawings, specifications, programs, data and other materials (or copies thereof) pertaining to the Company's businesses or its product(s) and service(s), generated or received by Executive during the course of his employment with the Company.

*11.3 Non-Disclosure.* Executive represents and agrees that during the term of this Agreement, and after the Termination Date, he will not report, publish, disclose, use, or transfer to any person(s) or entity(ies) any property or information belonging to the Company without first having obtained the prior express written consent of the Company to do so; it being understood, however, that information which was publicly known, or which is in the public domain, or which is generally known, shall not be subject to this restriction.

12. *Information of Others.*

Executive agrees that the Company does not desire to acquire from Executive any secret or confidential information or "know-how" of others. Executive, therefore, specifically represents to the Company that he will not bring to the Company any materials, documents, or writings containing any such information. Executive represents and warrants that from the Effective Date of this Agreement he is free to divulge to the Company, without any obligation to, or violation of, the rights of others, information, practices and/or techniques which Executive will describe, demonstrate or divulge or in any other manner make known to the Company during Executive's performance of services. Executive also agrees to indemnify and hold the Company harmless from and against any and all liabilities, losses, costs, expenses, damages, claims or demands for any violation of the rights of others as it relates to Executive's misappropriation of secrets, confidential information, or "know-how" of others.

13. *Notice.*

All notices and other communications under this Agreement shall be in writing and shall be delivered personally or mailed by registered or certified mail, return receipt requested, and shall be deemed given when so delivered or mailed, to a party at his or its address as follows (or at such other address as a party may designate by notice given hereunder):

8

| If to Executive: | G. Michael Hogan<br>8205 Aqua Spray Avenue<br>Las Vegas, NV 89128 |
| --- | --- |
| With a copy to: | G. Michael Hogan<br>30 Allangrove Crescent<br>Toronto, Ontario, Canada M1W 1S5 |
| If to the Company: | CAN-CAL RESOURCES LTD.<br>8205 Aqua Spray Avenue<br>Las Vegas, NV, 89128 |
| With a copy to: | Christine C. Donovan<br>Can-Cal Resources Ltd.<br>8205 Aqua Spray Avenue<br>Las Vegas, NV 89128 |

14. *Resolution of Disputes.*

Any controversy between the Company and Executive arising out of or relating to any of the terms, provisions or conditions of this Agreement shall first be attempted to be resolved informally between the parties. In the even the parties are not able to resolve the controversy informally within 10 days; the matter shall be mediated, with each party appointing a mediator for said purpose. K within 20 days of the appointment of mediators the parties continue to be unable resolve their controversy, the matter shall be submitted to arbitration in accordance with the American Arbitration Association's National Arbitration Rules for the Resolution of Employment Disputes. Only a person who is a practicing lawyer admitted to a state bar may serve as the arbitrator. On the written request of either party for arbitration of such a claim pursuant to this paragraph, the Company and Executive shall both be deemed to have waived the right to litigate the claim in any federal or state court. The expenses of arbitration and reimbursement of a prevailing party's reasonable legal *fees* and expenses shall be as determined by the arbitrator in the arbitrator's sole discretion. Any result reached by the arbitrator shall be binding on all parties to the arbitration, and no appeal may be taken. It is agreed that any party to any award rendered in such arbitration proceeding may seek a judgment upon the award and that judgment may be entered thereon by any court having jurisdiction. The arbitration shall be conducted at either the Executive's principal place of residence or the Company's principal place of business, or at such other location as the parties may mutually agree. The parties agree that the required attempts at informal resolution and mediation shall constitute mandatory conditions precedent to application of the arbitration provisions set forth herein.

9

15. *Miscellaneous.*

   *15.1. Post Termination Obligations.* Notwithstanding the termination of Executive's employment hereunder, the provision(s) of Section(s) 4.3, 5, 9, 10, 11, and 14 shall survive the Termination Date.

   *15.2. No Assignment.* This Agreement shall not be assignable. Further, Executive understands and agrees that this Agreement is exclusive and personal to him only, and, as such, he will neither assign nor subcontract all or part of his undertaking(s) or obligation(s) under the terms of this Agreement.

   *15.3. Entire Agreement.* Each party acknowledges that this Agreement constitutes the entire understanding between them, and that there are no other written or verbal agreement(s) or understanding(s) between them other than those set forth herein; it being understood that no amendment(s) to this Agreement shall be effective unless reduced to writing and signed by each party hereto.

   *15.4. Severability.* In the event that any provision of this Agreement shall be determined to be unenforceable or otherwise invalid, the balance of the provision(s) shall be deemed to be enforceable and valid; it being understood that all provision(s) of this Agreement are deemed to be severable, so that unenforceability or invalidity of any single provision will not affect the remaining provision(s).

   *15.5. Headings.* The Section(s) and paragraph heading(s) in this Agreement are deemed to be for convenience only, and shall not be deemed to alter or affect any provision herein.

   *15.6. Interpretation of Agreement.* This Agreement shall be interpreted in accordance plain meaning of its terms and under the laws of the State of Nevada.

   *15.7. Variation.* Any changes in the Sections relating to salary, bonus, or other material condition(s) after the Effective Date of this Agreement shall not be deemed to constitute a new Agreement. All unchanged terms are to remain in force and effect.

   *15.8. Unenforceability.* The unenforceability or invalidity of any provision(s) of this Agreement shall not affect the enforceability and/or the validity of the remaining provision(s).

   *15.9. Collateral Documents.* Each party hereto shall make, execute and deliver such other instrument(s) or document(s) as may be reasonably required in order to effectuate the purposes of this Agreement.

   *15.10. Non-Impairment.* This Agreement may not be amended or supplemented at any time unless reduced to a writing executed by each party hereto. No amendment, supplement or termination of this Agreement shall affect or impair any of the rights or obligations which may have matured there under.

   *15.11. Execution.* This Agreement may be executed in one or more counterpart(s), and each executed counterpart(s) shall be considered by the parties as an original. This Agreement may be executed via facsimile.

10

*15.12. Legal Counsel.* Executive represents to the Company that he has retained legal counsel of his own choosing, or was given sufficient opportunity to obtain legal counsel prior to executing this Agreement. Executive also represents that he has read each provision of this Agreement and understands its meaning.

*15.13. Transition.* In the event that Executive's employment with the Company terminates, Executive shall, through the last day of employment, and at the Company's request, use Executive's reasonable best efforts (at the Company's expense) to assist the Company in transitioning Executive's duties and responsibility responsibilities to Executive's successor and maintaining the Company's professional relationship with all customers, suppliers, etc. Without limiting the generality of the foregoing, Executive shall cooperate and assist the Company, at the Company's direction and instruction, during the transition period between any receipt of or giving of notice of the termination of employment and the final day of employment.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals this 1st day of July, 2010.

CAN-CAL RESOURCES, LTD.

By: /s/ William J. Hogan
William J. Hogan
Its: Chairman of the Board

EXECUTIVE

/s/ G. Michael Hogan
By: G. Michael Hogan

---

11

EXHIBIT 4

Incorporation date is April 3, 2013

# Review Legal Entity History

## 2017397346, CANDEO LAVA PRODUCTS INC.

### Service Request Summary

| Service Request Number | Transaction Type | Creation Date | Activity Status |
|---|---|---|---|
| 19488705 | Incorporate Alberta Corporation | 2013/04/03 | Complete |

EXHIBIT 5



**DAVIS** LLP

LEGAL ADVISORS SINCE 1892

| FROM THE OFFICE OF | Roy H. Hudson |
|---|---|
| DIRECT LINE | 403.698.8708 |
| DIRECT FAX | 403.213.4464 |
| E-MAIL | rhudson@davis.ca |

FILE NUMBER     73707-00002

April 2, 2013

DELIVERED BY E-MAIL

PRIVILEGED AND CONFIDENTIAL

Can-Cal Resources Ltd.
Suite 650, 1414 – 8th Street S.W.
Calgary, AB  T2R 1J6

Attention:  G. Michael Hogan

Dear Mr. Hogan:

Re:    Our Engagement

1.      Scope of Our Engagement

You have retained us as to act as Canadian counsel for Can-Cal Resources Ltd.

We will provide the legal services which in our professional judgment are reasonably necessary and appropriate to carry out our engagement. We confirm that we are not providing legal services except as described above and upon completion of the engagement, we will close our file, and unless specifically retained in writing to do so, will not monitor or advise you of subsequent legal developments relating to this matter. In particular, we are not providing any tax advice or considering taxation issues applicable to you in connection with the legal services we provide, except to the extent you specially request we provide such advice or consider such issues.

2.      The Client

We will be representing Can-Cal Resources Ltd. ("you") in this matter.

Except as noted above, our representation of you does not include the representation of related persons or entities, such as the individuals or entities that are shareholders, directors or officers of a corporation, its parent, subsidiaries or affiliates; partners of a partnership or joint venture; or members of a trade association or other organization. In acting for you, we are not acting for or taking on any responsibilities, obligations or duties to any such related persons or entities and no lawyer-client or other fiduciary relationship exists between us and any such related persons or entities.

# DAVIS LLP

3.    Responsible Lawyer and Staffing

Your primary contact with Davis LLP will be Roy Hudson whom we refer to as the "responsible lawyer" who will provide or supervise the provision of legal services and report to you.  Other lawyers in the Firm, as well as legal assistants and articling students, may be asked to assist to ensure that services are provided at appropriate levels of expertise and cost effectiveness.

4.    Instructions

We will accept instructions for this engagement from you and/or such other person(s) as the you may advise.

5.    Confidentiality and Conflicts

We will at all times protect your confidential information, subject only to applicable law and our professional and ethical obligations.

Because we owe this duty to all our clients, we can not disclose to you information we hold in confidence from others (even if relevant to our representation of you) or disclose to others information we hold in confidence for you (even if relevant to our representation of those others).

While you are a client, we will not to take on any matter that would create a substantial risk that our representation of you on this matter would be materially and adversely affected (a "conflicting interest").

We do not normally consider ourselves to have a conflicting interest because we represent another client who is a business competitor, customer or supplier of yours; or is asserting through us legal positions or arguments that may be inconsistent with those you are asserting or may wish to assert; or is adverse in interest in another matter to an entity with which you have a relationship through ownership, contract or otherwise.  Unless you have asked us to perform a search against particular entities described in one of the above categories, our conflict search will not identify any issues arising from our representation of them.

We are not aware of any current matters where we act on behalf of other clients which create a conflicting interest.  If we learn, while we are representing you, that we are engaged in a matter which creates a conflicting interest, we may ask for your agreement to our continuing to act on terms satisfactory to all concerned but we will not accept a new engagement where that is the case without first obtaining your informed consent.

6.    Termination

You may terminate your engagement of us for any reason prior to the completion of this engagement by giving us written notice to that effect.   We will assist in transitioning uncompleted work to the counsel selected by you.  Such termination will not affect your obligation to pay for legal services and expenses incurred up to the time of, or resulting from, such termination. Subject to our professional and ethical obligations, we may terminate our legal

# DAVIS LLP

representation of you prior to the completion of this engagement for any reason including as a result of conflicts of interest that arise, unpaid legal fees and costs, or your failure to increase the retainer by the date specified. If the termination of our legal representation necessitates our withdrawal as your counsel of record in a Court proceeding, you irrevocably consent to our withdrawal in such circumstances.

Unless our engagement has been previously terminated, our representation of you will cease upon receipt by you of our final account for services rendered. If, upon termination or completion of this engagement, you wish to have any documentation returned to you, please advise us. Otherwise, any documentation that you have provided to us and the work product completed for you will be dealt with in accordance with our records retention policies and practices. Please note that our records retention policies and practices may not be synchronized with yours. If you have any concerns about what we retain in our records or dispose of, you must alert us to your concern. Absent written agreement with you to the contrary, we are free to retain or destroy the records we possess with respect to this engagement as we determine to be appropriate.

The fact that we may subsequently send you information on legal developments without charge or that we may include you in general mailings will not change the fact that our engagement has been terminated.

When you are no longer a client, under applicable professional rules we may represent another client in a matter adverse to your interests if the other matter is unrelated and we protect your confidential information. You acknowledge that the timely establishment of a conflict screen will be sufficient protection of the confidentiality of such information.

7.     Electronic Communications

During the course of our engagement, we may exchange electronic versions of documents and e-mails with you using commercially available software. Unfortunately, the available technology is vulnerable to attack by viruses and other destructive electronic programs. As a result, while we have sought to take countermeasures, our system may occasionally reject a communication you send to us, or we may send you something that is rejected by your system. Accordingly, we cannot guarantee that all communications and documents will always be received, or that such communications and documents will always be virus free, and we make no warranty with respect to any electronic communications between us. In addition, we make no warranty with respect to the security of any electronic communication between us and you consent to our exchange of electronic communications, including confidential documents, unencrypted.

8.     Legal Fees

Our fees are based on our assessment of the reasonable value of our services. To assist us in determining that value, we assign hourly billing rates to each of our lawyers and legal assistants, and record the time spent (in increments of one-tenth of an hour) and services rendered by each of them on the matter.

# DAVIS LLP

Currently, the hourly billing rates for the lawyers who will be involved in this matter are:

| | |
|---|---|
| Roy Hudson | $500 per hour |
| Catherine Kay | $350 per hour |

It may be necessary to involve other lawyers, articling students and legal assistants to work on this matter, in which case their time will also be recorded and billed at their current hourly rates.

Our rates may change to reflect increases in our costs, the increased experience and abilities of our lawyers and legal assistants and other factors. If our rates change before this matter has been completed, the new rates will apply to the balance of the engagement.

We are not requesting a retainer at this time but reserve the right to do so. The retainer is not an estimate of our anticipated fees and costs and nor is it intended to be applied to our interim invoices as they are rendered. The retainer, including any interest earned, will be held as security for the timely payment of our interim invoices, and ultimately applied to payment of our final invoice. If any interim invoice is unpaid after 30 days, you irrevocably authorize us to apply the retainer to payment of such invoice. We reserve the right to require an increase in the retainer before any period of significant activity to an amount sufficient, in our sole discretion, to secure the anticipated amount of our fees and costs in respect of such period.

9.    Costs

In addition to legal fees, the costs that we incur in connection with this matter will be billed to you. Costs typically include long distance telephone charges, messenger and express delivery charges, postage and courier charges, computer research charges, word-processing charges, printing and reproduction costs, overtime costs for administrative staff, facsimile transmission costs, travel expenses, filing charges, court reporter fees for examinations and transcripts, witness fees, fees for service of legal process and other costs and expenses. Costs also include any applicable taxes.

Where we obtain these services directly from outside suppliers, we bill you the amount billed to us. Where the amounts charged for these services are significant, we may forward the invoices from these outside suppliers directly to you, in which case, you will be responsible to pay the invoices, in accordance with their terms, directly to the outside supplier.

It may be necessary for us to engage outside experts, such as accountants, economists, appraisers or investigators to assist in this matter. We will consult with you before retaining any experts. It may also be necessary for us to retain lawyers and others as agents in other jurisdictions. Fees for outside experts and agents in other jurisdictions are not included in our legal fees. Ordinarily, you will be asked to pay the invoices, in accordance with their terms, directly to these parties.

# DAVIS LLP

10.     Payment

Our invoice for fees and costs will be sent to you monthly and at the closing of the file and are payable on receipt/at closing. Interest is charged on amounts outstanding greater than 30 days at an annual rate set by us from time to time which will be shown on each invoice. Each invoice will provide a detailed summary of the services provided. You will appreciate that our continued work on this matter is contingent on the timely payment of our invoices and the honouring of the financial retainer arrangement. Time shall be of the essence and if any invoice is unpaid after 30 days, or if you fail to increase the retainer upon request by the date specified, we reserve the right, in our sole discretion, to take one or more of the following actions. We may cease providing legal services until such time as financial terms satisfactory to Davis LLP are agreed upon, terminate any or all engagements with you, withdraw as counsel of record in any Court proceeding in which we may be acting for you, or commence legal proceedings to recover any unpaid invoices and you irrevocably agree to pay the actual legal fees and costs on a solicitor and own client basis incurred by us in taking such proceedings.

If you have requested electronic invoices either by direct e-billing to a program of yours, or by e-mail, we will endeavour to comply to the extent permitted by the applicable regulatory body, and where such regulatory body requires a lawyer's signature in connection with such invoices, you consent to such signature being provided electronically or digitally.

11.     Trust Accounts

We maintain trust accounts for all clients' funds which come into our hands. The funds are deposited in a common trust account the interest on which is remitted by the financial institution to non-profit foundations established under legislation in the jurisdictions in which we practice. The rules for the maintenance of trust accounts, including the use of a common trust account are prescribed by the law societies of the jurisdictions in which we practice. An itemization and accounting will be carefully maintained for all trust account transactions.

The trust accounts we maintain in Canadian chartered banks are insured to a fixed limit by the Canada Deposit Insurance Corporation which does not insure trust deposits in foreign currencies (including US dollars). To the extent your deposits with us are in a foreign currency, you consent to those funds being held in a trust account that is not insured.

12.     Personal Information Requirements

We will collect and disclose personal information about you to the extent required to provide legal services to you and to comply with applicable laws, regulations, and professional rules of conduct, including "know your client" rules imposed by Law Societies throughout Canada which require us to obtain and keep certain information about clients and persons instructing us, and to verify that information with government issued documents when engaged for a financial transaction. Our collection, use and disclosure of personal information is subject to our professional duties of confidentiality and our privacy policy which is available on our website (www.davis.ca).

# DAVIS LLP

13.    Further Engagements

These terms of engagement will apply to all future legal services provided by us whether arising from the current engagement or in respect of new matters unless other terms are agreed upon and confirmed in writing.

14.    Governing Law and Attornment

The terms of our engagement with you is governed by the laws of Alberta and the federal laws of Canada. Any dispute between us will be dealt with exclusively in the courts of that province and you agree to attorn to the jurisdiction of such courts.

This letter of agreement has been drafted in English at the express request of the parties. Cette lettre d'entente a eté rédigee en anglais à la demande expresse des parties.

Please confirm the terms of our engagement by signing the enclosed duplicate copy and returning it to my attention.

Again we thank you for selecting Davis LLP to provide legal services to you.

Yours truly,
**DAVIS LLP**
Per:

Roy H. Hudson
RHH/ayr

The terms above are agreed and accepted

By: _____    Date: _____

Name: G. Michael Hogan

Title: _____

Davis: 13000090.1

EXHIBIT 6

## MATERIAL SUPPLY AGREEMENT

THIS MATERIAL SUPPLY AGREEMENT (hereinafter the "Material Supply Agreement") is made and entered into as of this 5th day of April, 2013, by and between Can Cal Resources, Ltd., a Nevada corporation, as supplier (hereinafter referred to as "Can-Cal" or "Supplier") and Candeo Lava Products Inc., an Alberta corporation, as customer, (hereinafter referred to as "Candeo" or "Customer").

### WITNESSETH:

WHEREAS, Can-Cal is the owner of that certain property situated 45 miles east of the city of Barstow, CA, containing 120 acres, more or less, which property, including all Finished Material (as defined herein) situated therein, thereon and thereunder and all improvements thereon and appurtenances thereto, is hereinafter referred to as the "Property" and is more fully described on Exhibit A, attached hereto;

WHEREAS, Candeo desires to enter this Material Supply Agreement for the supply of certain volcanic lava or cinders on the Property that has been previously crushed and stockpiled (the "Finished Material") from Can-Cal;

NOW, THEREFORE, in consideration of ten dollars ($10.00) in hand paid to Can-Cal, the receipt and sufficiency of which are hereby acknowledged, and further in consideration of the covenants hereinafter set forth, Can-Cal and Candeo agree as follows:

1.    REMOVAL OF FINISHED MATERIAL. Supplier does hereby agree to allow Candeo to remove the Finished Material during the Term and upon the covenants and conditions set forth in this Material Supply Agreement for the purposes of subsequent sale by Candeo for use in earth mineralization, both organic and inorganic, for rural and urban distribution in various industry sectors, including but not limited to construction, landscaping, gardening, lawns and fields, agriculture and other uses to be determined by Candeo in accordance with market demand. Notwithstanding the foregoing, Candeo agrees that it shall not attempt to extract or cause to have extracted precious metals from the Finished Material or otherwise receive compensation, directly or indirectly, from the sale or use of the Finished Material for precious metal purposes. The parties agree that the anticipated removal of the Finished Material will not commence until the second year of the initial Term. Candeo hereby agrees that it will provide three (3) months prior written notice to Supplier of the commencement of the operations on the Property, which notice will state the anticipated amount of Finished Material to be removed, the period of time during which the removal will occur and the means that will be used to effect such removal.

2.    DEFINITIONS. The following words and terms wherever used in this Material Supply Agreement are defined as follows:

"Environmental Laws" means all federal, state, county, territorial, regional, municipal and local laws, statutes, ordinances, codes, rules and regulations related to protection of the environment or the handling, use, generation, treatment, storage, transportation or disposal of Hazardous Materials.

"Hazardous Materials" means any hazardous or toxic substance, material or waste that is regulated by any federal, state, county, territorial, regional, municipal or local governmental authority under any Environmental Law now or hereafter effective, including, without limitation, any waste, pollutant, hazardous substance, toxic substance, hazardous waste, special waste, petroleum or petroleum-derived substance or waste, or any constituent of any such substance or waste.

"Net Sales Margins" means the actual gross sale revenue of Finished Material made by Candeo to third party purchasers less (a) all direct costs, fees and expenses of such sales, (b) all sales, use, and other similar taxes paid or payable in connection with the particular transaction involved and not reimbursed or reimbursable by the purchaser, and (c) amounts credited or refunded to the purchaser for returned or defective goods.

"Term" shall mean the initial term of this Material Supply Agreement and any extension and renewal thereof.

3.   RIGHTS OF CUSTOMER. Can-Cal grants unto Candeo the following rights and privileges with respect to the Finished Material:

(a) The exclusive right and privilege during the Term to remove the initial amount (the "Initial Amount") of up to 1,000,000 tons of the Finished Material from the Property, in such manner as Candeo, in its sole discretion but in compliance with all Environmental Laws, deems advisable;

(b) Provided that Candeo has removed the Initial Amount, the exclusive right and privilege during the Term to remove an additional amount (the "Additional Amount") of 1,000,000 tons of the Finished Material from the Property, in such manner as Candeo, in its sole discretion but in compliance with all Environmental Laws, deems advisable;

(c) The non-exclusive right to use and affect the surface of the Property, as may be necessary or incidental to the exercise of the rights herein granted;

(d) The non-exclusive right, to construct, assemble, erect, use, maintain, improve, repair, replace, rebuild, remove and relocate in or upon the Property such machinery, equipment, and such other improvements and services, including roads, inclines, drifts, entry ways, or conveyors, as may be necessary or incidental to the removal of the Finished Material and the subsequent sale of the Finished Material;

(e) The non-exclusive right to use, subject to applicable laws, rules and regulations and in compliance with all Environmental Laws, any surface or ground water situated within or upon the Property in connection with Candeo's operations hereunder; provided, however, that Candeo shall not take water from Supplier's existing wells, tanks or surface reservoirs without the written consent of Supplier, which consent shall not be unreasonably withheld;

(f) The non-exclusive right, to be exercised in connection with Candeo's operations hereunder, to cut and use timber situated upon the Property, subject to the provisions of Paragraph 5 below; and

(g) All other rights and privileges which are necessary to Candeo in the exercise of any or all of the rights hereinabove set forth which are not in conflict with Supplier's rights under this

Material Supply Agreement or with applicable state, federal or local laws, ordinances and regulations including, without limitation, all Environmental Laws.

4.  TERM.  The Term of this Material Supply Agreement shall commence on the date of this Material Supply Agreement, as first set forth above and shall, subject to Candeo's right to terminate as set forth in Paragraph 16 below, and to Supplier's right to terminate as set forth in Paragraph 17 below, continue for an initial period of ten (10) years from said date, unless extended pursuant to the terms hereof.  The Customer shall have the option to extend the Term of this Material Supply Agreement for [up to three (3)] additional five (5) year periods exercisable at any time with no less than three (3) months written notice prior to the expiry of the then current term, provided that the Customer is not in default under any of the provisions of this Material Supply Agreement and that the whole of the Initial Amount and the Additional Amount of Finished Material have been completely removed from the Property. `

5.  DAMAGES.  Candeo shall pay Supplier reasonable compensation for any damages to fences, existing structures or other tangible improvements, timber, crops or livestock resulting from Candeo's removal of the Finished Material, but Candeo shall not be liable for consequential, special or incidental damages such as, but not limited to, loss of opportunity or loss of future profits.

6.  PRODUCTION PAYMENT.  The purchase price that Candeo shall pay to Supplier per ton of the Finished Material ("Production Payment"), in accordance with Paragraph 8 hereof, shall be equal to the greater of:

(i) 33 $^{1/3}$% of the Net Sales Margins; and

(ii) Fifteen US dollars (US$15.00).

7.  PRE-PURCHASE OF FINISHED MATERIAL.  Candeo will purchase thirteen thousand, three hundred and thirty-five (13,335) tons (the "Pre-Purchased Finished Material") of the Finished Material during the first year of the Term at a purchase price of fifteen US dollars (US$15.00) per ton, for a total payment of two hundred and twenty-five thousand US dollars (US$225,000) (the "Pre-Purchased Payment"). The Pre-Purchased Finished Material will remain on the Property until Candeo commences its production operations, which will be subject to all necessary regulatory and other approvals required to remove the Finished Material from the Property, such as permits, certified weigh scale, productions plan, environmental reclamation plan (if applicable) and insurance all of which shall be the responsibility and at the sole cost of Candeo.  The Pre-Purchased Payment will not be refundable to Candeo but shall be credited against the first Production Payment.

8.  BOOKS AND RECORDS: INSPECTION

(a) Candeo shall keep books and records necessary to document the quantity of the Finished Material removed from the Property and the Net Sales Margins.

(b) Candeo shall install and maintain a bucket scale or truck scale to weigh all Finished Material removed immediately prior to its removal from the Property.   Candeo shall weigh all Finished Material removed  from the Property by use of such bucket scale or truck scale to determine and record the weight of all Finished Material that has been removed from the

Property.  Scale tickets or other automatic means shall be used to record the weight of all such Finished Material.

(c) For the purpose of permitting verification by Supplier of any amounts due hereunder, Customer will keep and preserve supporting documentation and records which shall disclose in reasonable detail all information required to permit Supplier to verify the Production Payment calculations under this Material Supply Agreement.  Upon reasonable advance notice to Customer, Supplier or its agents shall have the right, during Customer's regular business hours, to examine or audit such supporting documentation and records. Customer shall retain such supporting documentation and records for a period of one (1) year following the termination or expiration of this Material Supply Agreement.

(d) On or before the 25th day of the month following commencement of operations by the Customer and for each full month of this Material Supply Agreement, Customer shall forward to Supplier, at the address herein given or at such other place or places as Supplier shall from time to time designate in writing, monthly reports indicating thereof the quantity of Finished Material removed from the Property during the previous month, the Net Sales Margins, as well as a computation of the Production Payment due thereon, and payment of such amount.

(e) In the event that Supplier and Candeo cannot agree as to the accuracy of the calculation of the Production Payment, then either party may refer the matter to arbitration under Paragraph 19 hereof.

9.  PERFORMANCE OBLIGATIONS

(a) Operations and Reclamation.  Candeo shall conduct its operations on the Property in a careful and workmanlike manner and in compliance with all applicable laws, ordinances and regulations of all governmental authorities having jurisdiction over the Property or Candeo's operations including, without limitation, all Environmental Laws.

(b) Pledge Not to Compete.  Candeo and Cal-Cal shall not, and each shall cause its affiliates and associates to not, conduct its business in a manner which is in competition with the other parties business.

10. TAXES AND UTILITIES.

(a) Customer shall pay prior to delinquency all personal property taxes applicable to Customer's personal property, fixtures, furnishing and equipment located on the Property, as well as all production or severance taxes computed or based upon removal by Customer of Finished Material from the Property.  If Customer shall in good faith desire to contest the validity or amount of any tax, assessment, levy, or other governmental charge herein agreed to be paid by Customer, Customer shall be permitted to do so, and to defer payment of such tax or charge, until final determination of the contest.  If the outcome of such contest is unfavorable to Customer, Customer shall immediately pay all taxes, charges, interest and penalties determined to be due.

(b) Customer agrees to pay all expenses for heat, electricity, lighting, telephone, waste management fees and charges for water assessed against the Property, arising from Customer's activities thereon, at such time as said charges become due.

Davis: 13555291.1

11. PERMITS.

(a) Customer shall use its good faith efforts to cause all permits associated with its operations on the Property to be issued in the names of Customer and Supplier provided, however, that the parties agree and acknowledge that such permit obligations are only applicable for activities associated with the removal and sale of Finished Material. Customer shall pay for any fees or costs associated with obtaining and maintaining such permits.

(b) In the event that Customer's permits are terminated or not renewed as a result of Supplier's actions, Customer may, in its sole discretion, either (i) terminate this Material Supply Agreement with no further obligations hereunder; or (ii) suspend the Term of this Material Supply Agreement until Customer reinstates such permits, up to a maximum period of two (2) years. In the event Customer's permits are not reinstated prior to the expiration of such two (2) year period, or in the event Customer notifies Supplier that it has abandoned its efforts to reinstate such permits, this Material Supply Agreement shall terminate, and Customer shall have no further obligations hereunder. In the event that Customer reinstates such permits within such two (2) year period, the applicable Term of this Material Supply Agreement shall be extended for the period of suspension.

12. SUPPLIER'S RESERVED RIGHTS

(a) The rights of Customer granted hereby shall be subject to Supplier's reserved concurrent right to use the Property for the purpose of exploration, development and mining and the use of any surface or underground water or water rights occurring on or appurtenant to the Property; so long as Supplier's use does not interfere with the rights granted Customer herein. Customer shall be entitled to reasonable compensation for any damages caused to Customer by Supplier's use of the Property.

(b) Supplier shall not conduct its operations in any way which would adversely affect Customer's use of the Property in accordance with this Agreement.

(c) Supplier agrees that for so long as this Material Supply Agreement is in effect, it will not use any Finished Material from the Property in any manner which is in competition with Customer's operations in accordance with this Material Supply Agreement.

13. INSURANCE. Each party shall, at its sole cost and expense, commencing no later than the date upon which the Customer commences operations on the Property, and continuing throughout the duration of this Material Supply Agreement, obtain, keep, and maintain in full force and effect comprehensive general public liability insurance against claims for personal injury, bodily injury, death, or property damage occurring in, upon, or about the Property in an amount of not less than Five Million United States Dollars (US$5,000,000.00) , or such other amount as the parties may agree,  in respect to injury or death of one person and to the limit of not less than Five Million United States Dollars (US$5,000,000.00), or such other amount as the parties may agree, in respect to any one accident, and to the limit of not less than Five Million United States Dollars (US$5,000,000.00) , or such other amount as the parties may agree,  in respect to property damage with respect to the use of the Property.  Each party shall deliver to the other party certificates of insurance, which shall declare that the respective insurer may not cancel the same, in whole or in part, without giving each party written notice of its intention to do so at least thirty (30) days' prior written notice. In addition, the Customer shall ensure that any

contractors or sub-contractors engaged in respect of operations on the Property shall have insurance coverage substantially similar to that required of the Customer, which to the extent that all operations have been contracted by the Customer, can stand in place of the coverage required to be obtained by the Customer.

14. INDEMNIFICATION.

(a) Customer shall pay, defend and indemnify and hold Supplier and its officers, directors, shareholders, agents and employees ("Supplier Indemnified Parties," individually a "Supplier Indemnified Party") harmless from and against any and all claims of liability for injury or damage to any person or property arising from the use of the Property by Customer, or from the conduct of Customer's business, or from any activity, work or thing done, permitted or suffered by Customer or Customer's invitees, licensees, agents, contractors or employees in or about the Property or elsewhere. Customer shall further pay, defend, indemnify and hold the Supplier Indemnified Parties harmless from and against any and all claims arising from any breach of any representation, warranty or covenant hereunder, or default in the performance of any obligation on Customer's part to be performed under this Material Supply Agreement, or arising from any negligence of Customer or Customer's invitees, licensees, agents, contractors or employees, and from and against all costs, attorneys' fees, expenses and liabilities incurred in the defense of any such claim or action or proceeding brought thereon. In the event any action or proceeding is brought against any Supplier Indemnified Party by reason of any such claim, Customer, upon notice from such Supplier Indemnified Party, shall defend the same at Customer's expense by counsel reasonably satisfactory to such Supplier Indemnified Party.

(b) Supplier shall pay, defend and indemnify and hold Customer and its officers, directors, shareholders, agents and employees ("Customer Indemnified Parties," individually a "Customer Indemnified Party") harmless from and against any and all claims of liability for injury or damage to any person or property arising from the use of the Property by Supplier, or from the conduct of Supplier's business, or from any activity, work or thing done, permitted or suffered by Supplier or Supplier's invitees, licensees, agents, contractors or employees in or about the Property or elsewhere. Supplier shall further pay, defend, indemnify and hold the Customer Indemnified Parties harmless from and against any and all claims arising from any breach of any representation, warranty or covenant hereunder or default in the performance of any obligation on Supplier's part to be performed under this Material Supply Agreement, or arising from any negligence of Supplier or Supplier's invitees, licensees, agents, contractors or employees, and from and against all costs, attorneys' fees, expenses and liabilities incurred in the defence of any such claim or action or proceeding brought thereon. In the event any action or proceeding is brought against any Customer Indemnified Party by reason of any such claim, Supplier, upon notice from such Customer Indemnified Party, shall defend the same at Supplier's expense by counsel reasonably satisfactory to such Customer indemnified Party.

15. LIENS. If any liens or claims of mechanics, laborers, or material men shall be filed against the Property or any part or parts thereof, for any work, labor, or materials furnished or claimed to be furnished to Customer, or on behalf of Customer, then Customer shall cause such lien to be discharged within thirty (30) days after the date such lien is filed; or if such lien is disputed by Customer and Customer contests the same in good faith, Customer shall cause such lien to be discharged within thirty (30) days after the date of any judgment by any court of competent jurisdiction shall become final.

16. CUSTOMER'S RIGHT TO TERMINATE. Candeo may terminate this Material Supply Agreement:

(i)     With the prior written consent of Can-Cal;

(ii)    If any court of competent jurisdiction or any governmental, administrative or regulatory authority, agency or body shall have issued an order, decree or ruling or taken any other action permanently enjoining, restraining or otherwise prohibiting the transactions contemplated by this Material Supply Agreement;

(iii)   In the event that Can-Cal files a petition in bankruptcy or be adjudicated a bankrupt or insolvent, or make an assignment for the benefit of creditors or an arrangement pursuant to any bankruptcy law, or discontinue or dissolve its business, or if a receiver is appointed for Can-Cal's business and such receiver is not discharged within thirty (30) days; or

(iv)    If Can-Cal breaches any of its representations or warranties hereof or fails to perform in any material respect any of its covenants, agreements or obligations under this Material Supply Agreement, without curing such failure with ten (10) days written notice thereof (or moving to cure such failure is the event of such failure cannot be feasibly cured within such period).

17. SUPPLIER'S RIGHT TO TERMINATE. Can-Cal may terminate this Material Supply Agreement:

(i)     With the written consent of Candeo;

(ii)    If Candeo at any time, other than during the first year of the initial Term, does not remove any Finished Material from the Property for a period of twelve (12) consecutive months;

(iii)   If any court of competent jurisdiction or any governmental, administrative or regulatory authority, agency or body shall have issued an order, decree or ruling or taken any other action permanently enjoining, restraining or otherwise prohibiting the transactions contemplated by this Material Supply Agreement;

(iv)    If Candeo breaches any of its representations or warranties hereof or fails to perform in any material respect any of its covenants, agreements or obligations under this Material Supply Agreement, without curing such failure with ten (10) days written notice thereof (or moving to cure such failure is the event of such failure cannot be feasibly cured within such period);

(vi)    In the event that Candeo fails to obtain or maintain sufficient property liability insurance, which policies shall be made available to Can-Cal upon Candeo's commencement of operations on the Property, without curing such failure with thirty (30) days written notice thereof, *provided*, however, that during such notice period Candeo shall cease any and all activity on the Property until such cure (or termination);

(vii)   In the event that Candeo files a petition in bankruptcy or be adjudicated a bankrupt or insolvent, or make an assignment for the benefit of creditors or an arrangement

pursuant to any bankruptcy law, or discontinue or dissolve its business, or if a receiver is appointed for Candeo's business and such receiver is not discharged within thirty (30) days.

18. EXPROPRIATION.

(a) In the event that all or substantially all of the Property shall be taken by eminent domain for any public or quasi-public purpose such that Customer's operations are no longer economically feasible, then this Material Supply Agreement shall expire on the date when title to the Property vests in the appropriate authority or on the date possession is required to be surrendered, whichever is earlier. The compensation or damages for this taking shall be apportioned by and between the Supplier and Customer taking into consideration the residual value of the land and surface rights to Supplier and the remaining present value of the existing term of this Material Supply Agreement to the Customer.

(b) A voluntary sale or conveyance under threat of expropriation or condemnation but in lieu thereof, shall be deemed an appropriation or taking under the power of eminent domain.

19. ARBITRATION. Any disagreement between the parties in connection with any matter arising out of this Material Supply Agreement shall be referred to arbitration before a single arbitrator. Any such arbitration, including the selection of the arbitrator, shall be governed by the rules and regulations of the American Arbitration Association. The decision of any such arbitrator shall be final and binding on the parties and the costs and fees relating thereto shall be borne and paid in the manner the arbitrator determines to be fair and equitable.

20. NOTICES. Any notice or other communication which may be permitted or required under this Material Supply Agreement shall be in writing and shall be delivered personally or sent by United States registered or certified mail, postage prepaid, addressed as follows, or to any other address as either party may designate by notice to the other party:

| If to Supplier: | Can-Cal Resources Ltd.<br>8205 Aqua Spray Avenue, Las Vegas, NV  89128<br>Las Vegas, Nevada 89128 USA |
| --- | --- |
| With a copy to: | Davis LLP<br>1000, 250 2nd Street S.W.<br>Calgary, Alberta  T2P 0C1<br>Attention: Roy H. Hudson |
| If to Customer: | Candeo Lava Products Inc.<br>Mt. Royal Place, Suite 450<br>1712 - 25 St. S.W., Calgary, Alberta T3C 1J6<br>Attention: William J. Hogan |

21. ASSIGNMENT. Customer shall not assign or transfer this Material Supply Agreement, without Supplier's prior written consent, which consent will not be unreasonably withheld or delayed; except that such consent shall not be required if such assignment is by Customer is to an affiliate of Customer.

22. BINDING ON SUCCESSORS AND ASSIGNS. All covenants, agreements,

Davis: 13555291.1

provisions, and conditions of this Material Supply Agreement shall be binding upon and enure to the benefit of the parties hereto, their respective heirs, personal representatives, successors, and assigns.

23.   PARTIAL INVALIDITY. If any term or provision of this Material Supply Agreement shall to any extent be held invalid or unenforceable, then the remaining terms and provisions of this Material Supply Agreement shall not be affected thereby, but each term and provision of this Material Supply Agreement shall be valid and be enforced to the fullest extent permitted by law. In the event that any provision of this Material Supply Agreement relating to the time periods shall be declared by a court of competent jurisdiction to exceed the maximum time period that such court deems reasonable and enforceable, the time period deemed reasonable and enforceable by the court shall become and thereafter be the maximum time period.

24.   GOVERNING LAW. This Material Supply Agreement shall be governed by the laws of the State of Nevada.

25.   CAPTIONS. The captions of this Material Supply Agreement are for convenience only and are not to be construed as part of this Material Supply Agreement and shall not be construed as defining or limiting in any way the scope or intent of the provisions of this Material Supply Agreement.

26.   NO WAIVER. No waiver of any covenant or condition contained in this Material Supply Agreement or of any breach of any such covenant or condition shall constitute a waiver of any subsequent breach of such covenant or condition by either party or justify or authorize the non-observance on any other occasion of the same or any other covenant or condition.

27.   ENTIRE AGREEMENT; MODIFICATION. This Material Supply Agreement represents the entire understanding and agreement between the parties and supersedes all prior written instruments or memoranda with respect thereto. No modification of this Material Supply Agreement shall be binding unless it is in writing and executed by an authorized representative of Supplier and Customer.

28.   COUNTERPARTS. This Material Supply Agreement may be executed in one or more counterparts which, together, shall constitute an original and binding agreement on the parties hereto.

29.   RELATIONSHIP OF THE PARTIES. Nothing contained in this Material Supply Agreement shall be deemed or construed by the parties hereto, nor by any third party, as creating the relationship of principal and agent, partnership, or joint venture between the parties hereto, it being understood and agreed that no provision contained in this Material Supply Agreement nor any acts of the parties hereto shall be deemed to create any relationship other than the relationship of supplier and customer.

30.   INCORPORATION OF EXHIBITS. This Material Supply Agreement shall be deemed to have incorporated by reference all of the Exhibits referred to herein to the same extent as if such Exhibits were fully set forth herein.

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals as of the day and

Davis: 13655291.1

year first above written.

Executed on April _9th_, 2013

CUSTOMER:

**CANDEO LAVA PRODUCTS INC.**

Name: WILLIAM H. HOGAN
Title: PRESIDENT


SUPPLIER:

**CAN-CAL RESOURCES, LTD.**

Name: T MacDonald
Title: Chairman

<u>Exhibit A</u>

The Pisgah Mine Project is located in San Bernardino County, 72 kilometers (45 miles) east of the city of Barstow, California, and 307 kilometers (192 miles) south-southeast of Las Vegas, Nevada, United States. Barstow lies near the southwest border of California, east of the junction of Interstate 15, Interstate 40 and U.S. Route 66. The Project is centered at Latitude 34° 44' 47" North, Longitude 116° 22' 29" West, or UTM (metric) co-ordinates 55700 E/384500 N in Zone 11, datum point NAD 27. It lies within Section 32, Township 8 North, Range 6 East from San Bernardino Meridian. It has an area of 48.4 hectares (120.2 acres). In 1997 Can-Cal Resources Ltd., a Las Vegas, NV based exploration company, gained 100% ownership of the claim which covers the Pisgah property.

Access to the Pisgah Project is by the paved 2-lane paved road from the junction of Interstate 15 and Interstate 40 just east of Barstow, California travel east along Interstate 40 for 52 kilometers (32.5 miles). Take the Hector Rd. Exit and turn right onto Hector Rd. From here turn left onto Historic Route 66 for 7.4 kilometers (4.6 miles), and then turn right (south) onto the Pisgah Crater road. Follow this road for 3.2 kilometers (2.0 miles) to the Pisgah Crater workings.

The Pisgah Mining Property lies near the south end of the Mojave Desert. The region forms the southwestern extent of Precambrian continental North America and rests at the present plate edge formed by the San Andreas transform fault. An oceanic plate has bordered the region since late Precambrian time. Starting in late Miocene time the Mojave Desert area was dissected by NW-trending right-lateral strike-slip faults with local areas of E-trending left-lateral strike-slip faults.

11

EXHIBIT 7

From: WJ HOGAN <wjhogan.fcc@shaw.ca>
Date: Thu, Aug 29, 2013 at 11:05 PM
Subject: CANDEO CORPORATE UPDATE - AUGUST 20 2013
To: "William J. Hogan" <wjhogan@foodcheksystems.com>

Hello Everyone,

I am pleased to send you today's Corporate Update regarding Candeo Lava Products. The Company has come along way this summer and we are very impressed and encouraged with the Pisgah Material laboratory analysis, together with the outstanding results from our first in-house Beta project.

We are now moving forward with "White Paper" validations on the Pisgah "Volcanic Basalt" material with universities and commercial greenhouses and are very confident that the product will fully demonstrate the its impressive benefits for the remineralization of soils. The potential market for organic crops of vegetables and fruits has skyrocketed and is extremely lucrative financially. This will bode very well for Candeo and the potential demand of the Pisgah Material, being a completely all natural green product.

We are also commencing our second private placement for US$225,000 at US$0.15 totaling 1,500,000 shares and expect it to sell out quickly on a first come, first serve basis. This will be ample funds to get us to complete our near term initiatives and get Candeo to the next phase, which will include putting the product into a strong position to begin courting major North American distribution companies that are buyers for the national box stores such as Walmart, Home Depot, Lowe's Home Improvement, etc. It is endless the retailer outlets we could approach for such an impressive organic garden area product. But not until the final valuations are completed.


Please feel free to contact me to discuss the project. The best number to reach me is my cell at (403) 689-2200. Thank you for your support and interest.

Best regards,
Bill


William J. Hogan,
Chairman, Director
Candeo Lava Products Inc.
1712 – 25th Street SW
Calgary, Alberta, Canada   T3C 1J6

Bus:  (403) 457-1403
Cell: (403) 689-2200
Fax:  (403) 457-1404
Email: wjhogan.fcc@shaw.ca

## Candeo Lava Products Inc.

Corporate Update
August 29, 2013

Hello Everyone,

On April 26, 2013, we sent our a letter regarding the opportunity of becoming a shareholder in Candeo Lava Products Inc. ("Candeo") and that in part, also permitted Can-Cal Resources Ltd. ("Can-Cal") to expand its operations.

To recap the letter, Candeo and Can-Cal entered into a Material Supply Agreement on April 9, 2013 whereby Candeo would develop and distribute the volcanic basalt material found on Can-Cal's Pisgah Crater, California property. Candeo's business will be essentially taking the Pisgah volcanic basalt material (the "Pisgah Material") and turning it into a finished remineralization product for residential and commercial soil for use in flower beds, gardens, trees, shrubs, lawns, organic vegetables, grain crops, etc. (the "Garden Areas"). The Pisgah Material is intended to be crushed into powder form and subsequently bagged and labeled into what we believe will be an exciting all natural product to remineralize the soil in the Garden Areas. The product will have no added chemicals and will be promoted as a "totally environmentally green" and "organic" product.

The Agreement gave Candeo access to 1.0 million tons of the Pisgah Material and an option on an additional 1.0 million tons. Can-Cal will benefit in a revenue split, whereby Candeo will retain two thirds (2/3) and Can-Cal will receive one third (1/3) of the net revenue from Candeo's sales of the product, with Candeo guaranteeing Can-Cal a minimum floor price of US$15.00 per ton or the 1/3 net margin per ton, whichever is greater. It is expected that the Pisgah Material product for the Garden Areas when put into 1, 3, 10 or 20 kilogram containers will be very profitable and will benefit both Candeo and Can-Cal simultaneously. Other currently similar powder products can range in price from $250 to $1,500 of gross revenue per ton.

Also outlined were Candeo's strategic 2013 milestones or goals, which included:

1. Complete several private placements to fund Candeo's operations;
2. Over 12 months, pre-purchase US$200,000 of Pisgah Material totaling 13,335 tons;
3. Enter into a Distribution Agreement for North America with one or more established distribution companies dealing in the Garden Areas sector(s);
4. Develop the Marketing and Sales Design aspects for product containers, labels, sales selling sheets, material technical spec sheets, etc.; and
5. Beta projects with universities or commercial greenhouses for third party validated product results.

To this end, the last several months have been an exceptional period for Candeo in meeting our strategic goals. Here are the highlights:

First Private Placement Completed:

Candeo completed its first US$50,000 private placement ("PP") on July 04, 2013. Management would like to extend our appreciation to all of the individuals who participated.

Pre-purchase of Pisgah Material:

Candeo has now pre-purchased 3,000 tons of Pisgah Material totaling US$45,000. The balance of 10,335 tons totaling US$155,000 will be completed prior to April 08, 2014. The next pre-purchase of Pisgah Material will come from the second PP of US$225,000, which will be marketed immediately.

Pisgah Material Laboratory Analysis Completed:

Chemical analysis by independent laboratories in Canada and the United States has confirmed the presence of extremely favorable levels of macro and micro nutrients as well as an excellent pH level in the Pisgah Material. Additionally, there is a very high Silica level in the material, which is crucial for essential plant development.

- 2 -

**Mini Beta Valuation Results:**

Management undertook to have ½ ton of the Pisgah Material delivered to Calgary, Alberta in mid-July to commence an internal verification project or "Beta Validation", which commenced on August 10th. The Beta Validation consisted of growing ½ dozen green onions each in two individual pots, with the same environmental conditions including outdoor conditions of light, water and potting soil. One of the pots consisted of a 3.7% concentration by volume of the Pisgah Material. The Pisgah Material was screened to a mesh size of approximately 100, which is approximately half of the ideal powder mesh size of 200. We believe the 200 mesh size to be most ideal for full root absorption.

We are pleased to report that the results of the pot with the Pisgah Material onion plants were very impressive after only 18 days of growth. The photos below (A and B) show the comparisons between the smallest and largest onion plants of each pot. Emphasis should focus on the root structure, which shows the vitality of the plant. There is superior growth in the Candeo Pisgah Material over its comparable equivalent. Although this Beta Valuation is "non-arm's length", it gives management a great deal of confidence that the Pisgah Material has the potential to be an outstanding and lucrative world class product. This prediction will hopefully be born out in the next series of true "arm's length" validations at a recognized agricultural university. For additional information on the benefits of the Pisgah Material, see "Appendix A" at the end of this Update.


Smallest Onion Plants


Largest Onion Plants

## IMMEDIATE NEXT STEPS:

### 1. Controlled Third Party Growth Validation

The Pisgah Material held in Calgary will be crushed to around 75 microns (and smaller) and delivered to independent third party university greenhouses for growth trials. These trials will be under the supervision of Professors in the Department of Soil and Plant Sciences. With a variety of plant and vegetable crops, they will compare growth rates, yield, root system development, water retention and ultimately the minerals in the end produce for nutritional values. This will be a recognized comprehensive research program comparing control soils vs. soils containing our Candeo Pisgah Material. Additionally, Candeo will also be working with commercial greenhouses in several locations in Alberta to allow for controlled testing in order to receive valuable testimonial test results data.

### 2. Second Private Placement to Commence Immediately

The second PP of US$225,000 at US$0.15 totaling 1,500,000 common shares will begin immediately. The Subscription Agreement and Term Sheet are attached with the Use of Proceeds earmarked to continue towards completing the 2013 goals and milestones. A third PP (at a price yet to be determined) will follow as Candeo heads towards full operations expected in the QTR 2, 2014.

- 3 -

If you or any your circle of influence (that are qualified accredited investors) would be interested in becoming a Candeo shareholder, please do not hesitate to contact me for assistance at wjhogan.fcc@shaw.ca.

We will continue to keep you informed on Candeo's progress towards our goal of supplying the North American market place with this outstanding and value added organic soil product. As always, we confirm our promise and commitment of focusing on providing all Shareholders with an above average return on their investment.

Sincerely,

Signed "*William J. Hogan*"

William J. Hogan,
Chairman, Director

Contact Information:
Candeo Lava Products Inc.
1712 – 25th Street SW
Calgary, Alberta, Canada   T3C 1J6
Bus: (403) 457-1403
Cell: (403) 689-2200
Fax: (403) 457-1404
Email: wjhogan.fcc@shaw.ca

- 4 -

# APPENDEX "A"

## Candeo's Pisgah 'Volcanic Basalt' Material

This outline provides important background and technical information regarding the Pisgah Material. We believe this will be helpful to you in ascertaining the outstanding benefits of the material and why Candeo is excited about its viability as a world class soil remineralization product.

### 1.  What is Volcanic Basalt Material?

Volcanic Basalt material (sometimes referred to as Rock Dust) is an organic soil nutrient and remineralizer. It is crushed to a size smaller than 5mm and then applied to the soil, allowing for minerals to dissolve in the shortest possible time naturally enriching the soil/plants. Volcanic Basalt material provides a rich blend of essential macro and micro nutrients for a complete and balanced soil. Over the last century, these essential macro and micro nutrients have been lost from soils through leaching, erosion, and farming. Additionally, not all Volcanic Basalt is equal in its ability to provide these nutrients. Candeo's Volcanic Basalt contains the broadest spectrum of elements, in proper balance with the highest count of silicon, an often forgotten but key soil mineral element.

### 2.  What is the Problem with Today's Soil?

In 1936 a United States Government Senate Committee hearing, heard how soil on American farmland was so mineral depleted (even then) that to get enough minerals from food grown on it, sufficient to properly maintain human health, a human being would literally need to eat a whole wheelbarrow full of vegetables to obtain the necessary daily requirements. Over the ensuing decades, the problem has not improved and agricultural scientists believe it has further deteriorated.

### 3.  Why Volcanic Basalt? Some of the Benefits:

#### Improve Soil Vitality

Our present day soils are compacted, nearly lifeless and easily eroded away. Plants and trees are often sickly, stunted and sensitive to frosts and droughts. Crops are insipid, diseased, nutritionally inferior and susceptible to insect attacks. Volcanic Basalt remineralizes the soil bringing back its vitality.

#### Increase Plant Health

Most trace elements dissolve into water faster than the major elements. In average soil, trace elements leach out of soils faster than major elements resulting in sickly plant life. Acid rain, soluble chemical fertilizers and excessive tillage accelerate this removal of trace elements. The consequence is that all soils eventually and easily become deficient in minor or trace elements. Continued doses, with NPK fertilizer: (N) nitrogen, (P) phosphorus, (K) potassium and lime fertilizers, will not resolve these deficiencies, but actually make them worse. By increasing the trace elements through application of Volcanic Basalt, we address this problem resulting in strong, healthy plant life.

#### Strengthen Plant Immunity

Plants and animals require elements in specific proportions, not simply in specific quantities. Mineral nutrients must be supplied at certain ratios. The principle of proportion means that the least exert, the greatest effect. A tiny amount of a trace element can be more crucial to proper growth and health than a large amount of the major elements. Thus, the least is often the greatest; by remineralizing trace elements we can have strong plant life that resists disease, weeds, and insect attack.

#### Strengthen Plant Pest Resistance

Healthy plants with high silica values in their cell walls are much more resistant to insects and pests. Candeo's Volcanic Basalt contains a value of 47.16 % Silica enabling plants to have very strong cellular walls to better resist pest attacks.

Dramatic Increase in Plant Yield

Soil Remineralization ("SR") has been shown in scientific studies to increase yields as much as two to eight times for agriculture and forestry (wood volume), and to have immediate results and long term effects with a single application. See footnote link below:

http://remineralize.org/administrator/components/com_jresearch/files/publications/Rio%20Summit-RTE-2012.pdf

Unique Flavor and Mineral Composition in Produce

Much of our produce lacks minerals and nutrients and hence is tasteless compared to sources of produce loaded with these elements. By replacing what is missing, tastes comes alive and the high nutrient values are vital for human health and well-being.

Increased Value of Crops

Organic crops command more money and are desirable for their superior nutritional contents and lack of undesirable agents such as pesticides and herbicides. The combination of these factors, with the increase in yield and added unique flavor, results in greater profits for the producer.

Gradual Supply of Nutrients to the Soil

Plant life can access the minerals in the soil instead of growers relying on only supplying Macro nutrients Nitrogen, Phosphorus, Potassium (NPK) in high dosages.  By having a supply of Macro and Micro nutrients supplied by the Rock Dust, plants can access these elements at the pace they require for optimal growth and health.

Balance pH levels of Soil

The majority of larger volume volcanic basalt applications will be on acidic soils (5.5 pH and up), Candeo's Volcanic Basalt has a 9.8 pH reading which is very good. Our product will act as a very good liming agent for highly acidic soils, and our application quantities should prove to be less then that of competitive products.

Correction of Negative effects of Chemical Agro Applications

For maximum vitality, it's important to supply soil with ALL the nutrients that are essential for plant and animal growth - not merely NPK and major elements (Nitrogen, Phosphorus, Potassium, as well as (Ca) Calcium and (Mg) Magnesium) - but all of the elements, especially the trace elements which are so sadly neglected in conventional agriculture.

Erosion Control through better Plant Development

Volcanic Basalt enables healthy crops that require less water and are better able to resist pest attacks. The result is a healthy, dense, high yield crop that reduces the erosion of the soils.

Increases Plant Resistance to Draught, Excess Water, Frost and Insects

Volcanic Basalt is very hydroscopic. With the addition of plant matter and living microbes, this type of soils situation holds and needs at lot less watering than conventional chemical farming methods

100% Organic and Natural- Good for the Environment as Human Consumption

The biggest issue facing the use of chemical fertilizers is groundwater contamination. Nitrogen fertilizers break down into nitrates and travel easily through the soil. Because it is water-soluble and can remain in groundwater for decades, the addition of more nitrogen over the years has an accumulative effect.

Additionally, Volcanic Basalt's ability to help plants with pest and weed resistance enables growers to limit pesticide and herbicide usage which have terrible environmental impacts. This is due to the plant's ability to have strong cellular walls (due to high Silica levels in the Rock Dust) allowing the plant to better fend off attacks.

- 6 -

Most organic food gives 8 to 12 times more mineral content than food grown quickly by artificial methods like NPK, although this mineral content is still insufficient. Plants grown by the method of adding Volcanic Basalt are much more productive, much more nutritious than currently conventional organic produce, and much hardier and more resistant against disease, and pests.

<u>The Future of Organic Farming</u>

In an article published January 2013 by Marsha Laux, content specialist, AgMRC (Agricultural Marketing Resource Center), Iowa State University, it was stated that in the USA, "*Organics have continued to expand during the last few years, and industry experts are forecasting steady growth of 9 percent or higher*". The article also stated, "*The organic food sector grew by $2.5 billion during 2011; close to 50 percent of that growth was contributed by fruit and vegetable sales.*" This indicates that consumers are demanding Organic produce and it is a rapidly growing sector.

<u>Economics vs. Chemical Agro Applications (Fertilizers, Herbicides, Pesticides)</u>

Volcanic Basalt stays in the soils for many years providing great benefits for the long run vs. Chemical Applications that are applied much more often and at great expense. Clearly Volcanic Basalt is a superior choice in both the short and long run.

# CANDEO LAVA PRODUCTS INC.

## U.S. $225,000 PRIVATE PLACEMENT

## TERM SHEET

**Issuer:** Candeo Lava Products Inc. (the "Corporation"), a private Alberta corporation.

**Total Offering:** Up to U.S. $225,000 in Common Shares.

**Issue price:** Subscription Price of U.S. $0.15 per Common Share.

**Min/Max $$ Subscription:** U.S. $2,500 - In Alberta, BC and Ontario using National Instrument – "NI 45-106" for Accredited Investor requirements (see Subscription Forms).

**Use of Proceeds:** i) Pre-purchase U.S. $155,000 totaling 10,335 tons of Pisgah Crater, California material from Can-Cal Resources Inc.; ii) Legal costs related to new Distribution Agreement for North America with a yet to be determined distribution group; iii) Marketing design development for containers, labels, sales selling sheets, etc. as related to the Pisgah Material product; iv) Beta sites through 3rd party universities or commercial greenhouses for product results in all Garden Areas; and v) strategic working capital reserve.

**Liquidity:** There is no public market for the Common Shares at this time.

**Closing Date:** Initially September 15, 2013, and thereafter, such earlier date or later dates as the Corporation may determine, upon completion and execution of the Subscription Agreement and payment of the aggregate subscription price for the Common Shares subscribed for.

**Method of Subscription:** Completion of Subscription Forms, together with a currently dated U.S. bank draft cheque payable to Candeo Lava Products Inc. in the amount of the number of Common Shares subscribed for multiplied by U.S. $0.15.

**Transaction:** The Common Shares are being sold on a first-come first-serve basis with the Corporation reserving the right to accept any subscription and having the right to close the issue at any time, with the subscription funds being immediately released to the Corporation at closing(s).

For further information, please contact:

Candeo Lava Products Inc.
1712 – 25th Street SW
Calgary, Alberta, Canada   T3C 1J6
Attention: William J. Hogan, Chairman, Director
Bus: (403) 457-1403
Cell: (403) 689-2200
Fax: (403) 457-1404
Email: wjhogan.fcc@shaw.ca

CANADA, US & OFFSHORE

## SUBSCRIPTION AGREEMENT FOR SHARES

TO:   CANDEO LAVA PRODUCTS INC. (the "Corporation")

The undersigned (hereinafter referred to as the "Subscriber") hereby irrevocably subscribes for and agrees to purchase the number of Common shares of the Corporation (each a "Share") set forth below for the aggregate subscription amount set forth below (the "Aggregate Subscription Amount"), representing a subscription price of U.S. $0.15 per Share upon and subject to the terms and conditions set forth in "Terms and Conditions of Subscription for Shares of CANDEO LAVA PRODUCTS INC. attached hereto (together with this page and the attached exhibits, the "Subscription Agreement").

---

(Name of Subscriber – please print)

By:   X _____
         (Authorized Signature)

(Official Capacity or Title - please print)

(Please print name of individual whose signature appears above if different than the name of the Subscriber printed above.)

(Subscriber's Address including Postal Code)

(Telephone Number)                    (Email Address)

---

Number of Shares: _____

Aggregate Subscription Amount: U.S. $ _____

If the Subscriber is signing as agent for a principal, unless it is deemed to be purchasing as principal under NI 45-106, complete the following and ensure that the applicable Exhibit(s) are completed on behalf of such principal:

(Name of Principal)

(Principal's Address including Postal Code)

(Telephone Number)                    (Email Address)

---

**Register the Shares Exactly as set forth below:**

(Name)

(Account reference, if applicable)

(Address)

(Address)

---

**Deliver the Shares as set forth below:**

(Name)

(Account reference, if applicable)

(Contact Name)

(Address)

---

**TO BE COMPLETED BY SUBSCRIBERS RESIDENT IN BRITISH COLUMBIA:**

The Subscriber is ☐ or is not ☐ a registrant as defined in the *Securities Act* (Alberta) (the "Act"). [*Please check applicable box*]

The Subscriber is ☐ or is not ☐ an insider of the Corporation as defined in the Act. [*Please check applicable box*]

If the Subscriber is an insider or a registrant, the Subscriber currently owns, directly or indirectly, the following number of securities (including options, warrants and other convertible securities) of the Corporation: _____

---

**ACCEPTANCE:**   The Corporation hereby accepts the subscription as set forth above on the terms and conditions contained in this Subscription Agreement.

_____, 2013.

CANDEO LAVA PRODUCTS INC.

By: _____
         William J. Hogan, Chairman, Director

Subscription No:

*This is the first page of an agreement comprised of 11 pages (excluding Exhibits).*

TERMS AND CONDITIONS OF SUBSCRIPTION FOR
SHARES OF CANDEO LAVA PRODUCTS INC.

**Terms of the Offering**

1.      The Subscriber acknowledges (on its own behalf and, if applicable, on behalf of each person on whose behalf the Subscriber is contracting) that this subscription is subject to rejection or allotment by the Corporation in whole or in part at any time prior to closing.

2.      The Subscriber acknowledges (on its own behalf and, if applicable, on behalf of each person on whose behalf the Subscriber is contracting) that the Shares subscribed for by it hereunder form part of a larger issuance and sale by the Corporation of up to **1,500,000** Shares at a subscription price of U.S. **$0.15** per Share representing aggregate gross proceeds of up to U.S. **$225,000** (the "**Offering**"). Depending on market conditions, the Corporation reserves the right to increase the gross proceeds under the Offering. There is no minimum Offering amount. The Subscriber acknowledges that the Corporation may pay a finder's fee ("**Finder's Fee**") in connection with the issue and sale of any or all of the Units under the Offering. The Finder's Fee shall consist of a payment of no more than six percent (6%) cash of the gross proceeds of the Offering in relation to Subscribers introduced by any particular finder, payable in cash of the Corporation. The Subscriber also acknowledges that the Corporation may also pay a finder's warrants ("**Finder's Warrants**") exercisable into common shares of the Corporation ("**Finder's Shares**") in connection with the issue and sale of any or all of the common shares under the Offering. The Finder's Warrants may be issued in an amount up to the quotient of six percent (6%) of the gross proceeds on all or any portion of the Offering divided by $0.25. The Finder's Warrants shall be exercisable at a price of $0.25 per Finder's Share for a period of eighteen (18) months from the date of the issuance of the Finder's Warrants. If the Subscriber is introduced to the Corporation by a finder, the finder may be obligated under applicable securities legislation to obtain from the Subscriber a Risk Acknowledgement under Alberta Securities Commission Blanket Order 31-505 - *Registration Exemption for Trades in Connection with Certain Prospectus-Exempt Distributions* in the form attached as **Exhibit 5** to this Subscription Agreement.

3.      BY EXECUTING THIS SUBSCRIPTION AGREEMENT, THE SUBSCRIBER (ON ITS OWN BEHALF AND, IF APPLICABLE, ON BEHALF OF EACH PERSON ON WHOSE BEHALF THE SUBSCRIBER IS CONTRACTING) ACKNOWLEDGES THAT THE CORPORATION IS NOT A "REPORTING ISSUER" IN ANY PROVINCE IN CANADA OR ANY OTHER JURISDICTION AND THE CORPORATION HAS NO OBLIGATION TO BECOME A REPORTING ISSUER. FURTHERMORE, THE APPLICABLE "RESTRICTED PERIOD" UNDER APPLICABLE SECURITIES LAWS WILL NOT COMMENCE UNTIL THE CORPORATION BECOMES A "REPORTING ISSUER" IN A PROVINCE OF CANADA AND UNTIL SUCH TIME AS THE APPLICABLE "RESTRICTED PERIOD" HAS EXPIRED. THE SUBSCRIBER WILL NOT BE ABLE TO RESELL THE SECURITIES SUBSCRIBED FOR UNDER THIS SUBSCRIPTION AGREEMENT EXCEPT IN ACCORDANCE WITH LIMITED EXEMPTIONS UNDER APPLICABLE SECURITIES LEGISLATION.

**Representations, Warranties, Acknowledgements and Covenants by Subscriber**

4.      The Subscriber (on its own behalf and, if applicable, on behalf of each person on whose behalf the Subscriber is contracting) represents, warrants, acknowledges and covenants, as applicable, to the Corporation and its counsel (and acknowledges that the Corporation and its counsel, are relying thereon) both at the date hereof and at the Closing Time (as herein defined) that:

(a)     the Subscriber has been independently advised to consult with the Subscriber's own legal advisers as to restrictions with respect to trading in the Securities imposed by applicable securities legislation in the jurisdiction in which the Subscriber resides or to which the Subscriber is otherwise subject, confirms that no representation (written or oral) has been made to the Subscriber by or on behalf of the Corporation with respect thereto, acknowledges that the Subscriber is aware of the characteristics of the Securities, the risks relating to an investment therein and of the fact that the Subscriber may not be able to resell the Securities, except in accordance with limited exemptions under applicable securities legislation and regulatory policy

3                                          CANADA, US & OFFSHORE

until the expiry of the applicable restricted period and compliance with the other requirements of applicable law; and the Subscriber agrees that any certificates representing the Offered Shares, Warrants and Warrant Shares will bear a legend, if applicable, indicating that the resale of such securities is restricted; and

(b)     the Subscriber has not received nor been provided with, nor has the Subscriber requested, nor does the Subscriber have any need to receive, any offering memorandum, any prospectus, sales or advertising literature, or any other document (other than, if any, an annual report, annual information form, interim report, information circular, take-over bid circular, issuer bid circular, prospectus, or other continuous disclosure document, the content of which is prescribed by applicable securities law, that, in each case, has been filed with applicable securities commissions) describing, or purporting to describe, the business and affairs of the Corporation which has been prepared for delivery to, and review by, prospective purchasers in order to assist such prospective purchasers in making an investment decision in respect of the Shares; and

(c)     the Subscriber has not become aware of and the purchase of the Shares is not made through or as a result of any general solicitation or any advertisement in printed media of general and regular paid circulation (or other printed public media), radio, television or telecommunications or other form of advertisement (including electronic display such as the Internet) with respect to the distribution of the Shares; and

(d)     the Subscriber is, or is deemed to be, purchasing the Shares as principal for the Subscriber's own account, not for the benefit of any other person, for investment only and not with a view to the resale or distribution of all or any of the Securities, the Subscriber certifies that it is resident in the jurisdiction set out as the "Subscriber's Address" on the face page hereof, and if the Subscriber is acting as agent or trustee for a principal/beneficial purchaser, such principal/beneficial purchaser is purchasing as principal for its own account, not for the benefit of any other person, for investment only and not with a view to resale or distribution, and is resident in the jurisdiction set forth in this Subscription Agreement as the "Principal's Address" of the principal/beneficial purchaser and the Subscriber, or the principal/beneficial purchaser, as the case may be, fully complies with the criteria set forth below:

   (i)     the Subscriber is resident in or otherwise subject to applicable securities laws of any jurisdiction of Canada and:

      (A)     the Subscriber is an "accredited investor", as such term is defined in National Instrument 45-106 - "Prospectus and Registration Exemptions" ("NI 45-106"), and has concurrently executed and delivered a Representation letter in the form attached as Exhibit 1 to this Subscription Agreement with Appendix A to Exhibit 1 completed indicating that the Subscriber satisfies one of the categories of "accredited investor" set forth in such definition; or

      (B)     the Subscriber is one of the following and has so indicated by identifying the applicable subsection:

         _____  (I)     an employee, executive officer (as defined in NI 45-106), director or consultant of the Corporation or a related entity (as defined in NI 45-106) of the Corporation; or

         _____  (II)     a permitted assign (as defined in NI 45-106) of a person referred to in (I) above; and

         participation in the purchase is "voluntary" as explained in NI 45-106; or

   (ii)     the Subscriber is resident in or otherwise subject to applicable securities laws of any jurisdiction of Canada, other than Ontario, is one of the following and has so indicated by identifying the applicable subsection and, if a close personal friend or close business associate, has completed, executed and delivered Exhibit 2 to this Subscription Agreement:

         _____  (A)     a director, executive officer (as defined in NI 45-106) or control person of the Corporation, or of an affiliate (as defined in NI 45-106) of the Corporation; or

4                                       CANADA, US & OFFSHORE

     (B)   a spouse, parent, grandparent, brother, sister, child or grandchild of any person referred to in subclause (A) above; or

     (C)   a parent, grandparent, brother, sister, child or grandchild of the spouse of any person referred to in subclause (A); or

     (D)   a close personal friend of any person referred to in subclause (A); or

     (E)   a close business associate of any person referred to in subclause (A); or

     (F)   a founder (as defined in NI 45-106) of the Corporation or a spouse, parent, grandparent, brother, sister, child, grandchild, close personal friend or close business associate of a founder of the Corporation; or

     (G)   a parent, grandparent, brother, sister, child or grandchild of a spouse of a founder (as defined in NI 45-106) of the Corporation; or

     (H)   a person of which a majority of the voting securities are beneficially owned by, or a majority of the directors are, persons described in subsections (A) through (G) above; or

     (I)   a trust or estate of which all of the beneficiaries or a majority of the trustees are persons described in subsections (A) through (G) above; and

if the Subscriber is a close friend or close business associate resident in Saskatchewan, it has executed and delivered to the Corporation a Risk Acknowledgement Form in the form attached hereto as Exhibit 3; or

(iii)   the Subscriber is resident in or otherwise subject to applicable securities laws of **Ontario**, is one of the following and has so indicated by identifying the applicable subsection:

     (A)   a founder (as defined in NI 45-106) of the Corporation; or

     (B)   an affiliate (as defined in NI 45-106) of a founder (as defined in NI 45-106) of the Corporation; or

     (C)   a spouse, parent, brother, sister, grandparent, grandchild or child of an executive officer (as defined in NI 45-106), director or founder (as defined in NI 45-106) of the Corporation; or

     (D)   a person that is a control person (as defined in NI 45-106) of the Corporation, or

(iv)   if the Subscriber is a resident of or otherwise subject to applicable securities laws of any jurisdiction referred to in the preceding subsections but not purchasing thereunder, the Subscriber or any beneficial purchaser for whom the Subscriber is acting, is purchasing pursuant to an exemption from the prospectus and registration requirements (particulars of which are enclosed herewith) available to the Subscriber under applicable securities legislation of the jurisdiction of the Subscriber's residence and the Subscriber shall deliver to the Corporation such further particulars of the exemption(s) and the Subscriber's qualifications thereunder as the Corporation or its counsel may request; or

(v)   if the Subscriber is resident in or otherwise subject to applicable securities laws of the Shared States, the Subscriber is an "Accredited Investor" as such term is defined in Rule 506 of Regulation D of the Securities Act of 1933, as amended, (the "**1933 Act**") and has concurrently executed and delivered a U.S. Accredited Investor Certificate in the form attached as **Exhibit 5** to this Subscription Agreement as well as a Representation letter in the form attached as **Exhibit 1** to

this Subscription Agreement with Appendix A to Exhibit 1 completed indicating that the Subscriber satisfies one of the categories of "accredited investor" set forth in such definition; or

(vi)   if the Subscriber is resident in or otherwise subject to applicable securities laws of a jurisdiction other than Canada or the Shared States, the Subscriber confirms, represents and warrants that:

(E)   the Subscriber is knowledgeable of, or has been independently advised as to, the applicable securities laws of the jurisdiction in which the Subscriber is resident (the "International Jurisdiction") and which would apply to the acquisition of the Shares; and

(F)   the Subscriber is purchasing the Shares pursuant to exemptions from the prospectus or registration requirements or equivalent requirements under applicable securities laws or, if such is not applicable, the Subscriber is permitted to purchase the Shares under the applicable securities laws of the International Jurisdiction without the need to rely on any exemptions; and

(G)   the applicable securities laws of the International Jurisdiction do not require the Corporation to make any filings or seek any approvals of any kind whatsoever from any securities regulator of any kind whatsoever in the International Jurisdiction in connection with the issue and sale or resale of the Shares; and

(H)   the purchase of the Shares by the Subscriber does not trigger:

(III)   any obligation to prepare and file a prospectus or similar document, or any other report with respect to such purchase in the International Jurisdiction; or

(IV)   any continuous disclosure reporting obligation of the Corporation in the International Jurisdiction; and

(E)   if the Subscriber is an "accredited investor", as such term is defined in NI 45-106, the Subscriber will, if requested by the Corporation, execute and deliver a Representation letter in the form attached as Exhibit 1 to this Subscription Agreement with Appendix A to Exhibit 1 completed; and

the Subscriber will, if requested by the Corporation, deliver to the Corporation a certificate or opinion of local counsel from the International Jurisdiction which will confirm the matters referred to in subsections (B), (C) and (D) above to the satisfaction of the Corporation, acting reasonably; and

(e)   the Subscriber acknowledges that:

(i)   no securities commission or similar regulatory authority has reviewed or passed on the merits of the Securities; and

(ii)   there is no government or other insurance covering the Securities; and

(iii)   there are risks associated with the purchase of the Securities; and

(iv)   there are restrictions on the Subscriber's ability to resell the Securities and it is the responsibility of the Subscriber to find out what those restrictions are and to comply with them before selling the Securities; and

(v)   the Corporation has advised the Subscriber that the Corporation is relying on an exemption from the requirements to provide the Subscriber with a prospectus and to sell securities through a person or company registered to sell securities under the *Securities Act* (Alberta) and other

6                                                CANADA, US & OFFSHORE

applicable securities laws and, as a consequence of acquiring the Securities pursuant to this exemption, certain protections, rights and remedies provided by the *Securities Act* (Alberta) and other applicable securities laws, including statutory rights of rescission or damages, will not be available to the Subscriber; and

(vi)     the certificate(s) representing the Securities will be endorsed by a legend, if applicable, stating that the Securities will be subject to restrictions on resale in accordance with applicable securities legislation; and

(f)     the Subscriber has not received from the Corporation any financial assistance of any kind, directly or indirectly, in connection with its purchase of the Shares hereunder; and

(g)     the Subscriber has not and will not enter into any voting trust or similar agreement that has the effect of directing the manner in which the votes attached to the Offered Shares purchased pursuant to this Subscription Agreement or the Warrant Shares acquired upon exercise of the Warrants purchased pursuant to this Subscription Agreement may be voted following the Closing Date (as defined herein); and

(h)     the Subscriber is aware that the Securities and the common shares of the Corporation have not been and will not be registered under the 1933 Act or the securities laws of any state of the Shared States and that these securities may not be offered or sold, directly or indirectly, in the Shared States without registration under the 1933 Act or compliance with requirements of an exemption from registration or an exemption from such registration exemption is available and the securities laws of all applicable states and the Subscriber acknowledges that the Corporation has no present intention of filing a registration statement under the 1933 Act in respect of the Securities; and

(i)     the Shares have only been offered to the Subscribers in the Shared States pursuant to the exemption from registration provided by Rule 506 under Regulation D of the 1933 Act, and the individuals making the order to purchase the Shares and executing and delivering this Subscription Agreement on behalf of the Subscriber if in the Shared States when the order was placed and this Subscription Agreement was executed and delivered have executed and delivered Exhibit 4 hereto; and

(j)     the Subscriber undertakes and agrees that it will not offer or sell the Securities in the Shared States unless such securities are registered under the 1933 Act and the securities laws of all applicable states of the Shared States or an exemption from such registration requirements is available, and further that the Subscriber will not resell the Securities, except in accordance with the provisions of applicable securities legislation, regulations, rules, policies and orders and stock exchange rules; and

(k)     if a corporation, partnership, unincorporated association or other entity, the Subscriber has the legal capacity and competence to enter into and be bound by this Subscription Agreement and to perform all of its obligations hereunder, and if the Subscriber is a body corporate, it is duly incorporated or created and validly subsisting under the laws of the jurisdiction of its incorporation, and further certifies that all necessary approvals of directors, shareholders, partners or otherwise have been given and obtained; and

(l)     if the Subscriber is an individual, the Subscriber is of the full age of majority in the jurisdiction in which the Subscription Agreement is executed and is legally competent to execute this Subscription Agreement and take all action pursuant hereto; and

(m)     this Subscription Agreement has been duly and validly authorized, executed and delivered by and constitutes a legal, valid, binding and enforceable obligation of the Subscriber; and

(n)     the Subscriber acknowledges that this Subscription Agreement is not enforceable by the Subscriber until the Subscription Agreement has been executed by the Corporation; and

(o)     in the case of a subscription by the Subscriber for Shares acting as agent for a principal/beneficial purchaser, the Subscriber is duly authorized to execute and deliver this Subscription Agreement and all

7                                                    CANADA, US & OFFSHORE

other necessary documentation in connection with such subscription on behalf of such principal/beneficial purchaser and this Subscription Agreement has been duly authorized, executed and delivered by or on behalf of, and constitutes a legal, valid and binding agreement of, such principal/beneficial purchaser and the Subscriber acknowledges that the Corporation is required by law to disclose to certain regulatory authorities the identity of each principal/beneficial purchaser for whom the Subscriber may be acting; and

(p)     the Subscriber, or each principal/beneficial purchaser for whom it is acting, has such knowledge in financial and business affairs as to be capable of evaluating the merits and risks of its investment and the Subscriber, or, each principal/beneficial purchaser for whom it is acting, is able to bear the economic risk of loss of its entire investment; and

(q)     the Subscriber has relied solely upon this Subscription Agreement and publicly available information relating to the Corporation and, other than as stated herein, not upon any verbal or written representation as to fact or otherwise made by or on behalf of the Corporation and agrees and acknowledges that the Corporation's counsel is acting as counsel to the Corporation and not as counsel to the Subscriber; and

(r)     the Subscriber understands and acknowledges that the Shares are being offered for sale only on a "private placement" basis and that the sale and delivery of the Shares is conditional upon such sale being exempt from the requirements as to the filing of a prospectus or delivery of an offering memorandum or upon the issuance of such orders, consents or approvals as may be required to permit such sale without the requirement of filing a prospectus or delivering an offering memorandum; and

(s)     if required by applicable securities legislation, regulations, rules, policies or orders or by any securities commission, stock exchange or other regulatory authority, the Subscriber will execute, deliver, file and otherwise assist the Corporation in filing, such reports, undertakings and other documents with respect to the issue of the Securities as may be required, including, without limitation;

        (i)      **in the case of an "accredited investor"**, a representation letter in the form attached as Exhibit 1 with Appendix A to Exhibit 1 fully completed; and

        (ii)     **in the case of a "close personal friend" or "close business associate"**, a Close Personal Friend and/or Close Business Associate Questionnaire attached as **Exhibit 2**; and

        (iii)    **for a Subscriber that is a "close personal friend" or "close business associate" resident in Saskatchewan** and subscribing pursuant to the exemption contained in subsection 7(d)(ii), a Risk Acknowledgement Form attached hereto as **Exhibit 3**; and

        (iv)     **in the case of Subscriber resident or otherwise subject to applicable laws of the Shared States**, a U.S. Accredited Investor Certificate in the form attached as Exhibit 4 as well as a representation letter in the form attached as **Exhibit 1 with Appendix A to Exhibit 1** fully completed; and

        (v)      **if the Subscriber is introduced to the Corporation by a finder**, a Risk Acknowledgement in the form attached hereto as Exhibit 5; and

(t)     the Subscriber will not resell the Securities except in accordance with the provisions of applicable securities legislation and stock exchange rules, if applicable, in the future; and

(u)     the entering into of this Subscription Agreement and the transactions contemplated hereby will not result in a violation of any of the terms or provisions of any law applicable to the Subscriber, or if the Subscriber is not a natural person, any of the Subscriber's constating documents, or any agreement to which the Subscriber is a party or by which the Subscriber is bound; and

(v)     none of the funds that the Subscriber is using to purchase the Shares represent proceeds of crime for the purposes of the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act* (Canada) (the

"PCMLTFA") and the Subscriber acknowledges that the Corporation may in the future be required by law to disclose the Subscriber's name and other information relating to this Subscription Agreement and the Subscriber's subscription hereunder, on a confidential basis, pursuant to the PCMLTFA, and to the best of the Subscriber's knowledge (i) the Aggregate Subscription Amount to be provided by the Subscriber (A) has not been or will not be derived from or related to any activity that is deemed criminal under the law of Canada, the Shared States of America, or any other jurisdiction, or (B) is not being tendered on behalf of a person or entity who has not been identified to the Subscriber, and (ii) the Subscriber shall promptly notify the Corporation if the Subscriber discovers that any of such representations ceases to be true, and to provide the Corporation with appropriate information in connection therewith; and

(w)     none of the funds the Subscriber is using to purchase the Shares are, to the knowledge of the Subscriber, proceeds obtained or derived, directly or indirectly, as a result of illegal activities; and

(x)     the Subscriber understands and acknowledges that the Shares are being purchased pursuant to exemptions from the prospectus requirements contained in applicable securities legislation and, as a result:

    (i)     the Subscriber is restricted from using most of the civil remedies available under applicable securities legislation; and

    (ii)    the Subscriber may not receive information that would otherwise be required to be provided to the Subscriber under applicable securities legislation; and

    (iii)   the Corporation is relieved from certain obligations that would otherwise apply under applicable securities legislation; and

(y)     the Subscriber acknowledges that it has been encouraged to and should obtain independent legal, income tax and investment advice with respect to its subscription for the Shares, including, but not limited to, the applicable resale restrictions, and accordingly, has been independently advised as to the meanings of all terms contained herein relevant to the Subscriber for purposes of giving representations, warranties and covenants under this Subscription Agreement; and

(z)     the Subscriber is aware that there is no minimum gross proceeds amount under the Offering, the Corporation may close on any amount and the Subscriber may be the only purchaser under the Offering; and

(aa)    the Subscriber is aware and has been advised that his subscription funds will not be held in escrow and represent "seed" or "risk" capital for the immediate use of the Corporation, a non-reporting issuer and for whose securities there is no market whatsoever; and

(bb)    the Subscriber's offer to subscribe for Shares has not been induced by any representations with regard to the present or future worth of the Shares; and

(cc)    the Subscriber is aware that any Securities issued upon the Corporation's acceptance of this Subscription Agreement will be subject to restrictions on resale imposed by the securities legislation and the Subscriber agrees to be bound by and to comply with such restrictions; and

(dd)    the Subscriber acknowledges that the Corporation may complete additional financings in the future in order to develop the proposed business of the Corporation and to fund its ongoing development; that there is no assurance that such financings will be available and, if available, on reasonable terms; any such future financings may have a dilutive effect on current securityholders, including the Subscriber; that if such future financings are not available, the Corporation may be unable to fund its ongoing development and the lack of capital resources may result in the failure of its business venture; and

(ee)    the Subscriber acknowledges that the Corporation is not a reporting issuer in any jurisdiction and the Corporation cannot and is not representing that any of the Securities are or will be listed on the TSX

Venture Exchange Inc., The Toronto Stock Exchange or any other exchange and no market exists for the securities of the Corporation; and

(ff) upon acceptance by the Corporation of this Subscription Agreement, the Aggregate Subscription Amount is immediately releasable to the Corporation to be used for the ongoing business of the Corporation; and

(gg) the Subscriber is not a "control person" of the Corporation, as that term is defined in the *Securities Act* (Alberta), will not become a "control person" of the Corporation by purchasing the number of Shares subscribed for under this Subscription Agreement, and does not intend to act jointly or in concert with any other person to form a control group in respect of the Corporation; and

(hh) no authorization, consent, order, approval or notice of any federal, provincial, territorial, municipal or foreign regulatory body or official must be obtained or given, and no waiting period must expire, in order that this Subscription Agreement and the transactions contemplated herein can be consummated by the Subscriber; and

(ii) the Subscriber does not act jointly or in concert with any other person for the purposes of the acquisition of the Securities; and

(jj) the delivery of this Subscription Agreement, the acceptance hereof by the Corporation and the issuance of the Shares to the Subscriber complies or will comply with all applicable laws of the Subscriber's jurisdiction of residence and domicile and will not cause the Corporation or any of its officers or directors to become subject to or require any disclosure, prospectus or other reporting requirement; and

(kk) the Subscriber acknowledges that the Subscriber or the Corporation may be required to provide the applicable securities regulatory authorities with a list setting forth the identities of the beneficial purchasers of the Shares and notwithstanding that the Subscriber may be purchasing the Shares as agent for a principal, it will provide, on request, particulars as to the identity of such principal as may be required by the Corporation (in order to comply with the foregoing).

**Closing**

5.    The Subscriber agrees to deliver to the Corporation, not later than 4:30 p.m. (Calgary time) on the day that is two business days before the Closing Date: (a) this duly completed and executed Subscription Agreement; (b) a USD cheque or USD bank draft payable to the Corporation for the Aggregate Subscription Amount of the Shares subscribed for under this Subscription Agreement or payment of the same amount in such other manner as is acceptable to the Corporation; (c) <u>if the Subscriber is an "accredited investor"</u>, a fully executed and completed Representation Letter in the form of Exhibit 1 with Appendix A to Exhibit 1 fully completed; (d) <u>if the Subscriber is purchasing as a "close personal friend" or "close business associate"</u>, a Close Personal Friend and/or Close Business Associate Questionnaire attached as Exhibit 2; (e) <u>if the Subscriber is resident in Saskatchewan and subscribing pursuant to the exemption contained in subsection 7(d)(ii)</u>, a Risk Acknowledgement Form attached hereto as Exhibit 3 and (f) <u>if the Subscriber is resident or otherwise subject to applicable laws of the Shared States</u>, a U.S. Accredited Investor Certificate in the form attached as **Exhibit 4** as well as a representation letter in the form attached as **Exhibit 1** with Appendix A to Exhibit 1 fully completed; and (g) <u>if the Subscriber is introduced to the Corporation by a finder</u>, a Risk Acknowledgement in the form attached hereto as **Exhibit 5**. .

6.    The sale of the Shares pursuant to this Subscription Agreement will be completed at the offices of Davis LLP, the Corporation's counsel, in Calgary, Alberta at 10:00 a.m. or such other times as the Corporation may determine (the "**Closing Time**") on September 15, 2013 or such other earlier or later date or dates as the Corporation may determine (each a "**Closing Date**"). At the Closing Time, the certified cheque or bank draft payable to the Corporation in payment of the Aggregate Subscription Amount delivered as set forth in section 8 will be tendered to the Corporation against delivery by the Corporation of the certificates representing the Securities.

7.    The Corporation shall be entitled to rely on delivery of a facsimile or scanned and emailed copy of executed subscriptions, and acceptance by the Corporation of such facsimile or scanned and emailed subscriptions

shall be legally effective to create a valid and binding agreement between the Subscriber and the Corporation in accordance with the terms hereof. Notwithstanding the foregoing, the Subscriber shall deliver originally executed copies of the documents listed in section 8 hereof to the Corporation within two business days of being requested to do so by the Corporation. In addition, this Subscription Agreement may be executed in counterparts, each of which shall be deemed to be an original and all of which shall constitute one and the same document.

**General**

8.      The Subscriber agrees that the representations, warranties and covenants of the Subscriber herein will be true and correct both as of the execution of this Subscription Agreement and as of the Closing Time as if made at that time and will survive the completion of the issuance of the Securities. The representations, warranties and covenants of the Subscriber herein are made with the intent that they be relied upon by the Corporation and its counsel in determining the Subscriber's eligibility to purchase the Securities and the Subscriber hereby agrees to indemnify and hold harmless the Corporation and its respective directors, officers, employees, advisors, affiliates, shareholders, partners and agents from and against any and all loss, liability, claim, damage and expense whatsoever including, but not limited to, any fees, costs and expenses whatsoever reasonably incurred in investigating, preparing or defending against any litigation, administrative proceeding or investigation commenced or threatened or any claim whatsoever arising out of or based upon any representation or warranty of the Subscriber contained herein or in any document furnished by the Subscriber to the Corporation in connection herewith being untrue in any material respect or any breach or failure by the Subscriber to comply with any covenant or agreement made by the Subscriber herein or in any document furnished by the Subscriber to the Corporation in connection herewith. The Subscriber undertakes to immediately notify the Corporation c/o Davis LLP, 1000, 250 - 2nd Street S.W., Calgary, Alberta T2P 0C1, Attn: Roy Hudson (Fax Number: (403) 296-4474) of any change in any statement or other information relating to the Subscriber set forth herein which takes place prior to the Closing Time.

9.      The Subscriber, if an individual, acknowledges that this Subscription Agreement and the Exhibits hereto require the Subscriber to provide certain personal information to the Corporation and its counsel. Such information is being collected by the Corporation and its counsel for the purposes of completing the Offering described herein, which includes, without limitation, determining the Subscriber's eligibility to purchase the Shares under applicable securities legislation, preparing and registering certificates representing the Offered Shares, Warrants and Warrant Shares to be issued to the Subscriber and completing filings required by any stock exchange, securities commission or securities regulatory authority or taxation authorities. Certain securities commissions have been granted the authority to indirectly collect this personal information pursuant to securities legislation and this personal information is also being collected for the purpose of administration and enforcement of securities legislation. In Ontario, the Administrative Assistant to the Director of Corporate Finance, Suite 1903, Box 55 20 Queen Street West, Toronto, Ontario M5H 3S8, Telephone (416) 593-8086, Facsimile: (416) 593-8252 is the public official who can answer questions about the indirect collection of personal information. The Subscriber agrees that the Subscriber's personal information may be disclosed by the Corporation or its counsel to: (a) stock exchanges, securities commissions or securities regulatory authorities; (b) the Corporation's registrar and transfer agent; (c) taxation authorities; (d) any of the other parties involved in the Offering, including legal counsel. By executing this Subscription Agreement, the Subscriber is deemed to be authorizing and consenting to the foregoing collection (including the indirect collection of personal information), use and disclosure of the Subscriber's personal information as set forth above. The Subscriber also consents to the filing of copies or originals of any of the Subscriber's documents described in this Subscription Agreement as may be required to be filed with any stock exchange, securities commission or securities regulatory authority in connection with the transactions contemplated hereby.

10.     The Subscriber hereby irrevocably authorizes the Corporation to: (a) act as its representative at the closing and to execute in its name and on its behalf all closing receipts and documents required; (b) complete or correct any errors or omissions in any form or document, including this Subscription Agreement, provided by the Subscriber; (c) receive on its behalf certificates representing the Securities purchased under this Subscription Agreement; and (d) approve any opinions, certificates or other documents addressed to the Subscriber.

11.     The obligations of the parties hereunder are subject to all required regulatory approvals.

11                              CANADA, US & OFFSHORE

12.     The Subscriber agrees that upon satisfaction of the closing conditions, the entire Aggregate Subscription Amount shall be immediately released to the Corporation on the Closing Date, and that no part of such proceeds will be held in escrow.

13.     The Subscriber acknowledges and agrees that all costs incurred by the Subscriber (including any fees and disbursements of any special counsel retained by the Subscriber) relating to the sale of the Shares to the Subscriber shall be borne by the Subscriber.

14.     The contract arising out of this Subscription Agreement and all documents relating thereto shall be governed by and construed in accordance with the laws of the Province of Alberta and the federal laws of Canada applicable therein.   The parties irrevocably attorn to the exclusive jurisdiction of the courts of the Province of Alberta. Time shall be of the essence hereof.

15.     This Subscription Agreement represents the entire agreement of the parties hereto relating to the subject matter hereof and there are no representations, covenants or other agreements relating to the subject matter hereof except as stated or referred to herein.

16.     The terms and provisions of this Subscription Agreement shall be binding upon and enure to the benefit of the Subscriber and the Corporation and their respective heirs, executors, administrators, successors and assigns; provided that, except for the assignment by a Subscriber who is acting as nominee or agent to the beneficial owner and as otherwise herein provided, this Subscription Agreement shall not be assignable by any party without prior written consent of the other parties.

17.     Except as otherwise provided herein, the parties may waive, modify, change, discharge or terminate this Subscription Agreement only by a written instrument signed by each party against whom the waiver, change, discharge or termination is sought.

18.     The invalidity, illegality or unenforceability of any provision of this Subscription Agreement shall not affect the validity, legality or enforceability of any other provision hereof.

19.     The Subscriber, on its own behalf and, if applicable, on behalf of others for whom it is contracting hereunder, agrees that this subscription is made for valuable consideration and may not be withdrawn, cancelled, terminated or revoked by the Subscriber, on its own behalf and, if applicable, on behalf of others for whom it is contracting hereunder.

20.     The covenants, representations and warranties contained herein shall survive the closing of the transactions contemplated hereby.

21.     In this Subscription Agreement (including exhibits), references to "$" are to United States dollars.

EXHIBIT I

REPRESENTATION LETTER

(FOR ACCREDITED INVESTORS)

TO:          CANDEO LAVA PRODUCTS INC. (the "Corporation")

In connection with the purchase of Shares of the Corporation as defined in the attached Subscription Agreement by the undersigned subscriber or, if applicable, the principal on whose behalf the undersigned is purchasing as agent (the "**Subscriber**" for the purposes of this Exhibit I), the Subscriber hereby represents, warrants, covenants and certifies to the Corporation that:

1.    The Subscriber is resident in the jurisdiction as set forth on the face page of this Subscription Agreement or is subject to the securities laws of such jurisdiction;

2.    The Subscriber is purchasing the Shares as principal for its own account (unless the Subscriber is an accredited investor pursuant to paragraphs (p) and (q) in Appendix "A" hereto);

3.    The Subscriber has read and understands the initialed criterion of an accredited investor as set out in Appendix "A" attached to this Representation Letter.

4.    The Subscriber is, and at the time of closing will be, an "accredited investor" within the meaning of National Instrument 45-106 entitled "Prospectus and Registration Exemptions" by virtue of satisfying the initialed criterion as set out in Appendix "A" attached to this Representation Letter;

5.    The Subscriber was not created or used solely to purchase or hold securities as an accredited investor as described in paragraph (m) of the attached Appendix "A" of this Exhibit I; and

6.    Upon execution of this Exhibit I by the Subscriber, this Exhibit I shall be incorporated into and form a part of the Subscription Agreement.

Dated:          .          .          , 2013.

_____
Print name of Subscriber

By:    _____
Signature

_____
Print name of Signatory (if different from Subscriber)

_____
Title

**IMPORTANT: PLEASE INITIAL THE CATEGORY OR CATEGORIES
IN APPENDIX "A" ON THE NEXT PAGE THAT DESCRIBES YOU**

APPENDIX "A" TO EXHIBIT 1

NOTE: THE INVESTOR MUST INITIAL BESIDE THE APPLICABLE PORTION OF THE DEFINITION BELOW.

Accredited Investor - (defined in National Instrument 45-106) means:

_____  (a)  a Canadian financial institution, or a Schedule III bank; or

_____  (b)  the Business Development Bank of Canada incorporated under the *Business Development Bank of Canada Act* (Canada); or

_____  (c)  a subsidiary of any person referred to in paragraphs (a) or (b), if the person owns all of the voting securities of the subsidiary, except the voting securities required by law to be owned by directors of that subsidiary; or

_____  (d)  a person registered under the securities legislation of a jurisdiction of Canada, as an adviser or dealer, other than a person registered solely as a limited market dealer under one or both of the *Securities Act* (Ontario) or the *Securities Act* (Newfoundland and Labrador); or

_____  (e)  an individual registered or formerly registered under the securities legislation of a jurisdiction of Canada as a representative of a person referred to in paragraph (d); or

_____  (f)  the Government of Canada or a jurisdiction of Canada, or any crown corporation, agency or wholly-owned entity of the Government of Canada or a jurisdiction of Canada; or

_____  (g)  a municipality, public board or commission in Canada and a metropolitan community, school board, the Comité de gestion de la taxe scolaire de l'île de Montréal or an intermunicipal management board in Québec; or

_____  (h)  any national, federal, state, provincial, territorial or municipal government of or in any foreign jurisdiction, or any agency of that government; or

_____  (i)  a pension fund that is regulated by the Office of the Superintendent of Financial Institutions (Canada), a pension commission or similar regulatory authority of a jurisdiction of Canada; or

_____  (j)  an individual who, either alone or with a spouse, beneficially owns financial assets having an aggregate realizable value that before taxes, but net of any related liabilities, exceeds CDN $1,000,000; or

_____  (k)  an individual whose net income before taxes exceeded CDN $200,000 in each of the two most recent calendar years or whose net income before taxes combined with that of a spouse exceeded CDN $300,000 in each of the two most recent calendar years and who, in either case, reasonably expects to exceed that net income level in the current calendar year; or

*(Note: if individual accredited investors wish to purchase through wholly-owned holding companies or similar entities, such purchasing entities must qualify under paragraph (l) below, which must be initialed.)*

_____  (l)  an individual who, either alone or with a spouse, has net assets of at least CDN $5,000,000; or

|  | (m) | a person, other than an individual or investment fund, that has net assets of at least CDN $5,000,000 as shown on its most recently prepared financial statements; or |

|  | (n) | an investment fund that distributes or has distributed its securities only to: |

    (i)   a person that is or was an accredited investor at the time of the distribution, or

    (ii)  a person that acquires or acquired securities in the circumstances referred to in sections 2.10 or 2.19 of National Instrument 45-106, or

    (iii) a person described in paragraph (i) or (ii) that acquires or acquired securities under section 2.18 of National Instrument 45-106; or

|  | (o) | an investment fund that distributes or has distributed securities under a prospectus in a jurisdiction of Canada for which the regulator or, in Quebéc, the securities regulatory authority, has issued a receipt; or |

|  | (p) | a trust company or trust corporation registered or authorized to carry on business under the *Trust and Loan Companies Act* (Canada) or under comparable legislation in a jurisdiction of Canada or a foreign jurisdiction, acting on behalf of a fully managed account managed by the trust company or trust corporation, as the case may be; or |

|  | (q) | a person acting on behalf of a fully managed account managed by that person, if that person |

    (iv) is registered or authorized to carry on business as an adviser or the equivalent under the securities legislation of a jurisdiction of Canada or a foreign jurisdiction, and

    (v)  in Ontario, is purchasing a security that is not a security of an investment fund; or

|  | (r) | a registered charity under the *Income Tax Act* (Canada) that, in regard to the trade, has obtained advice from an eligibility adviser or an adviser registered under the securities legislation of the jurisdiction of the registered charity to give advice on the securities being traded; or |

|  | (s) | an entity organized in a foreign jurisdiction that is analogous to any of the entities referred to in paragraphs (a) to (d) or paragraph (i) in form and function; or |

|  | (t) | a person in respect of which all of the owners of interests, direct, indirect or beneficial, except the voting securities required by law to be owned by directors, are persons that are accredited investors (as defined in National Instrument 45-106); or |

*(Note: if you are purchasing as an individual accredited investor paragraph (j) and/or (k) above must be initialed rather than paragraph (t).)*

|  | (u) | an investment fund that is advised by a person registered as an adviser or a person that is exempt from registration as an adviser; or |

|  | (v) | a person that is recognized or designated by the securities regulatory authority or, except in Ontario and Quebéc, the regulator as an accredited investor. |

**For the purposes hereof:**

(a)      "Canadian financial institution" means

    (i)    an association governed by the *Cooperative Credit Associations Act* (Canada) or a central cooperative credit society for which an order has been made under section 473(1) of that Act, or

    (ii)    a bank, loan corporation, trust company, trust corporation, insurance company, treasury branch, credit union, caisse populaire, financial services cooperative, or league that, in each case, is authorized by an enactment of Canada or a jurisdiction of Canada to carry on business in Canada or a jurisdiction of Canada;

(b)    "control person" has the same meaning as in securities legislation and generally means any person that holds or is one of a combination of persons that holds:

    (i)    a sufficient number of the voting rights attached to all outstanding voting securities of an issuer to affect materially the control of the issuer, and

    (ii)    if a person holds more than 20% of the outstanding voting rights attached to all outstanding voting securities of an issuer, the person is deemed, in the absence of evidence to the contrary, to hold a sufficient number of the voting rights to affect materially the control of the issuer;

(c)    "director" means:

    (i)    a member of the board of directors of a company or an individual who performs similar functions for a company, and

    (ii)    with respect to a person that is not a company, an individual who performs functions similar to those of a director of a company;

(d)    "eligibility adviser" means:

    (i)    a person that is registered as an investment dealer and authorized to give advice with respect to the type of security being distributed, and

    (ii)    in Saskatchewan or Manitoba, also means a lawyer who is a practicing member in good standing with a law society of a jurisdiction of Canada or a public accountant who is a member in good standing of an institute or association of chartered accountants, certified general accountants or certified management accountants in a jurisdiction of Canada provided that the lawyer or public accountant must not

        (A)    have a professional, business or personal relationship with the issuer, or any of its directors, executive officers, founders, or control persons, and

        (B)    have acted for or been retained personally or otherwise as an employee, executive officer, director, associate or partner of a person that has acted for or been retained by the issuer or any of its directors, executive officers, founders or control persons within the previous 12 months;

(e)    "executive officer" means, for an issuer, an individual who is

    (i)    a chair, vice-chair or president,

    (ii)    a vice-president in charge of a principal business Share, division or function including sales, finance or production, or

    (iii)    performing a policy-making function in respect of the issuer;

(f)    "financial assets" means

    (i)      cash,

    (ii)     securities, or

    (iii)    a contract of insurance, a deposit or an evidence of a deposit that is not a security for the purposes of securities legislation;

(g)    "**foreign jurisdiction**" means a country other than Canada or a political subdivision of a country other than Canada;

(h)    "**founder**" means, in respect of an issuer, a person who,

    (i)      acting alone, in conjunction, or in concert with one or more persons, directly or indirectly, takes the initiative in founding, organizing or substantially reorganizing the business of the issuer, and

    (ii)     at the time of the distribution or trade is actively involved in the business of the issuer;

(i)    "**fully managed account**" means an account of a client for which a person makes the investment decisions if that person has full discretion to trade in securities for the account without requiring the client's express consent to a transaction;

(j)    "**investment fund**" means a mutual fund or a non-redeemable investment fund, and, for greater certainty in British Columbia, includes an EVCC and a VCC (as such capitalized terms are defined in National Instrument 81-106 - *Investment Fund Continuous Disclosure*);

(k)    "**jurisdiction**" means a province or territory of Canada except when used in the term foreign jurisdiction;

(l)    "**local jurisdiction**" means the jurisdiction in which the Canadian securities regulatory authority is situate;

(m)    "**non-redeemable investment fund**" means an issuer,

    (i)      whose primary purpose is to invest money provided by its security holders,

    (ii)     that does not invest;

        (A)    for the purpose of exercising or seeking to exercise control of an issuer, other than an issuer that is a mutual fund or a non-redeemable investment fund; or

        (B)    for the purpose of being actively involved in the management of any issuer in which it invests, other than an issuer that is a mutual fund or a non-redeemable investment fund; and

    (iii)    that is not a mutual fund;

(n)    "**person**" includes

    (i)      an individual,

    (ii)     a corporation,

    (iii)    a partnership, trust, fund and an association, syndicate, organization or other organized group of persons, whether incorporated or not, and

    (iv)    an individual or other person in that person's capacity as a trustee, executor, administrator or personal or other legal representative;

(o)    "regulator" means, for the local jurisdiction, the Executive Director as defined under securities legislation of the local jurisdiction;

(p)    "related liabilities" means

    (i)    liabilities incurred or assumed for the purpose of financing the acquisition or ownership of financial assets, or

    (ii)    liabilities that are secured by financial assets.

(q)    "Schedule III bank" means an authorized foreign bank named in Schedule III of the *Bank Act* (Canada);

(r)    "spouse" means, an individual who,

    (i)    is married to another individual and is not living separate and apart within the meaning of the *Divorce Act* (Canada), from the other individual,

    (ii)    is living with another individual in a marriage-like relationship, including a marriage-like relationship between individuals of the same gender, or

    (iii)    in Alberta, is an individual referred to in paragraph (i) or (ii) above, or is an adult interdependent partner within the meaning of the *Adult Interdependent Relationships Act* (Alberta); and

(s)    "subsidiary" means an issuer that is controlled directly or indirectly by another issuer and includes a subsidiary of that subsidiary.

All monetary references are in United States Dollars.

EXHIBIT 2

CLOSE PERSONAL FRIEND AND/OR
CLOSE BUSINESS ASSOCIATE QUESTIONNAIRE

TO:           CANDEO LAVA PRODUCTS INC. (the "Corporation")

To be completed by Subscribers to whom the "close personal friend" or the "close business associate" aspect of subsections 7(d)(ii)(D), (E), (F), (H) or (I) of the Subscription Agreement applies.  For the purposes of this certificate "close personal friend" means that you have directly known such individual well enough and for a sufficient period of time and in a sufficiently close relationship (where such relationship is direct and extends beyond being a relative or member of the same organization, association or religious group or a client, customer or former client or customer or being a close personal friend of a close personal friend of such individual) to be in a position to assess the capabilities and the trustworthiness of such individual.  For the purposes of this certificate "close business associate" means that you have had a direct sufficient prior business dealings with such individual (where such relationship is direct and extends beyond being a casual business associate or person introduced or solicited for the purpose of purchasing securities or a client, customer or former client or customer or being a close business associate of a close business associate of such individual) to be in a position to assess the capabilities and trustworthiness of such individual.

Name of director, executive officer, control person or founder: _____

Length of Relationship: _____

Details of Relationship: _____

Prior Business Dealings (if applicable): _____

The undersigned understands that the Corporation is relying on this information in determining to sell securities to the undersigned in a manner exempt from the prospectus and registration requirements of the applicable securities laws.

The undersigned has executed this Questionnaire as of the _____ day of _____, 2013.

If a Corporation, Partnership or other Entity:          If an Individual:

_____          _____
Name of Entity                                              Signature

_____          _____
Signature of Person Signing                            Name of Individual

_____
Title of Person

EXHIBIT 3

RISK ACKNOWLEDGEMENT FORM

---

**Risk Acknowledgement**
**Saskatchewan Close Personal Friends and Close Business Associates**

I acknowledge that this is a risky investment:
- I am investing entirely at my own risk.
- No securities regulatory authority or regulator has evaluated or endorsed the merits of these securities.
- The person selling me these securities is not registered with a securities regulatory authority or regulator and has no duty to tell me whether this investment is suitable for me.
- I will not be able to sell these securities except in very limited circumstances.  I may never be able to sell these securities.
- I could lose all the money I invest.
- I do not have a 2 -day right to cancel my purchase of these securities or the statutory rights of action for misrepresentation I would have if I were purchasing the securities under a prospectus.  I do have a 2-day right to cancel my purchase of these securities if I receive an amended offering document.

I am investing U.S. $_____ [total consideration] in total; this includes any amount I am obliged to pay in future.

I am a **close** personal friend or **close** business associate of _____ [state name], who is a _____ [state title - founder, director, executive officer or control person] of CANDEO LAVA PRODUCTS INC.

I acknowledge that I am purchasing based on my close relationship with _____ [state name of founder, director, executive officer or control person] whom I know well enough and for a sufficient period of time to be able to assess her/his capabilities and trustworthiness.

**I acknowledge that this is a risky investment and that I could lose all the money I invest.**

_____
Date

_____
Signature of Purchaser

_____
Print name of Purchaser

**Sign 2 copies of this document. Keep one copy for your records.**

WARNING

**You are buying *Exempt Market Securities***
They are called *exempt market securities* because two parts of securities law do not apply to them. If an issuer wants to sell *exempt market securities* to you:

- the issuer does not have to give you a prospectus (a document that describes the investment in detail and gives you some legal protections), and

- the securities do not have to be sold by an investment dealer registered with a securities regulatory authority or regulator.

There are restrictions on your ability to resell *exempt market securities*. *Exempt market securities* are more risky than other securities.

**You may not receive any written information about the issuer or its business**
If you have any questions about the issuer or its business, ask for written clarification before you purchase the securities. You should consult your own professional advisers before investing in the securities.

**You will not receive advice**
Unless you consult your own professional advisers, you will not get professional advice about whether the investment is suitable for you.

**The issuer of your securities is a non-reporting issuer**
A non-reporting issuer does not have to publish financial information or notify the public of changes in its business. You may not receive ongoing information about this issuer. You can only sell the securities of a non-reporting issuer in very limited circumstances. You may never be able to sell these securities.

**The securities you are buying are not listed**
The securities you are buying are not listed on any stock exchange, and they may never be listed. There may be no market for these securities. You may never be able to sell these securities.

For more information on the exempt market, refer to the Saskatchewan Financial Services Commission's website at http://www.sfsc.gov.sk.ca.

*You must sign 2 copies of this form. You and the Corporation must each receive a signed copy.*

EXHIBIT 4

## U.S. ACCREDITED INVESTOR CERTIFICATE

*This is Exhibit 4 to the Subscription Agreement relating to the purchase of Shares of CANDEO LAVA PRODUCTS INC. (the "Corporation").  Capitalized terms used but not defined in this exhibit are intended to have the meanings ascribed thereto, as applicable, in the body of this Subscription Agreement.*

The Subscriber understands and agrees that neither the common shares of the Corporation, the Shares, nor the, Warrants and Warrant Shares for which they are convertible, have been nor will be registered under the Shared States *Securities Act of 1933*, as amended (the "**1933 Act**"), or applicable state securities laws, and are being offered and sold on behalf of the Corporation to the Subscriber in reliance upon Rule 506 of Regulation D under the 1933 Act.  Accordingly, the common shares of the Corporation, the Shares, the Warrants and the Warrant Shares for which they are convertible, will be "restricted securities" within the meaning of Rule 144 under the 1933 Act, and therefore may not be offered or sold by it without registration under Shared States federal and state securities laws, except (A) to the Corporation, (B) outside the Shared States in accordance with Rule 904 of Regulation S under the 1933 Act, (C) in a transaction that complies with Rule 144 or Rule 144A under the 1933 Act, or (D) in a transaction otherwise exempt from registration under the 1933 Act and, in any event, in compliance with any applicable state securities laws of the Shared States. Capitalized terms used in this Exhibit 5 and defined in the Subscription Agreement to which this Exhibit 5 is attached have the meanings defined in such Subscription Agreement unless otherwise defined in this Exhibit 5.

The undersigned represents, warrants and covenants (which representations, warranties and covenants shall survive the Closing Date) to the Corporation (and acknowledges that the Corporation is relying thereon) that:

(a) It is an "Accredited Investor" as defined in Rule 501(a) under the 1933 Act and is acquiring the Shares for its own account or for the account of one or more Accredited Investors with respect to which it exercises sole investment discretion, and in each case not with a view to any resale, distribution or other disposition of the Securities in violation of Shared States federal or state securities laws; and

(b) it, and if applicable, each person for whose account it is purchasing the Shares represents that it is an "Accredited Investor" as defined in Rule 501(a) and satisfies one or more of the categories of "accredited investor" indicated below (the **Subscriber must check the appropriate line(s)**):

_____Category 1.    A bank, as defined in Section 3(a)(2) of the 1933 Act, whether acting in its individual or fiduciary capacity; or

_____Category 2.    A savings and loan association or other institution as defined in Section 3(a)(5)(A) of the 1933 Act, whether acting in its individual or fiduciary capacity; or

_____Category 3.    A broker or dealer registered pursuant to Section 15 of the Shared States *Securities Exchange Act of 1934*, as amended; or

_____Category 4.    An insurance company as defined in Section 2(13) of the 1933 Act; or

_____Category 5.    An investment company registered under the Shared States *Investment Company Act of 1940*; or

_____Category 6.    A business development company as defined in Section 2(a)(48) of the Shared States *Investment Company Act of 1940*; or

_____Category 7.    A small business investment company licensed by the U.S. Small Business Administration under Section 301 (c) or (d) of the Shared States *Small Business Investment Act of 1958*; or

_____Category 8.    A plan established and maintained by a state, its political subdivisions or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, with total assets in excess of U.S. $5,000,000; or

_____Category 9.    An employee benefit plan within the meaning of the Shared States *Employee Retirement Income Security Act of 1974* in which the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company or registered investment adviser, or an employee benefit plan with total assets in excess of U.S. $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons who are accredited investors; or

_____Category 10.   A private business development company as defined in Section 202(a)(22) of the Shared States *Investment Advisers Act of 1940*; or

_____Category 11.   An organization described in Section 501(c)(3) of the Shared States *Internal Revenue Code*, a corporation, a Massachusetts or similar business trust, or a partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of U.S. $5,000,000; or

_____Category 12.   Any director or executive officer of the Corporation; or

_____Category 13.   A natural person whose individual net worth, or joint net worth with that person's spouse, at the date hereof exceeds U.S. $1,000,000, excluding the value, if any, of such person's primary residence; or

_____Category 14.   A natural person who had an individual income in excess of U.S. $200,000 in each of the two most recent years or joint income with that person's spouse in excess of U.S. $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year; or

_____Category 15.   A trust, with total assets in excess of U.S. $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) under the 1933 Act; or

_____Category 16.   Any entity in which all of the equity owners meet the requirements of at least one of the above categories;

(c)    it understands that upon the issuance thereof, and until such time as the same is no longer required under the applicable requirements of the 1933 Act or applicable U.S. state laws and regulations, the certificates representing the Shares, Offered Shares, Warrants and Warrant Shares, if any, for which they are convertible, and all securities issued in exchange therefor or in substitution thereof, will bear a legend in substantially the following form:

"THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SHARED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "1933 ACT") OR ANY STATE SECURITIES LAWS.   THESE SECURITIES MAY BE OFFERED, SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED OR ENCUMBERED ONLY (A) TO CANDEO LAVA PRODUCTS INC. (B) OUTSIDE THE SHARED STATES IN COMPLIANCE WITH RULE 904 OF REGULATION S PROMULGATED UNDER THE 1933 ACT, (C) IN COMPLIANCE WITH THE EXEMPTION FROM THE REGISTRATION REQUIREMENTS UNDER THE 1933 ACT PROVIDED BY RULE 144 OR RULE 144A THEREUNDER, IF AVAILABLE, AND IN ACCORDANCE WITH ANY APPLICABLE STATE SECURITIES LAWS, OR (D) IN A TRANSACTION THAT IS OTHERWISE EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE 1933 ACT AND ANY APPLICABLE STATE LAWS, AND THE HOLDER HAS, PRIOR TO SUCH SALE, FURNISHED TO THE CORPORATION AN OPINION OF COUNSEL OR OTHER EVIDENCE OF EXEMPTION, IN EITHER CASE REASONABLY SATISFACTORY TO THE CORPORATION.

DELIVERY OF THIS CERTIFICATE MAY NOT CONSTITUTE "GOOD DELIVERY" IN SETTLEMENT OF TRANSACTIONS ON STOCK EXCHANGES IN CANADA.  IF THESE SECURITIES ARE BEING SOLD AT ANY TIME THE CORPORATION IS A "FOREIGN ISSUER" AS DEFINED IN RULE 902 UNDER THE 1933

ACT, A NEW CERTIFICATE, BEARING NO LEGEND, THE DELIVERY OF WHICH WILL CONSTITUTE "GOOD DELIVERY" MAY BE OBTAINED FROM THE CORPORATION'S TRANSFER AGENT UPON DELIVERY OF THIS CERTIFICATE AND A DULY EXECUTED DECLARATION, IN FORM SATISFACTORY TO THE CORPORATION AND THE CORPORATION'S TRANSFER AGENT TO THE EFFECT THAT THE SALE OF THE SECURITIES IS BEING MADE IN COMPLIANCE WITH RULE 904 OF REGULATION S UNDER THE 1933 ACT."

Provided, that if the Shares, Offered Shares, Warrants or Warrant Shares are being sold under clause (B) above, at a time when the Corporation is a "foreign issuer" as defined in Rule 902 under the 1933 Act, the legend set forth above may be removed at the time of sale by providing a declaration to the Corporation and its transfer agent in the form attached hereto as Appendix A or as the Corporation may from time to time prescribe, to the effect that the sale of the securities is being made in compliance with Rule 904 of Regulation S under the 1933 Act; provided further, that if any of the Shares, Offered Shares, Warrants or Warrant Shares are being sold pursuant to Rule 144 of the 1933 Act and in compliance with any applicable state securities laws, the legend may be removed by delivery to the Corporation's transfer agent of an opinion satisfactory to the Corporation to the effect that the legend is no longer required under applicable requirements of the 1933 Act or state securities laws;

(d)     it understands and acknowledges that in addition to the legend set forth in Section (c) above, the certificates representing the Warrants may in addition bear a legend in substantially the following form:

"THIS WARRANT AND THE SECURITIES DELIVERABLE UPON EXERCISE THEREOF HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SHARED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "U.S. SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OF THE SHARED STATES. THIS WARRANT MAY NOT BE EXERCISED IN THE SHARED STATES OR BY OR ON BEHALF OF, OR FOR THE ACCOUNT OR BENEFIT OF, A U.S. PERSON UNLESS THIS WARRANT AND SHARES ISSUABLE UPON EXERCISE OF THIS WARRANT HAVE BEEN REGISTERED UNDER THE U.S. SECURITIES ACT AND THE APPLICABLE SECURITIES LEGISLATION OF ANY SUCH STATE OR AN EXEMPTION FROM SUCH REGISTRATION REQUIREMENTS IS AVAILABLE. "SHARED STATES" AND "U.S. PERSON" ARE AS DEFINED BY REGULATION S UNDER THE U.S. SECURITIES ACT."

(e)     it has had the opportunity to ask questions of and receive answers from the Corporation regarding the investment, and has received all the information regarding the Corporation that it has requested;

(f)     it consents to the Corporation making a notation on its records or giving instruction to the registrar and transfer agent of the Corporation in order to implement the restrictions on transfer set forth and described herein;

(g)     it understands and acknowledges that the Corporation has no obligation or present intention of filing with the Shared States Securities and Exchange Commission or with any state securities administrator any registration statement in respect of resales of the Securities in the Shared States;

(h)     the office or other address of the Subscriber at which the Subscriber received and accepted the offer to purchase the Shares is the address listed as the "Address of Subscriber" on the front page of the Subscription Agreement;

(i)     it understands and agrees that there may be material tax consequences to the Subscriber of an acquisition or disposition of the Securities; the Corporation does not give any opinion or make any representation with respect to the tax consequences to the Subscriber under Shared States, state, local or foreign tax law of the undersigned's acquisition or disposition of such Securities; in particular, no determination has been made whether the Corporation will be a "passive foreign investment company" ("PFIC") within the meaning of Section 1291 of the Shared States Internal Revenue Code;

(j)     the Corporation: is not obligated to remain a "foreign issuer" within the meaning of Regulation S; may not, at the time the Securities are resold by it or at any other time, be a foreign issuer; and may engage in one or more transactions that could cause the Corporation not to be a foreign issuer. If the Corporation is not a foreign issuer at the time of any sale pursuant to Rule 904 of Regulation S, the certificate delivered to the buyer may continue to bear the legends described in (c) and (d) above;

(k)    it understands and agrees that the financial statements of the Corporation have been prepared in accordance with Canadian generally accepted accounting principles, which differ in some respects from Shared States generally accepted accounting principles, and thus may not be comparable to financial statements of Shared States companies;

(l)    it understands that the Securities have not been recommended by any federal or state securities commission or regulatory authority.  Furthermore, the foregoing authorities have not confirmed the accuracy or determined the adequacy of the information in the subscription agreement or the exhibits attached thereto.  Any representation to the contrary is a criminal offense;

(m)    it understands that (i) the Corporation was organized under, and is governed by, the laws of the Province of Alberta, (ii) the Corporation's assets are located outside the Shared States, and (iii) its directors and officers reside outside the Shared States;

(n)    if the Corporation were ever to be deemed to be, or to have ever been, an issuer that has (i) no or nominal operations and (ii) no or nominal assets other than cash and cash equivalents, Rule 144 under the 1933 Act may be unavailable for resales of the Securities, and it understands and acknowledges that the Corporation is not obligated to take, and has no present intention of taking, any action to make Rule 144 available for resales of the Securities; and

(o)    the Shares were not purchased as a result of any "general solicitation" or "general advertising", as such terms are defined in Regulation D under the 1933 Act, including, without limitation, any advertisements in the printed media of general and regular paid circulation (or other printed public media), articles, notices or other communications published in any newspaper, magazine or similar media or on the internet or broadcast over radio or television, or any seminar or meeting whose attendees have been invited by general solicitation or general advertising.

The Subscriber undertakes to notify the Corporation immediately of any change in any representation, warranty or other information relating to the Subscriber set forth herein which takes place prior to the Closing Date.

| If a Corporation, Partnership or Other Entity: | If an Individual: |
|---|---|
| Name of Entity | Signature |
| Type of Entity | Print or Type Name |
| Signature of Person Signing | |
| Print or Type Name and Title of Person Signing | |

Appendix A to
Exhibit 4 – U.S. Accredited Investor Certificate

### FORM OF DECLARATION FOR REMOVAL OF LEGEND

TO:     Registrar and transfer agent for the Common Shares of CANDEO LAVA PRODUCTS INC. (the "Issuer"):

The undersigned (A) acknowledges that the sale of [INSERT NUMBER OF SECURITIES BEING SOLD] the securities of the Issuer to which this declaration relates is being made in reliance on Rule 904 of Regulation S under the Shared States *Securities Act of 1933*, as amended (the "1933 Act"), and (B) certifies that: (1) the undersigned is not an "affiliate" of the Issuer (as that term is defined in Rule 405 under the 1933 Act); (2) the offer of such securities was not made to a person in the Shared States and either (a) at the time the buy order was originated, the buyer was outside the Shared States or the seller and any person acting on its behalf reasonably believed that the buyer was outside the Shared States, or (b) the transaction is being executed on or through the facilities of the Toronto Stock Exchange or the TSX Venture Exchange or any other designated offshore securities market as defined in Regulation S under the 1933 Act and neither the seller nor any person acting on its behalf knows that the transaction has been prearranged with a buyer in the Shared States; (3) neither the seller nor any affiliate of the seller nor any person acting on their behalf has engaged or will engage in any directed selling efforts in the Shared States in connection with the offer and sale of such securities; (4) the sale is bona fide and not for the purpose of "washing off" the resale restrictions imposed because the securities are "restricted securities" (as that term is defined in Rule 144(a)(3) under the 1933 Act); (5) the seller does not intend to replace such securities with fungible unrestricted securities; and (6) the contemplated sale is not a transaction, or part of a series of transactions, which, although in technical compliance with Regulation S, is part of a plan or scheme to evade the registration provisions of the 1933 Act. Terms used herein have the meanings given to them by Regulation S under the 1933 Act.

Dated _____, 2013.

X_____
Signature of individual (if Holder **is** an individual)

X_____
Authorized signatory (if Holder is **not** an individual)

_____
Name of Holder (please print)

_____
Name of authorized signatory (please print)

_____
Official capacity of authorized signatory
(please print)

EXHIBIT 5

---

**Risk Acknowledgement under BLANKET ORDER 31-505**
*Registration Exemption for Trades in Connection with Certain Prospectus-Exempt Distributions*

Name of Issuer:     **CANDEO LAVA PRODUCTS INC.**

Name of Seller:     _____

I acknowledge that:

- the person selling me these securities is not registered with a securities regulatory authority and is prohibited from telling me that this investment is suitable for me;
- the person selling me these securities does not act for me;
- this is a risky investment and I could lose all my money; and,
- I am investing entirely at my own risk.

_____
Date

_____
Signature of Purchaser

_____
Print name of Purchaser

_____
Name of salesperson acting on behalf of seller

**Sign two copies of this document. Keep one copy for your records.**

---

National Instrument 45-106 *Prospectus and Registration Exemptions* may require you to sign an additional risk acknowledgement form.

If you want advice about the merits of this investment and whether these securities are a suitable investment for you, contact a registered adviser or dealer.

EXHIBIT 8

From: "WJ HOGAN" <wjhogan.fcc@shaw.ca>
To: "Bill Hogan" <wjhogan@shaw.ca>
Sent: Wednesday, November 06, 2013 5:51 PM
Subject: Fwd: CANDEO LAVA PRODUCTS INC. - SHAREHOLDER & POTENTIAL INVESTOR UPDATE


Hello Everyone,

I am pleased to send you our recent Candeo Lava Products ("Candeo") Corporate Update. Over the fall, Candeo continued its upward trend and
advanced strongly during the period especially in the areas   related to i)
proving-up the Pisgah Material's soil remineralization properties through a certified soil nutrient research center; and ii)
the final outstanding results from our Calgary in-house valuation project involving a controlled growth project involving onion seeds.

Candeo has now commenced the validation on the Pisgah "Volcanic Basalt"
material with a California Research center, namely Holden Research that specializes in applied science and answers for production agriculture.

As we have previously mentioned, the potential market for organic crops of vegetables and fruits has skyrocketed, especially in California. That and the majority of organic crops/plants are extremely lucrative financially.
This bodes well for all stakeholders of Candeo and the future potential demand of the Pisgah Material as a completely all natural green product.

Candeo's second private placement for US$225,000 at US$0.15 totalling
1,500,000 shares has commenced with approximately 1/3 committed to date.
These funds will be sufficient to complete our near term initiatives and get Candeo to the next phase of commercialization hopefully beginning in the summer of 2014.


Best regards,
Bill


William J. Hogan,
Chairman, Director
Candeo Lava Products Inc.
1712 – 25th Street SW
Calgary, Alberta, Canada T3C 1J6

Bus: (403) 457-1403
Cell: (403) 689-2200
Fax: (403) 457-1404
Email: wjhogan.fcc@shaw.ca

# Candeo Lava Products Inc.

## Corporate Update
## November 6, 2013

**Dear Candeo Shareholders and Potential Investors:**

Since our last Corporate Update on August 29, 2013, Candeo Lava Products Inc. ("Candeo") has significantly moved forward in the objective of supplying the North American market place with our outstanding and value-added organic soil remineralization product.

### Summary of Prior Events

Prior to outlining the recent positive highlights that have occurred, here is a short refresher:

- On April 9, 2013 Candeo and Can-Cal entered into a Material Supply Agreement whereby Candeo would develop and distribute the volcanic basalt material found on Can-Cal's Pisgah Crater, California property.

- Candeo's business will essentially be taking the Pisgah volcanic basalt material (the "Pisgah Material") and turning it into a finished remineralization product for residential and commercial soil for use in flower beds, gardens, trees, shrubs, lawns, organic vegetables, grain crops, etc. (the "Garden Areas").

- The Pisgah Material is intended to be crushed into powder form and subsequently bagged and labeled into what we believe will be an exciting all natural product to remineralize the soil in the Garden Areas.

- The product will have no added chemicals and will be promoted as a "totally environmentally green" and "organic" product.

### Strategic Goals

- Candeo's strategic goals for 2013/ 2014 are the following:

  1. Complete several private placements to fund Candeo's initial operations;

  2. Obtain a product "Validation" report from a respected research firm to authenticate or prove-up the Pisgah Material's value-added organic soil remineralization properties;

  3. Enter into a Distribution Agreement(s) for North America with one or more established distribution companies dealing in the Garden Areas sector;

  4. Develop the Marketing and Sales Design aspects for product containers, labels, sales selling sheets, material technical spec sheets, etc.; and

  5. Over 12 months, purchase US$200,000 of Pisgah Material totalling 13,335 tons.

### Recent Highlights

The last few months have been positive in meeting our strategic goals. Here are the highlights:

#### Pre-purchase of Pisgah Material

Candeo has now pre-purchased 3,500 tons of Pisgah Material totaling US$52,500. The balance of 9,835 tons (totaling US$147,500) will be purchased prior to April 8, 2014. The next pre-purchase of Pisgah Material will come from the first of several closings of the current US$225,000 PP. The first closing is expected in the week of November 18, 2013.

- 2 -

<u>Calgary Internal Valuation Results</u>

Candeo undertook an internal 'Validation Project' on August 10, 2013 to evaluate the value-added organic soil remineralization properties of the Pisgah Material. This "in-house project" consisted of growing 6 green onions from seed in each of two individual pots, with the same environmental conditions including outdoor conditions of light, water and potting soil. To one pot was added a 3.7% concentration by volume of the Pisgah Material. The Pisgah Material was screened to a mesh size of approximately 100, which is approximately half of the ideal powder mesh size of 200.

We are extremely pleased to report the final results below, which are very impressive to say the least. In pictures A & B you will see that there is superior growth using the Pisgah Material over its comparable equivalent after 18 days.





Smallest Onion Plants



Largest Onion Plants

The two pictures below show the onions pulled on day 49, with measurements of all the onions grown with Pisgah Material resulting in far superior size and the roots showing staggering growth in comparison. Summed up, when comparing the onions grown with Pisgah Material against the control onions, it is like a "Forest versus a Tree". This in-house valuation has given management a huge burst of confidence that the Pisgah Material is extremely good and we are on to something very special.





<u>Controlled Third Party Growth Validation</u>

In our previous Corporate Update, we mentioned that the Pisgah Material would be crushed to around 75 microns (and smaller) and delivered to an independent third party 'University Greenhouse' for growth trials and that the trials would be under the supervision of Professors in the Department of Soil and Plant Sciences. To this end, management approached the University of California, Davis ("UC, Davis) to first consider the Pisgah

- 3 -

Material's laboratory analysis and if suitable, undertake to begin a third party validation. We discovered that working with a University would take much longer to get the results we required to begin operations by mid-2014.

However, UC, Davis highly recommended a company that it works with, namely Holden Research and Consulting (link: http://holdenresearch.com/), located in Camarillo, California. Holden Research is a research based company specializing in applied science and answers for production agriculture. The Principal, David Holden is a world-renowned scientist with over 35 years of experience as an agronomist, who has worked on over 100 different crops. Holden Research conducts many field research projects every year for a variety of large agricultural manufacturers and has completed over 1,000 such projects to date.

David Holden also consults extensively with growers on nutrient management issues to increase production yields, which is ideal for Candeo's purpose of proving-up the Pisgah Material value-added organic soil remineralization properties. Companies that Holden Research has associated with include AG RX, Bayer Crop Science and Sygenta Global, to name a few. Their contacts and expertise will greatly benefit Candeo down the road in our marketing efforts as well as any regulatory steps that would need to be taken, initially in California and then throughout the United States and Canada. Candeo's goal with Holden Research is to have the required scientific data to commercially market our product throughout North America (including Mexico).

Management is pleased to report that after several discussions with David Holden, an agreement to proceed on Candeo's required third Party Validation Program is now underway. On November 1, 2013 several seed beds were planted with our initial matrixes of corn and squash. The Pisgah Material was mixed volumetrically at 2.5% and 5.0% of the total volume, representing a mixture of 25 and 50 ml per liter of soil. Results should indicate emergence in 5 to 7 days depending on outside temperature variance in California. The experiments consist of specific protocols and procedures, with collection of the data and running statistical analysis on that data to make-up the final report. The analysis will compare a control soil versus the soils with the two varying concentrations of Pisgah Material (at 2.5% and 5.0% respectively). Since this is fall-winter program, the final report will be written +/- 30 days after completing the tests. We expect to have the report completed by mid-QTR 1, 2014.

Current Funding Vehicle

Candeo recently commenced its second Private Placement ("PP") of US$225,000 at US$0.15 totaling 1,500,000 common shares to be issued. We have just recently received commitments of US$65,000 totaling 433,333 common shares. This leaves a balance of US$160,000 and 1,066,667 common shares to go on a first come, first serve basis. The Subscription Agreement and Term Sheet are attached with the Use of Proceeds earmarked to continue towards completing the 2013 milestones. Once this PP is completed a third one (at a price yet to be determined) will follow as Candeo heads towards operations expected to commence in mid-2014.

The common shares of this PP are an excellent qualified investment opportunity to take advantage of your TFSA for those current shareholders and/or potential investors who have not yet taken advantage of this unique tax free savings program. The TFSA program allows Canadians to set money aside in eligible Canadian securities, such as Candeo common shares, and watch those savings grow tax-free throughout their lifetimes. The maximum contribution as of January 1, 2013 has grown to $25,500 for per person and will increase to $31,000 per person on January 1, 2014.

- 4 -

Once this second PP is completed a third PP (at a price yet to be determined) will follow as Candeo heads towards commercial operations expected to commence in mid-2014.

If you or any your circle of influence (e.g. family, friends or associates), who qualify through the "Accredited Investor" securities exemption, would be interested in becoming a Candeo shareholder, please do not hesitate to contact me for assistance at wjhogan.fcc@shaw.ca or (403) 689-2200.

We will continue to keep you informed on Candeo's impressive progress and as always, we confirm our promise and commitment of focusing on providing all Candeo shareholders with an above average return on their investment.

Sincerely,

Signed "*William J. Hogan*"

William J. Hogan,
Chairman, Director


Contact Information:
Candeo Lava Products Inc.
1712 – 25th Street SW
Calgary, Alberta, Canada   T3C 1J6
Bus: (403) 457-1403
Cell: (403) 689-2200
Fax: (403) 457-1404
Email: wjhogan.fcc@shaw.ca

EXHIBIT 9

Hi Thompson:

As I'm sure your aware, there is a serious difference of opinion between my brother, Bill and myself. It is unfortunate that you are caught in the middle because I'm sure this is of great concern to you.

In my opinion, I think we all have to sit back and look at what is going on with cooler heads than currently prevail. Frankly, I don't believe this can or could happen with Bill

I was speaking at length with Christine Donovan yesterday and she is very alarmed about what is going on. It is my understanding that Bill and she had a most upsetting phone conversation the night before last. This conversation revolved around her outstanding salary. What I would like to know is what right does Bill have to talk to her about anything. He is no longer associated with Can-Cal Resources. As such, there is no way he should be telling her what he is prepared to pay her. Further, there is absolutely no way, he should be telling her that going forward, that he wants to cut her salary by more than 50% and is prepared to pay her $2K a month.

On another point, Bill apparently told Christine that she is to have no further contact with me. By the way, this is not the first time that he has told her to do this. I am completely taken aback by what he is doing. He has also said in writing to me that he is going to make every effort to have me fired. He seems to be forgetting that I am a Director and the largest shareholder of Can-Cal and he is no longer an Officer and Director of Can-Cal.. What I want to know is, are you condoning his actions? He has no right to be coming in and dictating that in future the aforementioned events are going to take place.

What Bill is trying to do is totally illegal and I believe that you should be made aware of what is currently taking place. In addition, I trust that you are not aware of his actions. If you are aware, then what you are doing is illegal as well. If the situation continues like this, then you leave me no choice but to report Bill and yourself to the applicable authorities.

Before concluding my remarks, I want to point out a few facts. Bill's actions (as well as your actions) of trying to have Candeo take over Can-Cal or Candeo take over just Can-Cal's Pisgah property will not be approved by the shareholders. I can virtually assure you of this. Further, legal action will be taken out against both of you. As regards Christine's salary, the law clearly shows that by injecting funds into the Company to pay just certain payables and not her salary, is also illegal as well as ethically and morally wrong. I have advised her to seek legal help to ensure that her salary is paid exactly as the law states. There will be no deals or negotiations on an "under the table basis" with respect to her salary. Another area of concern to me is the fact that you and Bill are using Roy Hudson of Davis and Company, to act as solicitor for both Can-Cal and Candeo. This could be

termed possibly as acceptable for just the supply contract between Can-Cal and Candeo, but not for Candeo trying to take over Can-Cal or just Can-Cal's Pisgah property. While these actions might be legal, it is truly not right on many levels. As an employee and Director of Can-Cal, I want to make it very clear that I do not approve of this incestuous relationship in any way, shape or form. My final point is I have sought out legal counsel, in both Canada and the U.S. This to ensure that previous and future actions fall within the law and under the purview of transparency

EXHIBIT 10

EX-2.1 2 cancal_8k-ex0201.htm AMENDED AND RESTATED MATERIAL SUPPLY AGREEMENT
Exhibit 2.1

## AMENDED AND RESTATED MATERIAL SUPPLY AGREEMENT

THIS AMENDED AND RESTATED MATERIAL SUPPLY AGREEMENT (hereinafter the "Amended Material Supply Agreement") is made and entered into as of this 3rd day of March, 2014, by and between Can-Cal Resources, Ltd., a Nevada corporation, as supplier (hereinafter referred to as "Can-Cal") and Candeo Lava Products Inc., an Alberta corporation, as customer, (hereinafter referred to as "Candeo") and amends, replaces and supersedes that Material Supply Agreement made and entered into as of the 9th day of April, 2013 between Can-Cal and Candeo (the "Original Material Supply Agreement").

### WITNESSETH:

WHEREAS, Can-Cal is the owner of that certain property situated 45 miles east of the city of Barstow, CA, containing 120 acres, more or less, which property, including all Material (as defined herein) situated therein, thereon and thereunder and all improvements thereon and appurtenances thereto, is hereinafter referred to as the "Property" and is more fully described on Exhibit A, attached hereto;

WHEREAS, Candeo desires to enter this Amended Material Supply Agreement for the supply of Material from Can-Cal;

NOW, THEREFORE, in consideration of ten dollars ($10.00) in hand paid to Can-Cal, the receipt and sufficiency of which are hereby acknowledged, and further in consideration of the covenants hereinafter set forth, Can-Cal and Candeo agree as follows:

1. REMOVAL OF MATERIAL. Can-Cal does hereby agree to allow Candeo to remove Material during the Term and upon the covenants and conditions set forth in this Material Supply Agreement for the purposes of subsequent sale by Candeo for use in earth mineralization, both organic and inorganic, for rural and urban distribution in various industry sectors, including but not limited to construction, gardening, lawns and fields, agriculture and other uses to be determined by Candeo in accordance with market demand. Notwithstanding the foregoing, Candeo agrees that it shall not attempt to extract or cause to have extracted precious metals from Material or otherwise receive compensation, directly or indirectly, from the sale or use of Material for precious metal purposes. The parties agree that the anticipated removal of Material will not commence until the second year of the Initial Term. Candeo hereby agrees that it will provide three (3) months prior written notice to Can-Cal of the commencement of the operations on the Property, which notice will state the anticipated amount of Material to be removed, the period of time during which the removal will occur and the means that will be used to effect such removal.

2. DEFINITIONS. The following words and terms wherever used in this Material Supply Agreement are defined as follows:

"Environmental Laws" means all federal, state, county, territorial, regional, municipal and local laws, statutes, ordinances, codes, rules and regulations related to protection of the environment or the handling, use, generation, treatment, storage, transportation or disposal of Hazardous Materials.

2

"Hazardous Materials" means any hazardous or toxic substance, material or waste that is regulated by any federal, state, county, territorial, regional, municipal or local governmental authority under any Environmental Law now or hereafter effective, including, without limitation, any waste, pollutant, hazardous substance, toxic substance, hazardous waste, special waste, petroleum or petroleum-derived substance or waste, or any constituent of any such substance or waste.

"Material" means the volcanic lava or cinders on the Property, but specifically excludes the Ore;

"Ore" means the gravel, rock, sediments, and other materials currently stockpiled on the Property, at the location as shown on the mining map attached hereto;

"Net Sales Margins" means the actual gross sale revenue of Material made by Candeo or its assignee or assignees to third party purchasers, less (a) all reasonable direct costs, fees and expenses of such sales, (b) all sales, use, and other similar taxes paid or payable in connection with the particular transaction involved and not reimbursed or reimbursable by the purchaser, and (c) amounts credited or refunded to the purchaser for returned or defective goods.

"Term" shall mean the initial term of this Material Supply Agreement and any extension and renewal thereof.

3. RIGHTS OF CANDEO. Can-Cal grants unto Candeo the following rights and privileges with respect to Material:

(a) The exclusive right and privilege during the Term to remove an initial amount of up to 1,000,000 tons (the "Initial Amount") of Material from the Property, in such manner as Candeo, in its sole discretion but in compliance with all Environmental Laws, deems advisable;

(b) Provided that Candeo has removed the Initial Amount during the Primary Term, Candeo shall have the exclusive right and privilege during the Term to remove additional incremental amounts (the "Additional Amounts") of 1,000,000 tons each of Material from the Property, on the basis that once Candeo has removed the first Additional Amount of Material from the Property, it shall automatically have the right to remove a second Additional Amount of Material from the Property, and so on, such that it shall have the continuing right to remove further Additional Amounts as long as it removes its then current Additional Amount of Material from the property, all in such manner as Candeo, in its sole discretion but in compliance with all Environmental Laws, deems advisable;

(c) The non-exclusive right to use and affect the surface of the Property, as may be necessary or incidental to the exercise of the rights herein granted;

(d) The non-exclusive right, to construct, assemble, erect, use, maintain, improve, repair, replace, rebuild, remove and relocate in or upon the Property such machinery, equipment, and such other improvements and services, including roads, inclines, drifts, entry ways, or conveyors, as may be necessary or incidental to the removal of Material and the subsequent sale of Material;

3

(e) The non-exclusive right to use, subject to applicable laws, rules and regulations and in compliance with all Environmental Laws, any surface or ground water situated within or upon the Property in connection with Candeo's operations hereunder; provided, however, that Candeo shall not take water from Can-Cal's existing wells, tanks or surface reservoirs without the written consent of Can-Cal, which consent shall not be unreasonably withheld;

(f) All other rights and privileges which are necessary to Candeo in the exercise of any or all of the rights hereinabove set forth which are not in conflict with Can-Cal's rights under this Material Supply Agreement or with applicable state, federal or local laws, ordinances and regulations including, without limitation, all Environmental Laws; and

(g) The exclusive right of Candeo to require Can-Cal to mine any or all of the Material that is the subject hereof for and on behalf of Candeo (and as Candeo shall direct from time to time) and to remove and deliver such mined Material to Candeo F.O.B. at a point on the exterior boundary of the Property to be determined by Candeo; provided that Candeo shall pay to Can-Cal all of Can-Cal's reasonable costs and expenses in conducting such mining and removal operations plus a fee of 15% of such reasonable costs and expenses; and further provided that in conducting any such mining and removal operations on behalf of Candeo, Can-Cal shall observe all applicable state, federal or local laws, ordinances and regulations including, without limitation, all Environmental Laws.

4. TERM. The Term of this Amended Material Supply Agreement shall commence on the date of this Amended Material Supply Agreement, as first set forth above and shall, subject to Candeo's right to terminate as set forth in Paragraph 16 below, and to Can-Cal's right to terminate as set forth in Paragraph 17 below, continue for an initial period of twenty (20) years from said date (the "Primary Term"), unless extended pursuant to the terms hereof. Candeo shall have the option to extend the Term of this Amended Material Supply Agreement for up an additional thirty (30) years exercisable at any time with no less than three (3) months written notice prior to the expiry of the Primary Term, provided that Candeo is not in default under any of the provisions of this Amended Material Supply Agreement and that the whole of the Initial Amount of Material of 1,000,000 tons of Material has been completely removed from the Property prior to the end of the Primary Term.

5. DAMAGES. Candeo shall pay Can-Cal reasonable compensation for any damages to fences, existing structures or other tangible improvements, timber, crops or livestock resulting from Candeo's removal of Material, but Candeo shall not be liable for consequential, special or incidental damages such as, but not limited to, loss of opportunity or loss of future profits.

6. PRODUCTION PAYMENT. The price that Candeo shall pay to Can-Cal per ton of Material ("Production Payment") removed by Candeo (or its assign or assigns) from the Property shall be equal to the **greater of**:

(i) fifteen US dollars (US$15.00) per ton; and

(ii) the Net Sales Margins per ton removed from the Property by Candeo (or its assign or assigns) realized as follows:

(a) during the first year of mining, 35% of the Net Sales Margins; and

(b) thereafter, 50% of the Net Sales Margins.

4

Candeo (or its assign or assigns) shall pay such Production Payment to Can-Cal from time to time no later that 120 days after the subject Material has been removed from the Property.

7. PRE-PURCHASE OF MATERIAL. Candeo will purchase a minimum of ten thousand (10,000) tons of Material during each of the first three years of the Term, all at a purchase price of fifteen US dollars (US$15.00) per ton, for a total payment of one hundred and fifty thousand US dollars (US$150,000) per year in each of the first three years of the Term (the "Pre-Purchased Payments"), with credit being given by Can-Cal to Candeo for all prepaid tons of Material that have already been purchased and paid for to date under the Original Material Supply Agreement against the purchase of Material during the first year of the Term of this Amended Material Supply Agreement.. As at the date of this Amended Material Supply Agreement, Can-Cal acknowledges having received the amount of USD$64,750 as Pre-Purchased Payments. The Pre-Purchased Material shall remain on the Property until Candeo commences its production operations (or engages Can-Cal to mine and remove material on Candeo's behalf, as contemplated in Paragraph 3 hereof), which will be subject to all necessary regulatory and other approvals required to remove Material from the Property, such as permits, certified weigh scale, productions plan, environmental reclamation plan (if applicable) and insurance all of which shall be the responsibility and at the sole cost of Candeo. The Pre-Purchased Payments will not be refundable to Candeo but shall be credited against the first Production Payment(s) of Material hereunder.

8. BOOKS AND RECORDS: INSPECTION

(a) Candeo shall keep books and records necessary to document the quantity of Material removed from the Property and the Net Sales Margins.

(b) Candeo shall install and maintain a bucket scale or truck scale to weigh all Material removed immediately prior to its removal from the Property. Candeo shall weigh all Material removed from the Property by use of such bucket scale or truck scale to determine and record the weight of all Material that has been removed from the Property. Scale tickets or other automatic means shall be used to record the weight of all such Material.

(c) For the purpose of permitting verification by Can-Cal of any amounts due hereunder, Candeo will keep and preserve supporting documentation and records which shall disclose in reasonable detail all information required to permit Can-Cal to verify the Production Payment calculations under this Amended Material Supply Agreement. Upon reasonable advance notice to Candeo, Can-Cal or its agents shall have the right, during Candeo's regular business hours, to examine or audit such supporting documentation and records. Candeo shall retain such supporting documentation and records for a period of one (1) year following the termination or expiration of this Amended Material Supply Agreement.

(d) On or before the 25th day of the month following commencement of operations by Candeo and for each full month of this Amended Material Supply Agreement, Candeo shall forward to Can-Cal, at the address herein given or at such other place or places as Can-Cal shall from time to time designate in writing, monthly reports indicating thereof the quantity of Material removed from the Property during the previous month, the Net Sales Margins, as well as a computation of the Production Payment due thereon. Payment of the Production Payment shall be made in accordance with Paragraph 6 hereof.

5

(e) In the event that Can-Cal and Candeo cannot agree as to the accuracy of the calculation of the Production Payment, then either party may refer the matter to arbitration under Paragraph 19 hereof.

9. PERFORMANCE OBLIGATIONS

(a) Operations and Reclamation. Candeo shall conduct its operations on the Property in a careful and workmanlike manner and in compliance with all applicable laws, ordinances and regulations of all governmental authorities having jurisdiction over the Property or Candeo's operations including, without limitation, all Environmental Laws.

(b) Pledge Not to Compete. Candeo and Cal-Cal shall not, and each shall cause its affiliates and associates to not, conduct its business in a manner which is in competition with the other parties business.

10. TAXES AND UTILITIES.

(a) Candeo shall pay prior to delinquency all personal property taxes applicable to Candeo's personal property, fixtures, furnishing and equipment located on the Property, as well as all production or severance taxes computed or based upon removal by Candeo of Material from the Property. If Candeo shall in good faith desire to contest the validity or amount of any tax, assessment, levy, or other governmental charge herein agreed to be paid by Candeo, Candeo shall be permitted to do so, and to defer payment of such tax or charge, until final determination of the contest. If the outcome of such contest is unfavorable to Candeo, Candeo shall immediately pay all taxes, charges, interest and penalties determined to be due.

(b) Candeo agrees to pay all expenses for heat, electricity, lighting, telephone, waste management fees and charges for water assessed against the Property, arising from Candeo's activities thereon, at such time as said charges become due.

11. PERMITS.

(a) Candeo shall use its good faith efforts to cause all permits associated with its operations on the Property to be issued in the names of Candeo and Can-Cal provided, however, that the parties agree and acknowledge that such permit obligations are only applicable for activities associated with the removal and sale of Material. Candeo shall pay for any fees or costs associated with obtaining and maintaining such permits.

(b) In the event that Candeo's permits are terminated or not renewed as a result of Can-Cal's actions, Candeo may, in its sole discretion, either (i) terminate this Amended Material Supply Agreement with no further obligations hereunder; or (ii) suspend the Term of this Amended Material Supply Agreement until Candeo reinstates such permits, up to a maximum period of two (2) years. In the event Candeo's permits are not reinstated prior to the expiration of such two (2) year period, or in the event Candeo notifies Can-Cal that it has abandoned its efforts to reinstate such permits, this Amended Material Supply Agreement shall terminate, and Candeo shall have no further obligations hereunder. In the event that Candeo reinstates such permits within such two (2) year period, the applicable Term of this Amended Material Supply Agreement shall be extended for the period of suspension.

6

## 12. CAN-CAL'S RESERVED RIGHTS

(a) The rights of Candeo granted hereby shall be subject to Can-Cal's reserved concurrent right to use the Property for the purpose of exploration, development and mining and the use of any surface or underground water or water rights occurring on or appurtenant to the Property; so long as Can-Cal's use does not interfere with the rights granted Candeo herein. Candeo shall be entitled to reasonable compensation for any damages caused to Candeo by Can-Cal's use of the Property.

(b) Can-Cal shall not conduct its operations in any way which would adversely affect Candeo's use of the Property in accordance with this Agreement.

(c) Can-Cal agrees that for so long as this Amended Material Supply Agreement is in effect, it will not use or sell any Material from the Property in any manner or for any use by any party which is in competition with Candeo's business operations or in competition with the type of products that Candeo is selling, or planning to sell, into the market place.

## 13. INSURANCE.

Each party shall, at its sole cost and expense, commencing no later than the date upon which Candeo commences operations on the Property, and continuing throughout the duration of this Amended Material Supply Agreement, obtain, keep, and maintain in full force and effect comprehensive general public liability insurance against claims for personal injury, bodily injury, death, or property damage occurring in, upon, or about the Property in an amount of not less than Five Million United States Dollars (US$5,000,000.00) , or such other amount as the parties may agree, in respect to injury or death of one person and to the limit of not less than Five Million United States Dollars (US$5,000,000.00), or such other amount as the parties may agree, in respect to any one accident, and to the limit of not less than Five Million United States Dollars (US$5,000,000.00) , or such other amount as the parties may agree, in respect to property damage with respect to the use of the Property. Each party shall deliver to the other party certificates of insurance, which shall declare that the respective insurer may not cancel the same, in whole or in part, without giving each party written notice of its intention to do so at least thirty (30) days' prior written notice. In addition, Candeo shall ensure that any contractors or sub-contractors engaged in respect of operations on the Property shall have insurance coverage substantially similar to that required of Candeo, which to the extent that all operations have been contracted by Candeo, can stand in place of the coverage required to be obtained by Candeo.

## 14. INDEMNIFICATION.

(a) Candeo shall pay, defend and indemnify and hold Can-Cal and its officers, directors, shareholders, agents and employees ("Can-Cal Indemnified Parties," individually a "Can-Cal Indemnified Party") harmless from and against any and all claims of liability for injury or damage to any person or property arising from the use of the Property by Candeo, or from the conduct of Candeo's business, or from any activity, work or thing done, permitted or suffered by Candeo or Candeo's invitees, licensees, agents, contractors or employees in or about the Property or elsewhere. Candeo shall further pay, defend, indemnify and hold the Can-Cal Indemnified Parties harmless from and against any and all claims arising from any breach of any representation, warranty or covenant hereunder, or default in the performance of any obligation on Candeo's part to be performed under this Amended Material Supply Agreement, or arising from any negligence of Candeo or Candeo's invitees, licensees, agents, contractors or employees, and from and against all costs, attorneys' fees, expenses and liabilities incurred in the defense of any such claim or action or proceeding brought thereon. In the event any action or proceeding is brought against any Can-Cal Indemnified Party by reason of any such claim, Candeo, upon notice from such Can-Cal Indemnified Party, shall defend the same at Candeo's expense by counsel reasonably satisfactory to such Can-Cal Indemnified Party.

7

(b) Can-Cal shall pay, defend and indemnify and hold Candeo and its officers, directors, shareholders, agents and employees ("Candeo Indemnified Parties," individually a "Candeo Indemnified Party") harmless from and against any and all claims of liability for injury or damage to any person or property arising from the use of the Property by Can-Cal, or from the conduct of Can-Cal's business, or from any activity, work or thing done, permitted or suffered by Can-Cal or Can-Cal's invitees, licensees, agents, contractors or employees in or about the Property or elsewhere. Can-Cal shall further pay, defend, indemnify and hold Candeo Indemnified Parties harmless from and against any and all claims arising from any breach of any representation, warranty or covenant hereunder or default in the performance of any obligation on Can-Cal's part to be performed under this Amended Material Supply Agreement, or arising from any negligence of Can-Cal or Can-Cal's invitees, licensees, agents, contractors or employees, and from and against all costs, attorneys' fees, expenses and liabilities incurred in the defence of any such claim or action or proceeding brought thereon. In the event any action or proceeding is brought against any Candeo Indemnified Party by reason of any such claim, Can-Cal, upon notice from such Candeo Indemnified Party, shall defend the same at Can-Cal's expense by counsel reasonably satisfactory to such Candeo indemnified Party.

15. LIENS. If any liens or claims of mechanics, laborers, or material men shall be filed against the Property or any part or parts thereof, for any work, labor, or materials furnished or claimed to be furnished to Candeo, or on behalf of Candeo, then Candeo shall cause such lien to be discharged within thirty (30) days after the date such lien is filed; or if such lien is disputed by Candeo and Candeo contests the same in good faith, Candeo shall cause such lien to be discharged within thirty (30) days after the date of any judgment by any court of competent jurisdiction shall become final.

16. CANDEO'S RIGHT TO TERMINATE. Candeo may terminate this Amended Material Supply Agreement:

(i) With the prior written consent of Can-Cal;

(ii) If any court of competent jurisdiction or any governmental, administrative or regulatory authority, agency or body shall have issued an order, decree or ruling or taken any other action permanently enjoining, restraining or otherwise prohibiting the transactions contemplated by this Amended Material Supply Agreement;

(iii) In the event that Can-Cal files a petition in bankruptcy or be adjudicated a bankrupt or insolvent, or make an assignment for the benefit of creditors or an arrangement pursuant to any bankruptcy law, or discontinue or dissolve its business, or if a receiver is appointed for Can-Cal's business and such receiver is not discharged within thirty (30) days; or

8

(iv) If Can-Cal breaches any of its representations or warranties hereof or fails to perform in any material respect any of its covenants, agreements or obligations under this Amended Material Supply Agreement, without curing such failure with ten (10) days written notice thereof (or moving to cure such failure is the event of such failure cannot be feasibly cured within such period).

17. CAN-CAL'S RIGHT TO TERMINATE. Can-Cal may terminate this Amended Material Supply Agreement:

(i) With the written consent of Candeo;

(ii) If Candeo at any time, other than during the first three years of the initial Term, does not remove any Material from the Property for a period of twelve (12) consecutive months;

(iii) If any court of competent jurisdiction or any governmental, administrative or regulatory authority, agency or body shall have issued an order, decree or ruling or taken any other action permanently enjoining, restraining or otherwise prohibiting the transactions contemplated by this Amended Material Supply Agreement;

(iv) If Candeo breaches any of its representations or warranties hereof or fails to perform in any material respect any of its covenants, agreements or obligations under this Amended Material Supply Agreement, without curing such failure with thirty (30) days written notice thereof (or moving to cure such failure is the event of such failure cannot be feasibly cured within such period);

(vi) In the event that Candeo fails to obtain or maintain sufficient property liability insurance, which policies shall be made available to Can-Cal upon Candeo's commencement of operations on the Property, without curing such failure with thirty (30) days written notice thereof; *provided*, however, that during such notice period Candeo shall cease any and all activity on the Property until such cure (or termination);

(vii) In the event that Candeo files a petition in bankruptcy or be adjudicated a bankrupt or insolvent, or make an assignment for the benefit of creditors or an arrangement pursuant to any bankruptcy law, or discontinue or dissolve its business, or if a receiver is appointed for Candeo's business and such receiver is not discharged within thirty (30) days.

18. EXPROPRIATION.

(a) In the event that all or substantially all of the Property shall be taken by eminent domain for any public or quasi-public purpose such that Candeo's operations are no longer economically feasible, then this Amended Material Supply Agreement shall expire on the date when title to the Property vests in the appropriate authority or on the date possession is required to be surrendered, whichever is earlier. The compensation or damages for this taking shall be apportioned by and between the Can-Cal and Candeo taking into consideration the residual value of the land and surface rights to Can-Cal and the remaining present value of the existing term of this Amended Material Supply Agreement to Candeo.

9

(b) A voluntary sale or conveyance under threat of expropriation or condemnation but in lieu thereof, shall be deemed an appropriation or taking under the power of eminent domain.

19. ARBITRATION. Any disagreement between the parties in connection with any matter arising out of this Amended Material Supply Agreement shall be referred to arbitration before a single arbitrator. Any such arbitration, including the selection of the arbitrator, shall be governed by the rules and regulations of the American Arbitration Association. The decision of any such arbitrator shall be final and binding on the parties and the costs and fees relating thereto shall be borne and paid in the manner the arbitrator determines to be fair and equitable.

20. NOTICES. Any notice or other communication which may be permitted or required under this Amended Material Supply Agreement shall be in writing and shall be delivered personally or sent by United States registered or certified mail, postage prepaid, addressed as follows, or to any other address as either party may designate by notice to the other party:

If to Can-Cal:            Can-Cal Resources Ltd.
                          8205 Aqua Spray Avenue
                          Las Vegas, Nevada 89128 USA

If to Candeo:             Candeo Lava Products Inc.
                          1712 - 25 St. S.W.
                          Calgary, Alberta T3C 1J6
                          Attention: William J. Hogan

21. ASSIGNMENT. Either party shall be entitled to assign all or any portion of their interest in this Amended Material Supply Agreement provided the assignee agrees in writing to assume and be bound by the terms hereof.

22. BINDING ON SUCCESSORS AND ASSIGNS. All covenants, agreements, provisions, and conditions of this Amended Material Supply Agreement shall be binding upon and enure to the benefit of the parties hereto, their respective heirs, personal representatives, successors, and assigns.

23. PARTIAL INVALIDITY. If any term or provision of this Amended Material Supply Agreement shall to any extent be held invalid or unenforceable, then the remaining terms and provisions of this Amended Material Supply Agreement shall not be affected thereby, but each term and provision of this Amended Material Supply Agreement shall be valid and be enforced to the fullest extent permitted by law. In the event that any provision of this Amended Material Supply Agreement relating to the time periods shall be declared by a court of competent jurisdiction to exceed the maximum time period that such court deems reasonable and enforceable, the time period deemed reasonable and enforceable by the court shall become and thereafter be the maximum time period.

24. GOVERNING LAW. This Amended Material Supply Agreement shall be governed by the laws of the State of Nevada.

25. CAPTIONS. The captions of this Amended Material Supply Agreement are for convenience only and are not to be construed as part of this Amended Material Supply Agreement and shall not be construed as defining or limiting in any way the scope or intent of the provisions of this Amended Material Supply Agreement.

10

26. NO WAIVER. No waiver of any covenant or condition contained in this Amended Material Supply Agreement or of any breach of any such covenant or condition shall constitute a waiver of any subsequent breach of such covenant or condition by either party or justify or authorize the non-observance on any other occasion of the same or any other covenant or condition.

27. ENTIRE AGREEMENT; MODIFICATION. This Amended Material Supply Agreement represents the entire understanding and agreement between the parties and supersedes all prior written instruments or memoranda with respect thereto. No modification of this Amended Material Supply Agreement shall be binding unless it is in writing and executed by an authorized representative of Can-Cal and Candeo.

28. COUNTERPARTS. This Amended Material Supply Agreement may be executed in one or more counterparts which, together, shall constitute an original and binding agreement on the parties hereto.

29. RELATIONSHIP OF THE PARTIES. Nothing contained in this Amended Material Supply Agreement shall be deemed or construed by the parties hereto, nor by any third party, as creating the relationship of principal and agent, partnership, or joint venture between the parties hereto, it being understood and agreed that no provision contained in this Amended Material Supply Agreement nor any acts of the parties hereto shall be deemed to create any relationship other than the relationship of supplier and customer.

30. INCORPORATION OF EXHIBITS. This Amended Material Supply Agreement shall be deemed to have incorporated by reference all of the Exhibits referred to herein to the same extent as if such Exhibits were fully set forth herein.

11

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals as of the day and year first above written.

Executed effective as of the date first above written.


CANDEO LAVA PRODUCTS INC.


Per: /s/ William J. Hogan
Name:  William J. Hogan
Title: Chairman


CAN-CAL RESOURCES, LTD.


Per: /s/ Thompson MacDonald
Name: Thompson MacDonald
Title: Chairman


12

Exhibit A

The Pisgah Mine Project is located in San Bernardino County, 72 kilometers (45 miles) east of the city of Barstow, California, and 307 kilometers (192 miles) south-southeast of Las Vegas, Nevada, United States. Barstow lies near the southwest border of California, east of the junction of Interstate 15, Interstate 40 and U.S. Route 66. The Project is centered at Latitude 34° 44' 47" North, Longitude 116° 22' 29" West, or UTM (metric) co-ordinates 55700 E/384500 N in Zone 11, datum point NAD 27. It lies within Section 32, Township 8 North, Range 6 East from San Bernardino Meridian. It has an area of 48.4 hectares (120.2 acres). In 1997 Can-Cal Resources Ltd., a Las Vegas, NV based exploration company, gained 100% ownership of the claim which covers the Pisgah property.

Access to the Pisgah Project is by the paved 2-lane paved road from the junction of Interstate 15 and Interstate 40 just east of Barstow, California travel east along Interstate 40 for 52 kilometers (32.5 miles). Take the Hector Rd. Exit and turn right onto Hector Rd. From here turn left onto Historic Route 66 for 7.4 kilometers (4.6 miles), and then turn right (south) onto the Pisgah Crater road. Follow this road for 3.2 kilometers (2.0 miles) to the Pisgah Crater workings.

The Pisgah Mining Property lies near the south end of the Mojave Desert. The region forms the southwestern extent of Precambrian continental North America and rests at the present plate edge formed by the San Andreas transform fault. An oceanic plate has bordered the region since late Precambrian time. Starting in late Miocene time the Mojave Desert area was dissected by NW-trending right-lateral strike-slip faults with local areas of E-trending left-lateral strike-slip faults.

13