Suvinder S. Ahluwalia
Nevada Bar No. 3944
Sklar Williams PLLC
410 S. Rampart Boulevard, Ste. 350
Las Vegas, NV 89145
Telephone 702-360-6000
Facsimile 706-360-0000
Email: sahluwalia@sklar-law.com
Attorneys for Plaintiffs

# DISTRICT COURT

## CLARK COUNTY, NEVADA

| | |
|---|---|
| RONALD D. SLOAN; ROBIN SCHWARZ; GARY COLLINS; JILL BROWN; LARK TARRELL; NANCY HERBOLD; DANIEL R. SLOAN; BETTY ANN SLOAN; PEARL KIRK; JAMES BOAN; N O WAITE; LARRY ORWICK; PATRICIA LA SALLE; BRIAN WOLFE; STUART R. CAMERON; ROBERT WEBSTER; HUGO BONDI; JOAN BRATSETH; P A BRATSETH; DEREK MILANI; DEAN RACHEY; SAM BROUNSTEIN; SANDRA JANSEN; BRIAN JANSEN; KIM NICHOLS; SCOTT NICHOLS; GARY COLLINS; CARMEN ADAIR; CHRISTA SCHOFIELD; MARK BRATSETH; ROSE TRUST 11; CLIFF OLSON; DON COLLINS; ROYCE NORDSTROM; NATALIE MAYZEL; DAVID JESSKE; THORNTON D. BARNES; JAMES HASON SANDRA HASON; ELODIE GUILLET; RYAN GUILLET;<br><br>ON BEHALF OF CAN-CAL RESOURCES, LTD<br><br>Plaintiffs,<br><br>   vs.<br><br>CAN-CAL RESOURCES, LTD., a Nevada corporation; WILLIAM J. HOGAN; THOMPSON MACDONALD; RONALD SCHINNOUR; MICHAEL HOGAN; CANDEO LAVA PRODUCTS, INC., a Canadian Corporation, and FUTUREWORTH CAPITAL CORP., a Canadian Corporation,<br><br>Defendants. | Case No.: 2:14-cv-1164-RFB-NJK<br><br><br><br><br><br>**MOTION TO REMAND PURSUANT TO 28 U.S.C. §1447(C)** |

1

1    Plaintiffs by and through their attorney of record, SUVINDER S. AHLUWALIA, ESQ.,

2    of the law firm SKLAR WILLIAMS PLLC., hereby move this Court for an order remanding this

3    action to State Court pursuant to 28 U.S.C. § 1447(c).  This Motion is based on the following

4    Memorandum of Points and Authorities, the attached exhibits, and all other papers on file herein.

5    DATED this 15th day of August, 2014.

6    SKLAR WILLLIAMS PLLC

7

8    /s/ Suvinder S. Ahluwalia
     Suvinder S. Ahluwalia
     Nevada Bar No. 3944
9    Sklar Williams PLLC
     410 S. Rampart Boulevard, Ste. 350
10   Las Vegas, NV 89145

11   **MEMORANDUM OF POINTS AND AUTHORITIES**

12   I.   **DEFENDANTS' NOTICE OF REMOVAL**

13
14        On July 16, 2014, defendants removed this action from the District Court of Clark

15   County, Nevada to this Court.

16        In the Notice of Removal filed with this Court on July 16, 2014 the Defendants

17   contended that "This Court has original jurisdiction over this action under 28 U.S.C. § 1331

18   because Plaintiff's (sic) Complaint alleges violations of the Sarbanes-Oxley Act of 2002 and

19   Securities Exchange Act of 1934 . . . . While a specific federal claim is not pleaded, the

20   plaintiffs' 'right to relief necessarily depends on resolution of a substantial question of federal

21   law' and is thus removable. *Franchise Tax Board v. Construction Laborers Vacation Trust*, 463

22   U.S. 1, 27-28 (1983)."  The problem with the Notice of Removal is that Plaintiffs' right to relief

23   in this case does not necessarily depend upon resolution of a substantial question of federal law.

24   Defendants are guilty of violating federal laws, but this case is not about the violation of federal

25   laws.  It is about Defendants' violations of their duties owed under Nevada corporate law to

26   shareholders.

27

28

2

II.     **AS A MATTER OF LAW, THE DEFENDANTS CANNOT MEET THE BURDEN FOR JUSTIFYING THEIR REMOVAL OF THIS ACTION, AND THE MATTER SHOULD BE REMANDED TO THE DISTRICT COURT OF CLARK COUNTY FOR LACK OF FEDERAL JURISDICTION**

A.      **The Actual Claims in the Complaint Are Based on State Law.**

In essence Plaintiffs fundamental claim is that, William Hogan, Ronald Schinnour, Michael Hogan and Thompson MacDonald have looted Can-Cal by taking from the company its extraordinarily valuable organic fertilizer Pisgah Property and giving the benefit of that corporate asset to William Hogan and Candeo to exploit, thereby defrauding Can-Cal and its shareholders. In that regard and in the other specific instances set forth in the complaint, the individual defendants have acted for personal benefit to the detriment of the company.  That is what the lawsuit is about.

One of the ways in which the defendants have breached their fiduciary duties is the failure to disclose material information to shareholders.  The failure to disclose includes filing of misleading reports with the SEC.  This in and of itself is a violation of federal law that could give rise to federal action by federal authorities under circumstances that are wholly separate from the complaint in this case.  As discussed in more detail later, the overlap of violations of federal laws and federal statutes with state law causes of action does not constitute a sufficient basis for removal.  This case is about the violation of duties under state law.

The complaint contains seven causes of action, all of which are state-law claims brought derivatively against a Nevada corporation by the corporation's shareholders.  Specifically, those seven claims follow:

1.      Breach of fiduciary duty against William Hogan.

2.      Conversion against William Hogan and Candeo.

3.      Breaches of fiduciary duties against all four Individual Defendants.

4.      Aiding and abetting breaches of fiduciary duties against William Hogan, Michael Hogan, MacDonald and Schinnour.

5.   Civil conspiracy against all Defendants.

6.   Fraud and deceit against all the Individual Defendants and Candeo.

7.   Unjust enrichment against William Hogan, Michael Hogan, Candeo and FutureWorth.

These are all state law causes of action governed by Nevada law.  Plaintiffs right to relief does not necessarily depend on resolution of a substantial question of federal law, and this case does not arise out of the constitution, laws or treaties of the United States.

In fact, the lawsuit could not have been brought in federal court.  The disclosure laws violated by Defendants are the Securities Exchange Act of 1934 ("Exchange Act") and the Sarbanes-Oxley Act.   There are no civil causes of action for a violation of those statutes.

**B.    The Claims in the Complaint Are Not and Could Not Be based on the Exchange Act.**

There are three provisions of the Exchange Act which provide for a civil cause of action for securities fraud.  They are Sections 9, 18 and 10(b).  Section 9 and 18 provide for express liability and courts have implied a cause of action based on Rule 10b-5 promulgated by the SEC pursuant to section 10(b).  All three sections require that plaintiff be a "purchaser or seller" of securities or that the matters complained of were "in connection with the purchase or sale of a security".  Plaintiffs are neither purchasers nor sellers of securities, and nothing they complain of was in connection with the purchase or sale of a security.

Section 9 makes it unlawful to manipulate securities prices.  Any person who manipulates prices is liable to "any person who shall purchase or sell any security (at a manipulated price)." *See* 78 U.S.C.A. § 78i.

Section 18 provides that any person who makes a false or misleading statement of material fact in any report or document filed with the SEC shall be liable to "any person . . . who in reliance on such statement shall have purchased or sold a security at a price which was affected by such statement." *See* 78 U.S.C.A. § 78r.

4

Rule 10b-5 provides for liability for any misstatement or omission of a material fact or any device scheme or article to defraud <u>only</u> "in connection with the purchase or sale of security". *See* 78 U.S.C.A. 78j(b).  In an unbroken series of cases since *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975), which held that only actual purchasers and sellers of securities have standing to bring a private action under Rule 10b-5 for damages, federal courts have consistently held that <u>only</u> purchasers or sellers of securities have standing to assert claims pursuant to the Rule 10b-5.  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 80 (2006).

> By the time this Court first confronted the question, literally hundreds of lower court decisions had accepted "Birnbaum's conclusion that the plaintiff class for purposes of § 10(b) and Rule 10b-5 private damage actions is limited to purchasers and sellers." *Blue Chip Stamps*, 421 U.S., at 732-732, 95 S. Ct. 1917, 44 L. Ed. 2d 539.

None of the Plaintiffs' claims depend upon purchasing or selling securities, and the complaint contains no allegations in that regard.  Accordingly, the Plaintiffs have not – and could not - assert any claim for relief pursuant to federal securities laws or rules promulgated thereunder.  Indeed to the contrary they only allege "each of the Plaintiffs was a shareholder at the time of the transactions of which they complain." (Complaint, ¶17).  Therefore, as a matter of law, there is no original jurisdiction for any of Plaintiffs claims pursuant to the Exchange Act.

The Exchange Act is not an effort at federal preemption of corporate law.  The Supreme Court has clearly stated that corporate mismanagement and breach of fiduciary duties do not rise to the level of the Exchange Act.  *Santa Fe Indus. v. Green*, 430 U.S. 462, 479-480 (U.S. 1977):

> We thus adhere to the position that Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement." *Superintendent of Insurance v. Bankers Life & Cas. Co.*, 404 U.S., at 12.  There may well be a need for uniform federal fiduciary standards to govern mergers such as that challenged in this complaint.  But those standards should not be supplied by judicial extension of § 10(b) and Rule 10b-5 to "cover the corporate universe."

In *Lippitt v. Raymond James Financial Services, Inc., et al.*, 340 F.3d 1033, 1037 (9th Cir. 2003), a suit against stock brokerage firms alleging violations of state law in marketing of certificates of deposit (which are securities) was removed to federal court on the grounds that Section 27 of the Exchange Act gives exclusive jurisdiction to federal court. In remanding to state court, the Court noted that Congress contemplated the possibility of dual litigation in state and federal courts relating to securities matters: ". . . the Exchange Act does not completely preempt the field of securities regulation" citing the language from Section 28 of the Exchange Act stating "the rights and remedies provided by this Chapter shall be in addition to any and all other rights and remedies that may exist at law or in equity."

In *Roskind v. Morgan Stanley Dean Witter & Company*, 165 F.Supp.2d 1059, 1067 (ND Cal. 2001) plaintiffs sued for breach of fiduciary duty including a violation of National Association of Securities Dealers, Inc. ("NASD") rules which were adopted pursuant to the Exchange Act. Defendants removed based on federal securities law. The court held removal was proper that "state common law not NASD rules define the scope of defendant's fiduciary duty to plaintiff." The court also relied upon the fact that there, as in this case, is no private cause of action for the alleged federal violations.

In *Merrell Dow Pharmaceuticals, Inc. v. Thompson*, 478 U.S. 804, 814, 106 S.Ct. 3229, 3235 (1986), the United States Supreme Court stated:

> The congressional determination that there should be no federal remedy for the violation of this federal statute is tantamount to a congressional conclusion that the presence of a claimed violation of the statute as an element of a state cause of action is insufficiently "substantial" to confer federal question jurisdiction.

**C.     The Claims in the Complaint Are Not and Could Not Be based on Sarbanes-Oxley.**

The Sarbanes-Oxley Act of 2002 sets forth conduct that is required of Officers and Directors of a publicly held reporting company. Can-Cal is a public fully reporting company with the SEC and is obligated to file reports. Section 804 amended 28 U.S.C. § 1658's statute of

6

limitations period for certain actions and provides that "nothing in this section shall create a new, private right of action."  Pub.L. No. 107-204, Title VII, § 804(c), 116 Stat. 801.  Section 306 explicitly creates a private cause of action for insider trading during a pension fund blackout period but the other sections, which do not contain such language, do not create private causes of action.  In re Digimarc Corp. Deriv. Lit.Section, 549 F.3d. 1223 (9th Cir. 2008).  There are specific criminal penalties for violation of the Act.  Plaintiffs do not – and cannot - make any claim for relief pursuant to the Sarbanes-Oxley Act.

**D.    As a Matter of Law, the Existence of Peripheral Issues of Law Is Not Sufficient for Removal.**

Plaintiffs' seven (7) state law claims do not necessarily depend on resolution of any question of federal laws.  Indeed there is no substantial question of federal law to be resolved at all.  Defendants concealed – and continue to conceal - material information from Can-Cal's shareholders in breach of their fiduciary duties and as part and pursuant to their scheme to defraud Can-Cal and its shareholders under state law.  In the course of the violation of state law duties, there have been violations of federal law obligations, but the violation of federal laws are not the subject matter of this action.  The peripheral involvement of federal statutes, as is the case here, does not justify removal.  This principle is established in a number of cases, as set forth below.

At the outset, it is important to bear in mind that the removal statute is strictly construed against removal jurisdiction. *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992), states:

> We strictly construe the removal statute against removal jurisdiction. *Boggs v. Lewis*, 863 F.2d 662, 663 (9th Cir. 1988); *Takeda v. Northwestern Nat'l Life Ins. Co.*, 765 F.2d 815, 818 (9th Cir. 1985).  Federal jurisdiction must be rejected if there is any doubt as to the right of removal in the first instance.  *Libhart v. Santa Monica Dairy Co.*, 592 F.2d 1062, 1064 (9th Cir. 1979).

The "mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction."  Merrell Dow Pharm. Inc. v. Thomas, 478 U.S. 804, 813,

7

106 S.Ct. 3229, 3235 (1986).  "[O]riginal federal jurisdiction is unavailable unless it appears that some substantial, disputed question of federal law is a necessary element of one of the wll-pleaded state claims."  Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal., 463 U.S. 1, 13 (1983).

These United States Supreme Court principles are followed in a number of United States District Court of Nevada unreported decisions.  In *Addison v. Countrywide Home Loans, Inc.* a 2011 decision by Judge George, *Nebab v. JFK Financing, Inc.* a 2011 decision by Judge Navarro,  and *Krause v. Nevada Mutual Insurance Co.*, a 2014 decision by Judge Gordon, the courts in this district have uniformly remanded cases to state court on the grounds that the federal issues were peripheral and that the recovery of the relief requested was primarily a matter of state law.  Copies of these decisions are attached for ease of reference by the Court.

Another unreported but instructive case that is attached is *Finance & Trading Ltd, et al. v. Rhodia S.A., et al.*, a 2004 decision from the Southern District of New York, which involved the filing of a fraudulent prospectus with the SEC which induced plaintiffs to purchase Rhodia stock and sustain a loss.    Plaintiff sued only for common law fraud and negligent misrepresentation.    Defendants removed on the grounds that the case necessitated an interpretation of federal securities law.  In remanding to the state court the court determined that plaintiffs' claims did not necessarily engage the federal securities laws.

> This case was not brought to enforce liabilities or duties created solely by the Exchange Act . . .  plaintiff's state law claims . . . are not created by the Exchange Act."
>
> . . .
>
> *Travelers Indem. Co. v. Sarkisian*, 794 F.2d 754, 758 (2nd Cir. 1986) ("Where plaintiff's claim involves both a federal ground and a state ground, the plaintiff is free to ignore the federal question and pitch his claim on the state ground to defeat removal.") (internal quotation marks omitted); see also *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392, 96 L. Ed. 2d 318, 107 S. Ct. 2425 & n.7 (1987).
>
> . . .

8

> Plaintiffs' claims may be assessed entirely by applying New York's common law standards to the facts in this case. Although certain of defendants' alleged misrepresentations certainly were contained in prospectuses filed with the SEC, plaintiffs' claims do not depend on any rights or causes of action created by federal law. They stand independently on state common law grounds."

In the same vein, *Hill v. Marston*, 13 F.3d 1548, 1550 (11th Cir. 1994), states:

> The fact that part of the state statutory scheme requires some analysis of federal law it is insufficient to invoke federal jurisdiction. *See Moore v. Chesapeake & Ryco*, 291 U.S. 205, 214-15, 54 S. Ct. 402, 405-06, 78 L. Ed. 755 (1934) . . . *Moore* makes clear that violation of a federal standard as an element of the state court recovery does not fundamentally change the state tort nature of the action. *See also State of Nevada v. Bank of America Corporation*, 672 F.3d 661 (9th Cir. 2012).

**III.   ANALYSIS OF THE COMPLAINT DEMONSTRATES THAT IT IS A CASE ABOUT COMMON LAW FIDUCIARY DUTIES AND THEFT, NOT FEDERAL LAWS.**

Forty Plaintiffs who collectively own 7,022,577 shares of Can-Cal, which is approximately 17 % of all of the outstanding shares of Can-Cal, filed a shareholders derivative suit on behalf of Can-Cal against three current directors, MacDonald, Michael Hogan and Schinnour, along with former officer and director William Hogan (the "Individual Defendants") and Candeo Lava Products, Inc. ("Candeo") and FutureWorth Capital Corp. ("FutureWorth") which are companies controlled by William Hogan.  (Complaint, ¶¶ 1-17)

Can-Cal is a small publicly held company with a long history of losses as a result of unsuccessfully attempting to produce gold from its Pisgah Property. Its Pisgah Property which Can-Cal owns in fee, contains at least 13,000,000 tons of volcanic basalt material (the "Pisgah Property").  Can-Cal has about 42,000,000 shares outstanding and its stock was sporadically trading with the last reported trade at about $.025 per share.  Therefore the company had a market cap of about $1,700,000.  (Complaint, ¶¶ 16-20, 39-42)

In their fundamental claim, Plaintiffs allege that the Individual Defendants perpetrated a conspiracy and scheme to defraud Can-Cal and its shareholders by taking the value of its Pisgah

Property away from Can-Cal for the benefit of William Hogan and Candeo with the expectation that it is worth billions of dollars.  They have simply looted Can-Cal.  (Complaint, ¶¶ 1, 5). Since at least 2012 they learned that Can-Cal's Pisgah Material had essential properties and elements as an organic fertilizer in great demand and very valuable.  (Complaint, ¶¶ 43-46). They should of course have immediately informed Can-Cal shareholders of this development. Instead of disclosing what they had learned to Can-Cal shareholders, the Individual Defendants intentionally and deliberately concealed that information from Can-Cal shareholders as part of an effort to steal the asset and the opportunity from the company in breach of fiduciary duties.  The basis of the complaint is the taking of corporate assets and opportunities, corporate mismanagement, and acting for personal benefit to the detriment of the corporation.  In the course of that conduct, violations of federal laws occurred, but those violations were incidental to the more fundamental violations of the Nevada duties of corporate insiders to shareholders.  This lawsuit is about the duties to shareholders.  The federal violations are left to the authorities who enforce the federal laws.

On April 9, 2013, the Individual Defendants pursuant to their conspiracy and scheme to defraud caused Can-Cal to enter into a Material Supply Agreement ("MSA") with Candeo, a Canadian corporation formed and owned by William Hogan and former Chairman of the Board of Can-Cal, which gave Candeo the right to purchase 1,000,000 tons of Can-Cal's Pisgah Material and 66 2/3% of all the profits from the sale of Can-Cal's Material to Candeo and prohibited Can-Cal from selling any of its Pisgah Material as an organic fertilizer or for agricultural uses by itself.

The formation of Candeo was a sham. There was no business reason to give William Hogan and Candeo 66 2/3% - or any amount - of profit from the sale of the Pisgah Material or the Pisgah Property.  It was Can-Cal's property and its corporate opportunity to profit from its property for the benefit of its shareholders. (Complaint, ¶¶ 49-58)

On or about July 15, 2013 pursuant to the plan and conspiracy to obtain Can-Cal's Pisgah Property for William Hogan and Candeo, MacDonald, Michael Hogan and Schinnour held a Board of Directors meeting and approved a resolution regarding the reorganization of Candeo and Can-Cal which, upon information and belief, could possibly result in the takeover or acquisition of Can-Cal by Candeo. (Complaint, ¶59)

On April 26, 2013, less than 60 days after resigning as Chairman of the Board of Can-Cal, William Hogan sent a corporate update to prospective shareholders in Candeo extolling the virtues of Can-Cal's Pisgah Material representing, among other things, that:

- "we are very impressed and encouraged with the laboratory analysis and the outstanding results from our first in-house beta project.

- "the potential market for organic crops of vegetables and fruits has skyrocketed and is extremely lucrative financially.  This will bode very well for Candeo and the potential demand of the Pisgah Material, being a completely all natural green product."

. . .

- "Candeo's business will be essentially taking the Pisgah volcanic basalt material and turning it into a finished chemical remineralization product for residential and commercial sold for use in flower beds, gardens, trees, shrubs, lawns, organic vegetables, grain crops, etc."

. . .

- That Candeo's next phase "will include putting the product in a strong position to begin courting major North American distribution companies through buyers such as the national box store such as Wal-Mart, Home Depot, Lowes, Home Improvements, etc.  It is endless the

retailer outlets that we can approach for such an impressive organic garden area product."

. . .

- "It is expected that the Pisgah Material product for the Garden Areas when put into 1, 3, 10 or 20 kilogram containers will be very profitable and will benefit both Candeo and Can-Cal simultaneously. <u>Other currently similar powder products range in price from $250 to $1,500 of gross revenue per ton.</u>" (Emphasis added)

. . .

- "Chemical analysis by independent laboratories in Canada and the United States has confirmed the presence of extremely favorable levels of macro and micro nutrients as well as excellent pH level in the Pisgah Material.  Additionally, there is a very high Silica level in the material, which is crucial for essential plans development."

. . .

- Management has a "great deal of confidence that the Pisgah Material has a potential to be an outstanding and lucrative world class product."

. . .

- "Candeo is excited about its viability as a world class soil remineralization product."

. . .

- "Volcanic basalt is very hydroscopic.  With the addition of the plan matter and living microbes this type of soil situation holds and needs a lot less watering that conventional chemical farming methods."

. . .

12

- "Organic crops command more money and are desirable for their superior nutritional contents and lack of undesirable agents such as pesticides and herbicides. The combination of these factors with the increase in yield and added unique flavor, result in greater profits for the producer." (Complaint, ¶ 60)

In Candeo's November 26, 2013 solicitation William Hogan represented to prospective investors among other things:

- "Candeo has now commenced the validation of the Pisgah "Volcanic Basalt" material with the California Research Center namely Holden Research that specializes in applied science and answers for production agriculture."

. . .

- "As we have previously mentioned that potential market for organic crops of vegetables and fruits has skyrocketed, especially in California. That and the majority of organic crops/plants are extremely lucrative financially. These bode well for all stake holders of Candeo and future potential demand of the Pisgah Material as a completely all natural green product."

. . .

- " . . . Candeo will begin discussions with several major North American distribution companies that are buyers for national box source such as Wal-Mart, Home Depot. Lowes, Home Improvement, etc. On that note we have commenced conversations with several, who have indicated a strong interest in a potential "green organic product".

- "(Candeo) has significantly moved forward in the objective supply in the North American market place without standing the value added soil remineralization product."

. . .

- "(Candeo's) in-house valuation has given management a huge burst of confidence that the Pisgah Material is extremely good.  We are on to something very special".  (Complaint, ¶61)

In August, November and December 2013, William Hogan telephoned Ronald Sloan, the verifying Plaintiff and whose friends, family and associates own approximately 50% of Can-Cal stock, and disclosed to him, among other things, that Can-Cal's Pisgah Material had great value as an organic fertilizer; the wonderful tests results; that it was probably the best organic fertilizer in the world, and that it could be sold for $2,000 per ton; that Candeo would pay Can-Cal $2,000,000 to $2,500,000 for about 72% of the Pisgah Property; that the Pisgah Material had a special seed element that could increase the price of a ton to $10,000; that some of the fertilizer companies who he is dealing with are billion dollar firms and that Candeo would be willing to pay Can-Cal $2,000,000 to $3,000.000 for an ownership of about 72% of the Pisgah Property; that they have been in touch with Monsanto Fertilizer through Ronald Schinnour; that Candeo has commenced conversations with several major North American distribution companies who have indicated strong interest in the Pisgah Volcanic Basalt Material; that Can-Cal has tested the volcanic basalt material on several vegetables including onions, squash and corn with fabulous results; that Candeo plans on selling Can-Cal's Pisgah Property to a major company when they confirm the value.  (Complaint, ¶¶66-68, 70)

William Hogan asked Sloan to support the MSA and a sale of Can-Cal's Pisgah Property to Candeo.  Sloan refused stating that Can-Cal and its shareholders were entitled to 100% of any

profits and all of this information was important and should be disclosed to Can-Cal shareholders. (Complaint, ¶¶ 69, 71)

After Sloan refused to support the MSA or a sale of Pisgah Material to Candeo, William Hogan, Michael Hogan, MacDonald and Schinnour devised yet another plan and scheme of obtaining ownership and control of Can-Cal's Pisgah Property for Candeo.  Pursuant to this plan and scheme, Candeo defaulted on its obligation to pay a total of $225,000 pursuant to the MSA, paying only $64,750.  Instead, on March 4, 2014 the Individual Defendants caused Can-Cal to enter into an Amended MSA with Candeo and William Hogan which is even far more detrimental to Can-Cal and favorable to Candeo and effectively amounted to a sale of the Pisgah Property to Candeo for effectively no consideration.  (Complaint, ¶¶75, 76) (Exhibit 10)

In the Amended MSA Candeo is given <u>exclusive</u> right to mine all material (not included in the agreement with GoodCorp.) for agricultural and other uses as determined by Candeo for an initial term of 20 years and if it removes 1,000,000,000 tons during the 20 year period Candeo can extend the term at any time for an additional 30 years, <u>totaling a term of 50 years</u>.  Candeo is to pay Can-Cal the greater of $15 per ton or 35% of the net sales margin per ton during the first year of mining and 50% thereafter but Candeo has no obligation to remove any material from the property for up to 20 years. (Complaint, ¶¶ 77-79)

During this 50 year period Can-Cal is barred from competing with Candeo since it cannot sell its Pisgah Material to anyone or otherwise deal with its property since all rights to its Pisgah Property is now in Candeo's control.  As a result the Pisgah Property has essentially become valueless to Can-Cal and Can-Cal is wholly dependent on William Hogan and Candeo.  Candeo is to pay Can-Cal a total of $385,000 over three (3) years but those funds if paid will go to the Hogans pursuant to their "Employment Contracts". (Complaint, ¶79)

The other provisions of the Amended MSA are designed to cause Can-Cal to default on its obligation so Candeo will end up owning Can-Cal's Pisgah Property.  The Amended MSA

also gives Candeo the exclusive right to require Can-Cal to mine and deliver to Candeo such Pisgah Material as Candeo directs.  The purpose of that provision was to make it impossible for Can-Cal to perform the obligations imposed upon it so that Candeo could declare default. (Complaint, ¶80)

Candeo is given the absolute right to freely assign its rights under the MSA without Can-Cal's consent so it can profit by assigning its rights leaving Can-Cal with a "partner" it knows nothing about and did not approve.  (Complaint, ¶80)

William Hogan and Michael Hogan, when they were the only Directors of Can-Cal, caused Can-Cal to enter into employment contracts with which required Can-Cal to pay them $60,000 and $120,000, respectively.  Can-Cal was insolvent at the time and incapable of paying any amount. Those employment contracts are wildly excessive and constitute a breach of fiduciary duty and corporate mismanagement.  William Hogan and Michael Hogan caused Can-Cal to enter into Employment Agreements with them.   Pursuant to the terms of those Employment Agreements as of December 31, 2014, Can-Cal "owes" the Hogans $700,000. (Complaint, ¶¶ 10-38).

This litany of disregard for state law duties to shareholders is what is going to be litigated in this case.  The value of the Pigsah Material, the formation of Candeo, the MSA, the Amended MSA, and the fundraising by Candeo are the essential issues in this case.   The violations of federal laws along the way are not essential to the case.  Beyond that, there is no real dispute that if the complaint is proven, federal disclosure laws were violated.  There is no substantial federal dispute arising from this complaint that necessitates the exercise of federal jurisdiction.

. . .

. . .

. . .

. . .

16

## IV.     CONCLUSION

WHEREFORE Plaintiffs respectfully request this Court to remand this matter to the District Court of Clark County and award Plaintiffs their attorney fees and costs pursuant to 28 U.S.C. 1447(c).

DATED this 15th day of August, 2014.

SKLAR WILLLIAMS PLLC


 /s/ Suvinder S. Ahluwalia
Suvinder S. Ahluwalia
Nevada Bar No. 3944
Sklar Williams PLLC
410 S. Rampart Boulevard, Ste. 350
Las Vegas, NV 89145
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of August, 2014, a true and correct copy of the

Motion to Remand Pursuant to 28 U.S.C. § 1447(c) was mailed by first class mail and submitted

via the United States District Court CM/ECF system for electronic service on all parties or

persons requiring notice as indicated below:

Justin Jones, Esq.
Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP
3556 E. Russell Road, Second Floor
Las Vegas, Nevada 89120
(702) 341-5200/Fax (702) 341-5300
jjones@wrslawyers.com
*Attorneys for Defendant*
*CAN-CAL RESOURCES, LTD.*

Patrick J. Reilly, Esq.
Nicole E. Lovelock, Esq.
Krystal J. Gallagher, Esq.
Holland & Hart LLP
9555 Hillwood Drive, Second Floor
Las Vegas, Nevada 89134
(702)669-4600/Fax (702)669-4650
preilly@hollandhart.com
nelovelock@hollandhart.com
kjgallagher@hollandhart.com
*Attorneys for Defendants William J. Hogan,*
*Thompson MacDonald, Ronald Schinnour,*
*Michael Hogan, Candeo Lava Products, Inc.,*
*and Futureworth Capital Corp.*

Emily Kapolnai, Legal Assistant
Sklar Williams, PLLC
410 South Rampart Blvd. Suite 350
Las Vegas, NV 89145

18

Westlaw.

Page 1

Not Reported in F.Supp.2d, 2011 WL 146516 (D.Nev.)
**(Cite as: 2011 WL 146516 (D.Nev.))**

**C**
Only the Westlaw citation is currently available.

United States District Court,
D. Nevada.
Rosalinda M. **ADDISON**, et al., Plaintiffs,
v.
**COUNTRYWIDE** HOME LOANS, INC., et al.,
Defendants.

No. 2:10–cv–1304–LDG–PAL.
Jan. 14, 2011.

Jeffrey J. Whitehead, Whitehead Law Offices,
Henderson, NV, for Plaintiffs.

J. Christopher Jorgensen, Stefan M. Palys, Lewis
and Roca LLP, Las Vegas, NV, for Defendants.

### ORDER REMANDING CASE TO STATE COURT

LLOYD D. GEORGE, District Judge.

*1 Plaintiffs Rosalinda and Shawn Addison filed this action in the Eighth Judicial District Court of Nevada seeking equitable relief and monetary damages in connection with the planned non-judicial foreclosure sale of Plaintiffs' home residence. Defendants subsequently removed the case to federal court (# 1). The parties have since filed various motions, which the court will now address.[FN1]

> FN1. The following motions are presently before the court: Plaintiffs' Motion to Remand Case to State Court (# 6, opposition # 15, reply # 21); BOA Defendants' Motion to Dismiss (# 8, opposition # 17, reply # 23); BOA Defendants' Motion to Strike Plaintiffs' First Amended Complaint (# 22, opposition # 27, reply # 32); Plaintiffs' Motion to Amend Complaint (# 28); Plaintiffs' Emergency Motion for a Preliminary Injunction and to Shorten Time for Briefing and Issuance of an Order (# 30 & # 31, opposition # 36 & # 37, reply # 38);

and Defendant Vision Home Mortgage Co.'s Motion to Dismiss Under Rule 12(b)(6) or for More Definite Statement Under Rule 12(e)(# 45).

### I. Background

Plaintiffs took out a mortgage on a personal residence located in Las Vegas in October 2004. After receiving notification of a planned non judicial foreclosure sale of Plaintiffs' residence in 2010, Plaintiffs filed suit in state court alleging that Defendants engaged in fraud, misrepresentation, conspiracy, and civil racketeering, and breached various other duties arising out of tort and contract. On July 21, 2010, in light of the scheduled sale, the state court issued a temporary restraining order ("TRO") enjoining Defendants from taking any action until that court could conduct a preliminary injunction hearing on August 5, 2010. On August 3, however, BOA Defendants, comprising all original Defendants except Fidelity, who had not been served by that date, removed this case to federal court. The parties subsequently filed numerous motions, and this court extended the state court TRO until determination of Plaintiffs' motion for preliminary injunction (# 39).

### II. Analysis

**A. Plaintiffs' Motion to Remand**

Plaintiffs have moved to remand this action to state court. "On a motion to remand, the removing defendant faces a strong presumption against removal, and bears the burden of establishing that removal is proper." *Laughlin v. Midcountry Bank,* No. 3:10–CV–0294–LRH–VPC, 2010 WL 2681899, at * 1 (D.Nev. July 2, 2010) (citing *Gaus v. Miles, Inc.,* 980 F.2d 564, 566–67 (9th Cir.1992) and *Sanchez v. Monumental Life Ins. Co.,* 102 F.3d 398, 403–04 (9th Cir.1996)). Accordingly, "[f]ederal jurisdiction must be rejected if there is any doubt as to the right of removal in the first instance," *Libhart v. Santa Monica Dairy Co.,* 592 F.2d 1062, 1064 (9th Cir.1979), and "the court resolves all ambiguity in favor of remand to state

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 146516 (D.Nev.)
**(Cite as: 2011 WL 146516 (D.Nev.))**

court," *Hunter v. Philip Morris USA,* 582 F.3d 1039, 1042 (9th Cir.2009) (citing *Gaus,* 102 F.2d at 566) (internal quotation marks omitted). "If a district court lacks subject matter jurisdiction over a removed action, it has the duty to remand it, for 'removal is permissible only where original jurisdiction exists at the time of removal or at the time of the entry of final judgment....' " *Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc.,* 159 F.3d 1209, 1211 (9th Cir.1998) (citing *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach,* 523 U.S. 26, 44 (1998)).

Plaintiffs argue that this court lacks jurisdiction because not all Defendants joined in the notice of removal, because Plaintiffs' claims do not involve a federal question, and because complete diversity does not exist between the parties. Therefore, Plaintiffs argue, removal was improper, and the court should remand to state court. BOA Defendants, however, contend that removal was proper because only defendants who have been properly joined and served must join in notice of removal, Plaintiffs' claims involve federal questions, and Fidelity, the only non-diverse Defendant, was fraudulently joined. The court now turns to each of these arguments.[FN2]

> FN2. Plaintiffs' reply in support of their motion to remand also presents arguments based on their Amended Complaint, filed after removal. Such post-removal developments are inapposite and do not have any bearing on the propriety of removal. *See, e.g., Sparta Surgical Corp.,* 159 F.3d at 1213 (9th Cir.1998) ("Finally, Sparta directs our attention to an amended complaint it filed after removal ... This is of no moment to us, however, for jurisdiction must be analyzed on the basis of the pleadings filed at the time of removal without reference to subsequent amendments.").

**1. Notice**

**\*2** Plaintiffs argue that removal was improper because Fidelity failed to join in the notice of re-

moval. Generally, "all defendants must join in the notice of removal." *Chicago, Rock Island & Pac. Ry. Co. v. Martin,* 178 U.S. 245, 248 (1900). However, as BOA Defendants correctly suggest, "[t]his general rule applies ... only to defendants properly joined and served in the action." *Emrich v. Touche Ross & Co.,* 846 F.2d 1190, 1193 n. 1 (9th Cir.1988); *see also Cwiak v. Scott,* Nos. CV 09–1858–PHX–MHM, CV 09–2686–PHX–MHM, 2010 WL 2743225, at \*1 (D.Ariz. July 12, 2010) ("This general rule, however, applies only to defendants who were properly served in the state action, as the court has no jurisdiction over defendants who have not been served."). Therefore, because Plaintiffs failed to serve Fidelity at any time prior to removal, Fidelity need not have joined in the notice of removal.

**2. Original Jurisdiction**

Plaintiffs also argue that removal is improper because this court lacks original jurisdiction over their claims. Under 28 U.S.C. § 1441, "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a). "The threshold requirement for removal under 28 U.S.C. § 1441 is a finding that the complaint contains a cause of action that is within the original jurisdiction of the district court." *Ansley v. Ameriquest Mortg. Co.,* 340 F.3d 858, 861 (9th Cir.2003) (quoting *Toumajian v. Frailey,* 135 F.3d 648, 653 (9th Cir.1998) (internal quotation marks omitted)). Accordingly, "[a] defendant may remove an action to federal court based on federal question jurisdiction or diversity jurisdiction." *Philip Morris USA,* 582 F.3d at 1042 (citing 28 U.S.C. § 1441).

**a. Federal Question Jurisdiction**

Plaintiffs argue that this case does not present a federal question because Nevada law creates each of Plaintiffs' causes of action. A district court has federal question jurisdiction in "all civil actions

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 146516 (D.Nev.)
**(Cite as: 2011 WL 146516 (D.Nev.))**

arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. A suit arises under the Constitution and laws of the United States only if the original statement of the plaintiff's cause of action shows that it is based on the Constitution or federal statutes. *Louisville & Nashville R .R. Co. v. Mottley,* 211 U.S. 149 (1908).

The existence of federal question jurisdiction is ordinarily determined from the face of the complaint. *Ultramar Am. Ltd. v. Dwelle,* 900 F.2d 1412, 1414 (9th Cir.1990). However, in addition to examining the literal language selected by the plaintiff, the court must analyze whether federal jurisdiction would exist under a properly pleaded complaint. *Easton v. Crossland Mortg. Corp.,* 114 F.3d 979, 982 (9th Cir.1997). A plaintiff may not avoid federal jurisdiction by omitting from a complaint federal essential to his or her claim or by casting in state law terms a claim that can be made only under federal law. *Id.* However, the "mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction." *Merrell Dow Pharm. Inc. v. Thomas,* 478 U.S. 804, 813 (1986). "[O]riginal federal jurisdiction is unavailable unless it appears that some substantial, disputed question of federal law is a necessary element of one of the well-pleaded state claims...." *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal.,* 463 U.S. 1, 13 (1983); *see also Grable & Sons Metal Products, Inc. v. Darue Eng'g & Mfg.,* 545 U.S. 308, 314 (2005) (framing the essential question as: "[D]oes a state-law claim necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities").

**\*3** Although Plaintiffs' Complaint does not specifically reference any federal law, BOA Defendants nevertheless argue that this case presents a federal question because federal law constitutes essential elements of some of Plaintiffs' claims. Plaintiffs' first cause of action alleges that all De-

fendants "committed fraud in direct violation of NRS 205.372." *See* Com pl. 13–14, ECF No. 1. To prove a violation of § 205.372, Plaintiffs must establish that they constituted "Borrower[s]" pursuant to the Nevada Unfair Lending Practices Act, *see* Nev.Rev.Stat. § 205.372 6(c)1; *id .* § 598D.020, which requires them to establish that their debt constituted a mortgage for purposes of the Home Ownership and Equity Protection Act ("HOEPA"), 15 U.S.C. § 1602(aa), *see* Nev.Rev.Stat. § 598D.020; *id.* § 598D.040.[FN3] *See* Compl. 12. BOA Defendants, therefore, argue that because Plaintiffs must prove that their mortgage constituted a mortgage as defined by federal law, Plaintiffs' state law claims actually "arise under" federal law.

> FN3. In addition to § 205.372, Plaintiffs' Complaint also references § 598D.100 and § 598D.110, both of which similarly incorporate this same HOEPA definition.

Although the definition of "Participant" in § 205.372 indirectly incorporates HOEPA's definition of "Home Loan," such reference does not alone implicate substantial and disputed issues of federal law. *See Hines v. Nat'l Default Servicing Corp.,* No. 3:10–cv–0674–LRH–VPC, 2010 WL 5239233, at *2 (D.Nev. Dec. 15, 2010) ("Although federal regulations are expressly noted in the Nevada statutes, these references only provide a framework for determining the types of claims that can be brought under the state statutes."); *see also Hill v. Marston,* 13 F.3d 1548, 1550–51 (11th Cir.1994) ("[T]he only indication of the involvement of a specific federal law in the complaint is in connection with a state statutory section that incorporates a portion of the Securities Exchange Act of 1933 ... The fact that part of the state statutory scheme requires some analysis of federal law, however, is insufficient to invoke federal jurisdiction. Thus, the complaint alleges no claims 'arising under' federal law and removal was improper."); *Mackillop v. Parliament Coach Corp.,* No. 09–cv–1939–T–23TBM, 2009 WL 3430072, at *2 (M.D.Fla. Oct. 21, 2009) ("Even though the federal standard incorporated in-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 146516 (D.Nev.)
**(Cite as: 2011 WL 146516 (D.Nev.))**

Plaintiffs must first seek leave and convince the court of the propriety of "an amendment which adds parties purely to destroy jurisdiction...." Mot. to Strike Pls.' First Am. Compl. 1, ECF No. 22. BOA Defendants subsequently withdrew their motion to strike Plaintiffs' Amended Complaint and urged this court to consider their motion to dismiss in light of Plaintiffs' Amended Complaint. To do so, however, this court must have jurisdiction.

**\*5** If a plaintiff wishes to join additional defendants whose joinder would destroy federal diversity jurisdiction after removal from state court, the court may deny joinder, or permit joinder and remand to state court. *Graunstadt v. USS–Posco Indus.,* No. C 10–03225 SI, 2010 WL 3910145, at \*2 (N.D.Cal. Oct. 5, 2010) (citing 28 U.S.C. § 1447(e)). The decision to permit joinder of a defendant that destroys diversity jurisdiction is left to the sound discretion of the district court. *See Stevens v. Brink's Home Security, Inc.,* 378 F.3d 944, 949 (9th Cir.2004); *Newcombe v. Adolf Coors Co.,* 157 F.3d 686, 691 (9th Cir.1998). In exercising this discretion, courts have generally considered the following factors, including: (1) whether the party sought to be joined is needed for just adjudication and would be joined under Federal Rule of Civil Procedure 19(a); (2) whether the statute of limitations would preclude an original action against the new defendants in state court; (3) whether there has been unexplained delay in requesting joinder; (4) whether joinder is intended solely to defeat federal jurisdiction; (5) whether the claims against the new defendant appear valid; and (6) whether denial of joinder will prejudice the plaintiff. *See, e.g., JSR Micro, Inc. v. QBE Ins. Corp.,* No. C 09–3044 PJH, 2010 WL 5211504, at \*1 (N.D.Cal. Dec. 16, 2010). Here, taking these considerations into account, the court finds that, on balance, joinder is appropriate under § 1447(e). Plaintiffs' common law claims against Vision do not appear invalid. Although BOA Defendants correctly note a 3–year statute of limitations for breach of fiduciary duty claims under Nevada law, *see Golden Nugget, Inc. v. Ham,* 646 P.2d 1221, 1223

(Nev.1982), "the statutory period of limitations is tolled until the injured party discovers or reasonably should have discovered facts supporting a cause of action," *see Siragusa v. Brown,* 971 P.2d 801, 806 (Nev.1998) (quoting *Petersen v. Bruen,* 792 P.2d 18, 20 (Nev.1990)), and a plaintiff must prove, but need not plead, tolling facts, *see id.* at 806 n. 6 ("In *Prescott v. United States,* 523 F.Supp. 918, 940–41 (D.Nev.1981), which we cite in *Petersen,* the federal court held: 'Plaintiff who relies upon this delayed discovery rule must plead facts justifying delayed accrual of his action. The complaint must allege: (1) the time and manner of discovery, and (2) the circumstances excusing delayed discovery.' We reject Brown's contention that appellants failed to satisfy the pleading requirements for a claim of delayed discovery. The express requirements of *Prescott* are not the law of Nevada."); *Allen v. Webb,* 485 P.2d 677, 682–83 (Nev.1971) ( "Respondent also urged below as a basis for its motion to dismiss that the Allens failed to plead their reasons for failing to assert this claim within the statutory period ... Here, the Webbs described their fiduciary relationship with Title Insurance, described the acts and promises of Title Insurance and stated that they believed their interests and rights to be secure and that they had no reason to believe otherwise. To require more at the pleading stage would be akin to requiring them to show a negative-i.e., how notice was not brought to their attention ... [T]he pleading must be held to be sufficient."); *see also* Fed.R.Civ.P. 8(c)1 (listing statute of limitations as an affirmative defense); *Hinton v. Shaw Pittman Potts & Trowbridge,* 257 F.Supp.2d 96, 98 n. 2 (D.D.C.2003) (noting that plaintiff was not required to state in the complaint that he was incarcerated, thus tolling statute of limitations, since statute of limitations is affirmative defense that must be pled by defendant). Therefore, Plaintiffs' common law breach of fiduciary duty claim is not facially insufficient. In light of this fact, although Plaintiffs obviously considered the jurisdictional ramifications of joining Vision, the court is not convinced that this was Plaintiffs' sole motivation for their Amended Complaint. Although Vision is

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 146516 (D.Nev.)
**(Cite as: 2011 WL 146516 (D.Nev.))**

likely not an indispensable party to this litigation, Plaintiffs would no doubt suffer some prejudice by maintaining separate actions based upon the same overall fact situation. Furthermore, BOA Defendants have withdrawn their opposition to Plaintiffs' Amended Complaint. Therefore, in consideration of the foregoing factors, the court grants Plaintiffs' leave to amend their complaint. Consequently, however, remand is mandatary under 28 U.S.C. 1447(e).

### III. Conclusion

*6 For the reasons stated above,

THE COURT HEREBY ORDERS that BOA Defendants' Motion to Strike Plaintiffs' First Amended Complaint (# 22) is DENIED as moot following BOA Defendants' voluntary withdrawal of this motion.

THE COURT FURTHER ORDERS that Plaintiffs' Motion to Amend Complaint (# 28) is GRANTED.

THE COURT FURTHER ORDERS that this case is remanded to state court pursuant to 28 U.S.C. 1447(e).

D.Nev.,2011.
Addison v. Countrywide Home Loans, Inc.
Not Reported in F.Supp.2d, 2011 WL 146516 (D.Nev.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2011 WL 939198 (D.Nev.)
**(Cite as: 2011 WL 939198 (D.Nev.))**

C
Only the Westlaw citation is currently available.

United States District Court,
D. Nevada.
Manuel **NEBAB**, et al., Plaintiffs,
v.
**JFK** FINANCIAL, INC., doing business as Equity
Direct Funding, et al., Defendants.

No. 2:10–cv–01285–GMN–RJJ.
March 16, 2011.

Manuel Nebab, Henderson, NV, pro se.

Nestor C. Nebab, Henderson, NV, pro se.

Kevin R. Hansen, Michael C. Van, Shumway Van
Chtd., J. Christopher Jorgensen, Stefan M. Palys,
Lewis and Roca LLP, Joseph P. Garin, Lipson
Neilson Cole Seltzer & Garin, P.C., Abran E. Vigil,
Ballard Spahr, Las Vegas, NV, for Defendants.

**ORDER**
GLORIA M. NAVARRO, District Judge.
   *1 This lawsuit was commenced on July 20,
2010 in the Eighth Judicial District Court of Clark
County, Nevada. Plaintiff pleaded no federal causes
of action; instead, the Complaint contains four state
law causes of action: (1) Lack of Standing to Con-
duct Foreclosure; (2) Fraudulent Misrepresentation,
Concealment, and Inducement; (3) Unfair Trade
Practices under Nev.Rev.Stat. 598D.100; and (4)
Wrongful Foreclosure. Nevertheless, Defendants
Bank of America Home Loans Servicing and Re-
conTrust Company, N.A. (collectively,
"Defendants") removed this lawsuit on July 30,
2010, alleging that this Court has federal question
jurisdiction under 28 U.S.C. § 1331. Defendants do
not assert that the Court has diversity jurisdiction
over this action. The Court finds that federal ques-
tion jurisdiction does not exist in this case; there-
fore, the lawsuit will be remanded to state court
pursuant to 28 U.S.C. § 1447(c).

**I. SUBJECT MATTER JURISDICTION**
   Federal courts are courts of limited jurisdiction,
possessing only those powers granted by the Con-
stitution and statute. *See United States v. Marks,*
530 F.3d 799, 810 (9th Cir.2008) (citing *Kokkonen
v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377
(1994)). The party asserting federal jurisdiction
bears the burden of overcoming the presumption
against it. *Kokkonen,* 511 U.S. at 377. A court may
raise the question of subject matter jurisdiction *sua
sponte* at any time during an action. *United States
v. Moreno–Morillo,* 334 F.3d 819, 830 (9th
Cir.2003). "[W]hen a federal court concludes that it
lacks subject-matter jurisdiction, the court must dis-
miss the complaint in its entirety." *Arbaugh v. Y &
H Corp.,* 546 U.S. 500, 514 (2006) (citing 16 J.
Moore et al., Moore's Federal Practice § 106.66[1],
pp. 106–88 to 106–89 (3d ed.2005)).

   A district court's jurisdiction also extends to
cases removed from state court under particular cir-
cumstances. 28 U.S.C. § 1441(b) ("Any civil action
of which the district courts have original jurisdic-
tion founded on a claim or right arising under the
Constitution, treaties or laws of the United States
shall be removable without regard to the citizenship
or residence of the parties. Any other such action
shall be removable only if none of the parties in in-
terest properly joined and served as defendants is a
citizen of the State in which such action is
brought."). In cases removed from state court, a
federal court that finds a lack of subject matter jur-
isdiction does not dismiss, but must remand to state
court. 28 U.S.C. § 1447(c). "The removal statute is
strictly construed, and any doubt about the right of
removal requires resolution in favor of remand."
*Moore–Thomas v. Alaska Airlines, Inc.,* 553 F.3d
1241, 1244 (9th Cir.2009). A decision to remand a
case removed on any basis other than civil rights
removal jurisdiction under 28 U.S.C. § 1443 "is not
reviewable on appeal or otherwise." 28 U.S.C. §
1447(d).

   The presence or absence of federal-question

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 939198 (D.Nev.)
**(Cite as: 2011 WL 939198 (D.Nev.))**

jurisdiction is generally governed by the "well-pleaded complaint rule," which provides that "federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar Inc. v. Williams,* 482 U.S. 386, 392 (1987). This rule makes the plaintiff the master of his complaint and permits him to avoid federal jurisdiction by relying exclusively on state law. *Id.* Thus, federal question jurisdiction is ordinarily determined from the face of the plaintiff's complaint. *Easton v. Crossland Mortg. Corp.,* 114 F.3d 979, 982 (9th Cir.1997).

**\*2** The "artful pleading doctrine" provides a narrow corollary to the well - pleaded complaint rule. Under this doctrine, a plaintiff may not avoid federal jurisdiction by omitting from the complaint allegations of federal law that are essential to the establishment of his claim. *Lippitt v. Raymond James Financial Services, Inc.,* 340 F.3d 1033, 1041 (9th Cir.2003). The artful pleading doctrine permits courts to "delve beyond the face of the state court complaint" and find federal question jurisdiction by recharacterizing a state-law claim as a federal claim. *Id.* The Ninth Circuit has cautioned, however, that courts should invoke the artful pleading doctrine "only in limited circumstances." *Id.* (quoting *Sullivan v. First Affiliated Securities,* I nc., 813 F.2d 1368, 1373 (9th Cir.1987)). Accordingly, application of the artful pleading doctrine is normally limited to two types of cases: (1) those involving complete preemption; and (2) cases in which "a substantial, disputed question of federal law is a necessary element of ... the well-pleaded state claim," or where the right to relief depends upon resolution of a substantial, disputed federal question. *Lippitt,* 340 F.3d at 1042–43.

In this case, Defendants do not argue in their Petition of Removal that any of Plaintiffs' state law claims are completely preempted; therefore, whether there is a federal question hinges on whether there is a substantial federal question undergirding the state law claims. The scope of this exception to the well-pleaded complaint rule is limited, for it is

"long-settled ... that the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction." *Merrell Dow Pharmaceuticals Inc. v. Thompson,* 478 U.S. 804, 813 (1986). Thus, the fact that a complaint references federal law, or that the same facts would provide a basis for a federal claim does not, without more, convert a state law claim into a federal claim. *See Easton,* 114 F.3d at 982 (finding no removal jurisdiction where complaint alleged violations of the federal Civil Rights Act and federal Constitution, but sought relief only under state law); *Rains v. Criterion Systems, Inc.,* 80 F.3d 339, 344–47 (9th Cir.1996) (finding no removal jurisdiction where complaint referred to federal law to help establish a state-law claim for wrongful termination in violation of public policy and same facts could have supported a federal civil rights claim).

## II. ANALYSIS

### A. Section 598D

Defendants first argue that federal question jurisdiction attaches because Plaintiffs allege that Defendants violated Nev.Rev.Stat. § 598D.100 and a required element of Plaintiffs' section 598D claim will be a showing that Plaintiffs' loan is "a consumer transaction that constitutes a mortgage under § 152 of the Home Ownership and Equity Protection Act of 1994, 15 U.S.C. § 1602(aa), and the regulations adopted by the Board of Governors of the Federal Reserve System pursuant thereto, including, without limitation, 12 C .F.R. § 226.32." Nev.Rev.Stat. § 598D .040. (Pet. for Removal 4 ¶ 13, ECF No. 1.) In other words, Defendants are arguing that Plaintiffs' state law claim actually arises under federal law because Plaintiffs must prove that their loan was a "home loan," as defined by federal law, in order to prevail on their state law claim.

**\*3** Defendants and their counsel recently made a nearly identical argument in another case in this District, and it was rejected. *See Addison v. Countrywide Home Loans, Inc.,* No. 2:10–cv–01304–LDG–PAL, 2011 WL 146516, at

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 939198 (D.Nev.)
**(Cite as: 2011 WL 939198 (D.Nev.))**

*3 (D.Nev. Jan. 14, 2011). Just because section 598D incorporates HOEPA's definition of "home loan," does not mean that it implicates substantial and disputed issues of federal law. *See Hines v. Nat'l Default Servicing Corp.*, No. 3:10–cv–0674–LRH–VPC, 2010 WL 5239233, at *2 (D.Nev. Dec. 15, 2010) ("Although federal regulations are expressly noted in the Nevada statutes, these references only provide a framework for determining the types of claims that can be brought under the state statutes."); *see also Hill v. Marston*, 13 F.3d 1548, 1550–51 (11th Cir.1994) ("[T] he only indication of the involvement of a specific federal law in the complaint is in connection with a state statutory section that incorporates a portion of the Securities Exchange Act of 1933 ... The fact that part of the state statutory scheme requires some analysis of federal law, however, is insufficient to invoke federal jurisdiction.... Thus, the complaint alleges no claims 'arising under' federal law and removal was improper."); *Mackillop v. Parliament Coach Corp.*, No. 09–cv–1939–T–23TBM, 2009 WL 3430072, at * 2 (M.D.Fla. Oct. 21, 2009) ("Even though the federal standard incorporated into [the Florida Deceptive and Unfair Trade Practices Act] requires an analysis of federal law, no substantial question of federal law exists."); *id.* ("No federal question jurisdiction exists by virtue of the plaintiff's bringing a claim under a section of the [Florida Deceptive and Unfair Trade Practices Act] that incorporates a federal standard.").

Defendants' assertion that "[t]his Court routinely handles Section 598D claims" and citation to *Aguilar v. WMC Mortgage Corp .*, No. 2:09–cv–01416–ECR–PA L, 2010 WL 185951 (D.Nev. Jan. 15, 2010), (Pet. for Removal 4 ¶ 13, ECF No. 1), do nothing to support their argument that federal question jurisdiction exists in this case merely because Plaintiffs have brought a section 598D claim. In *Aguilar*, there was federal question jurisdiction because the plaintiffs explicitly pleaded violations of the Real Estate Settlement and Procedures Act ("RESPA") and the Truth in Lending Act ("TILA"), and the Court appears to have merely ex-

ercised supplemental jurisdiction over the state law claims—including section 598D—pursuant to 28 U.S.C § 1367. (*See* Notice of Removal, ECF No. 1, 2:09–cv–01416–ECR–PAL.) Nowhere is there an indication that the Court had federal question jurisdiction based on the plaintiffs' section 598D claims. Indeed, the Order from Judge George that Defendants cite in their Petition for Removal—but fail to attach [FN1] —explicitly lists claims arising under Nev.Rev.Stat. § 598D as state law claims over which the Court exercises mere supplemental jurisdiction. (*See* Order, Sept. 25, 2009, ECF No. 36, 2:09–cv–00078.)

> FN1. Whereas the Petition for Removal cites to an Order from Judge George dated September 24, 2009 (Pet. for Removal 4 ¶ 10, ECF No. 1), the Order erroneously attached as Exhibit A is dated September 28, 2009. The instant Order refers to the correct Order, dated September 24, 2009.

*4 In light of the foregoing, this Court finds that Defendant has not met their burden of proving that this court has removal jurisdiction based on Plaintiffs' section 589D claim.

**B. Fraudulent Misrepresentation, Concealment, and Inducement**
Defendants contend that "Plaintiffs' fraud claim is also a federal claim in disguise" and that it "is actually premised on the Truth in Lending Act ("TILA") and the Real Estate Settlement Procedures Act ("RESPA")." (Pet. for Removal 4 ¶ 14, ECF No. 1 .) In support of this contention, Defendants cite to paragraphs 23, 24, 47, and 49 of the Complaint. Paragraphs 23 and 24 are under the heading "General Allegations." Paragraph 23 alleges, in relevant part, "that a Good Faith Estimate was provided but additional funds were required for the sale to close," and paragraph 24 alleges that plaintiffs were deprived "of the three-day rescission period." (Compl. ¶¶ 23–24, Ex. B, ECF No. 1.) Defendants argue that the "Good Faith Estimate" language necessarily implies that a RESPA violation is at issue in this case because 12 U.S.C. § 2604(c)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 939198 (D.Nev.)
**(Cite as: 2011 WL 939198 (D.Nev.))**

—which is part of RESPA—requires a good faith estimate of the amount or range of charges the borrower is likely to incur. (Pet. for Removal 5 ¶ 14, ECF No. 1.) They also argue that the "three-day rescission period" refers to the period set forth in TILA. (*Id.*)

Paragraphs 47 and 49 both fall under the "Fraudulent Misrepresentation, Concealment, and Inducement" heading. Neither TILA, nor RESPA is explicitly mentioned under this heading. Defendants summarize Plaintiffs' allegations in paragraphs 47 and 49 as "Plaintiffs contend the Defendants defrauded them by failing to provide 'accurate, truthful, and complete information' based on which they were 'forced to close' or lose their deposit." (Pet. for Removal 5 ¶ 14, ECF No. 1.) Defendants claim that such allegations are premised on TILA and RESPA because "[b]oth TILA and RESPA concern what disclosures must be made prior to making a mortgage loan." (Pet. for Removal 5 ¶ 14, ECF No. 1.)

However, the scope of Plaintiffs' fraudulent misrepresentation, concealment, and inducement claim is far broader than one would glean from only reading Defendants' Petition for Removal. Plaintiffs allege that they were misled by some of the named defendants with an inflated purchase price, a fraudulent appraisal, and a "sales pitch" that convinced the Plaintiffs that the property was properly valued for the subject loan. (Compl. ¶ 46, Ex. B, ECF No. 1.) Plaintiffs also allege that Defendants breached their duty to provide accurate, truthful and complete information that they would understand, considering the Plaintiff's limited understanding and training in such matters. (Compl. ¶ 47, Ex. B, ECF No. 1.) Similarly, Plaintiffs claim that Defendants "failed to provide the information necessary for Plaintiffs to make a complete[,] accurate and well - thought decision on these financial issues." (Compl. ¶ 47, Ex. B, ECF No. 1.) Plaintiffs further allege that, despite agreeing to act fairly and in good faith without seeking an undue advantage, Defendants forced Plaintiffs to close the purchase with the threat that Plaintiffs would lose the entire $87,018.03 deposit if the deal fell through. (Compl. ¶ 49, Ex. B, ECF No. 1.) Finally, Plaintiffs allege that one of the named defendants fraudulently took a loan out of the escrow involved in the purchase of the home, and that loan was never repaid. (Compl. ¶ 50, Ex. B, ECF No. 1.)

**\*5** Even if the allegations concerning the duty to provide "accurate, truthful, and complete" information were generously read as invoking TILA, it is clear that Plaintiff's claim of fraudulent misrepresentation, concealment, and inducement is based on far more theories of relief than just those allegations. Thus, "this court cannot say that [Plaintiffs'] right to relief *necessarily* depends upon construction of a substantial question of any federal law," *Ultramar America Ltd. v. Dwelle,* 900 F.2d 1412, 1414 (9th Cir.1990), and remand is required. "The fact that an alternative theory of relief exists for each claim alleged in the complaint, one not dependent on federal law, is itself grounds to defeat federal question jurisdiction." *Id.; see Martynov v. Countrywide Financial Corp.,* No. 2:09–cv–03596–GEB–GGH, 2010 WL 1644570, at \*2 (E.D.Cal. Apr. 21, 2010).

Because federal question jurisdiction does not exist under either of the theories set forth in Defendants' Petition for Removal, the Court must remand the case.

### CONCLUSION
**IT IS HEREBY ORDERED** that this case is REMANDED to the Eighth Judicial District Court of Clark County, Nevada. The Court Clerk is directed to mail a copy of this Order to the clerk of that court.

D.Nev.,2011.
Nebab v. JFK Financial, Inc.
Not Reported in F.Supp.2d, 2011 WL 939198 (D.Nev.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

Page 1

Slip Copy, 2014 WL 953567 (D.Nev.)
(Cite as: 2014 WL 953567 (D.Nev.))

H

Only the Westlaw citation is currently available.

United States District Court,
D. Nevada.
Sandra K. **KRAUSE**, Plaintiff,
v.
NEVADA **MUTUAL** INSURANCE COMPANY,
Charles J. Wallace, Defendants.

No. 2:13–cv–00976–APG–CWH.
Signed March 10, 2014.
Filed March 11, 2014.

Kathleen J. England, England Law Office, Melanie
A. Hill, Law Office of Melanie Hill, Las Vegas,
NV, for Plaintiff.

Jack C. Juan, Nicholas Crosby, Marquis Aurbach
Coffing, Las Vegas, NV, Shannon M. McDonough,
Tyler Patton Brimmer, Fafinski Mark & Johnson,
Eden Prairie, MN, for Defendants.

**ORDER GRANTING MOTION TO REMAND
AND DENYING MOTION TO DISMISS**
(Dkt.Nos.8, 23, 26)
ANDREW P. GORDON, District Judge.
**I. BACKGROUND**
    *1 The parties are aware of the procedural and
factual background of this case. In short, Sandra
Krause brought two claims of wrongful discharge
in violation of public policy in Nevada state court
against Nevada Mutual Insurance Company and its
then-director and consultant Charles Wallace.
Krause was the vice president of claims for Nevada
Mutual during the relevant times. Wrongful dis-
charge is a state-law claim.

    Krause contends that "[p]rotecting the integrity
of [the] medical insurance claim process is an im-
portant public policy in Nevada." [Dkt. No. 1–2 at
11.] She alleges Nevada Mutual and Wallace en-
gaged in improper and unethical conduct related to
conflicts of interest, corporate transparency, insur-

ance claims processing, and litigation tactics.
Krause asserts she raised concerns to her superiors
"because she reasonably believed that the Defend-
ant's actions might be or were unethical, illegal, vi-
olation[s] of statutory insurance regulations, viola-
tions of state and federal laws (discrimination and
retaliation) and contrary to public policy." [Id. at
12.] She also asserts she refused to sign settlement
documents in a bankruptcy proceeding because she
"did not believe [the documents] were accurate and
proper." [Id . at 15.] In response, she alleges,
Nevada Mutual made her work environment so in-
tolerable that her resignation amounted to con-
structive discharge.

    Defendants removed the case to this Court un-
der the "artful pleading" doctrine, on the basis that
Krause's claims necessarily raise substantial, dis-
puted issues of federal law. [Dkt. No. 1.] Defend-
ants argue that Nevada law bars a wrongful dis-
charge claim if the conduct at issue is actionable
under existing statutory remedies. Next, Defendants
argue that Title VII [FN1] provides a statutory rem-
edy for the precise conduct of which Krause com-
plains, thereby precluding her wrongful discharge
claim. Defendants also contend that Krause's alleg-
ations concerning the aborted bankruptcy-related
settlement necessitate an interpretation of federal
bankruptcy law.

    FN1. 42 U.S.C. §§ 2000e—2000e–17.

    Presently before the Court are Krause's motion
to remand (Dkt. No. 26), Defendants' motion to dis-
miss (Dkt. No. 8), and Defendants' request for a
hearing on its motion to dismiss (Dkt. No. 23.)

**II. ANALYSIS**

**A. Removal Jurisdiction**

    A defendant may remove "any civil action
brought in a State court of which of which the dis-
trict courts of the United States have original juris-
diction." [FN2] District courts have original jurisdic-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 953567 (D.Nev.)
(Cite as: 2014 WL 953567 (D.Nev.))

tion over "federal question cases—civil actions that arise under the Constitution, laws, or treaties of the United States." [FN3] However, the Ninth Circuit "strictly construe[s] the removal statute against removal jurisdiction." [FN4] "Federal jurisdiction must be rejected if there is any doubt as to the right of removal in the first instance." [FN5] "The strong presumption against removal jurisdiction means that the defendant always has the burden of establishing that removal is proper." [FN6] Whether Defendants met their burden to establish removal jurisdiction depends on the operation of the artful pleading doctrine.

> FN2. 28 U.S.C. § 1441(a).

> FN3. *Exxon Mobil Corp. v. Allapattah Servs., Inc.,* 545 U.S. 546, 553 (2005) (citing 28 U.S.C. § 1331).

> FN4. *Gaus v. Miles, Inc.,* 980 F.2d 564, 566 (9th Cir.1992).

> FN5. *Id.*

> FN6. *Id.* (internal quotation marks and citation omitted).

## B. *Well–Pleaded Complaint Rule*
**\*2** In *Lippitt v. Raymond James Financial Services, Inc.,*[FN7] the Ninth Circuit thoroughly articulated the artful pleading doctrine, which arises from the well-pleaded complaint rule. The well-pleaded complaint rule is a "fundamental tenet of federal jurisdiction." [FN8] It "is a 'powerful doctrine that severely limits the number of cases in which state law 'creates the cause of action' that may be initiated in or removed to federal district court[.]' " [FN9] This doctrine provides:

> FN7. 340 F.3d 1033 (9th Cir.2003).

> FN8. *Id.* at 1039 (internal quotation marks and citation omitted).

> FN9. *Id.* at 103940 (*quoting Franchise Tax Bd. of Cal. v. Const. Laborers Vacation*

> *Trust,* 463 U.S. 1, 910 (1983)).

Whether a case is one arising under the Constitution or a law or treaty of the United States ... must be determined from what necessarily appears in the plaintiff's statement of his own claim in the bill or declaration, unaided by anything alleged in anticipation of avoidance of defenses which it is thought the defendant might interpose. [FN10]

> FN10. *Taylor v. Anderson,* 234 U.S. 74, 7576 (1914).

The Court's first task "is to determine whether the face of [Krause's] complaint contains any allegations that would render her cause of action one that 'arises' under federal law." [FN11] The answer is clearly no, as Defendants readily admit. Rather, Defendants assert that the wrongful discharge claims-state—law claims on their face—necessitate interpretation of federal law.

> FN11. *Lippitt,* 340 F.3d at 1040.

## C. *Artful Pleading Doctrine*
"Although the face of [Krause's] complaint does not present a claim arising under federal law to warrant subject matter jurisdiction, [the Court's] inquiry does not end there." [FN12] "The artful pleading doctrine is a corollary to the well-pleaded complaint rule, and provides that although the plaintiff is master of his own pleadings, he may not avoid federal jurisdiction by omitting from the complaint allegations of federal law that are *essential to* the establishment of his claim." [FN13]

> FN12. *Id.* at 1041.

> FN13. *Id.* (internal quotation marks and citation omitted, emphasis added).

"Under the artful pleading doctrine, 'a plaintiff may not defeat removal by omitting to plead *necessary* federal questions in a complaint.' " [FN14] "The artful pleading doctrine allows courts to delve beyond the face of the state court complaint and find

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 953567 (D.Nev.)
(Cite as: 2014 WL 953567 (D.Nev.))

federal question jurisdiction by recharacterizing a plaintiff's state-law claim as a federal claim." [FN15] Notably, "[c]ourts should invoke the doctrine only in limited circumstances as it raises difficult issues of state and federal relationships and often yields unsatisfactory results." [FN16]

FN14. *Id.* (quoting *Franchise Tax Bd.,* 463 U.S. at 22) (emphasis added).

FN15. *Id.* (internal quotation marks and citations omitted).

FN16. *Id.* (internal quotation marks and citations omitted).

Courts have used the artful pleading doctrine in two broad categories of cases: (1) complete preemption cases; and (2) substantial federal question cases.[FN17] "Subsumed within this second category are those cases where the claim is necessarily federal in character, ... or where the right to relief depends on the resolution of a substantial, disputed federal question." [FN18]

FN17. *Id.*

FN18. *Id.* at 104142 (citing *Merrell Dow Pharm., Inc. v. Thompson,* 478 U.S. 804, 814 (1986)).

This is not a "complete preemption" case, so the essential question is whether either of Krause's wrongful termination claims is necessarily federal in character or depends on the resolution of a substantial, disputed federal question. To answer this question, an understanding of wrongful discharge under Nevada law is necessary.

**\*3** The essence of a tortious discharge is the wrongful, usually retaliatory, interruption of employment by means which are deemed to be contrary to the public policy of this state. The prototypical tortious discharge case is found in *Hansen v. Harrah's,* 100 Nev. 60 (1984), in which an employee claimed to have been discharged to penalize him because he had filed a worker's compens-

ation claim Comparable tortious discharges may arise when an employer dismisses an employee in retaliation for the employee's doing of acts which are consistent with or supportive of sound public policy and the common good.[FN19]

FN19. *D'Angelo v. Gardner,* 107 Nev. 704, 718 (1991).

Likewise,

[tortious discharge] cases involve employer-employee confrontations in which the employee, in opposition to the employer's directions or policies, *does* something or *refuses* to do something that public policy entitles or empowers the employee to do or not to do. When an employer dismisses an employee *for* the employee's performing or refusing to perform public policy-favored actions, then an action for tortious discharge arises .[FN20]

FN20. *Bigelow v. Bullard,* 111 Nev. 1178, 1185 (1995) (emphasis in original).

Defendants first contend that Title VII provides a statutory remedy for the wrongful conduct about which Krause complains, thereby barring her wrongful discharge claim. If this is true, then Krause has simply pled a non-cognizable state-law claim. The state court is certainly capable of recognizing and addressing this. This Court need not recharacterize Krause's state-law claim into a federal claim merely because it may fail in state court.

Defendants next contend that Krause has pled a cognizable retaliation claim under Title VII. The facts may support a Title VII retaliation claim, but two factors counsel against the Court's recharacterization of Krause's claims into Title VII claims. First, she is presently litigating a Title VII case in this Court; [FN21] there seems to be no need to litigate the same issue twice. Second, her wrongful discharge claims do not depend on retaliation for behavior protected under Title VII. Interpreting the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 953567 (D.Nev.)
(Cite as: 2014 WL 953567 (D.Nev.))

Supreme Court's decision in *Christianson v. Colt Industries Operating Corp .,* the Sixth Circuit persuasively stated: " *Christianson* suggests that there is no federal question jurisdiction when the complaint on its face states alternate theories supporting a state-law claim, at least one of which does not involve a federal question." [FN22] Krause alleges retaliation on the basis of her internal complaints concerning corporate malfeasance and improper insurance claims processing. These alleged bases for retaliation do not involve a federal question. Furthermore, Krause's mere reference to federal anti-discrimination laws is insufficient to make her claim depend upon those laws.[FN23]

> FN21. *Krause v. Nev. Mut. Ins. Co.,* No. 2:12–cv–00342–JCM–CWH.

> FN22. *Long v. Bando Mfg. of Am., Inc.,* 201 F.3d 754, 760 (6th Cir.2000) (citing *Christianson v. Colt Ind. Operating Corp.,* 486 U.S. 800, 809–10 (1988)).

> FN23. *See Merrell Dow,* 478 U.S. at 808 (It is a "long-settled understanding that the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction.").

Finally, Defendants argue that assessing Krause's and Defendants' conduct surrounding Krause's refusal to sign a bankruptcy-related settlement agreement requires interpretation of federal bankruptcy law. The Court disagrees. Other than pointing out that bankruptcy law is federal, Defendants have not met their burden of explaining how the resolution of any particular aspect of bankruptcy law is necessary or essential for the resolution of Krause's wrongful discharge claim. To prevail, Krause must prove that her behavior was consistent with sound public policy or the common good.[FN24] The state court is capable of determining whether refusing to sign a document with incorrect data (and thereby possibly perpetuating a fraud upon the otlier parties and/or the bankruptcy court) is protected behavior under state law without re-

sorting to an interpretation of bankruptcy law. And even if an interpretation of bankruptcy law is needed, Defendants have not demonstrated how that interpretation would be necessary or essential to Krause's claims.[FN25]

> FN24. *D'Angela,* 107 Nev. at 718.

> FN25. *Lippitt,* 340 F.3d at 104142.

**\*4** Moreover, reliance on the artful pleading doctrine to establish removal jurisdiction is disfavored.[FN26] This is not one of the "limited circumstances" in which that reliance is properly invoked.

> FN26. *Id.* at 1041.

**III. CONCLUSION**

In accord with the above, the Court GRANTS Krause's motion to remand (Dkt. No. 26). The Court thus DENIES as moot Defendants' motion to dismiss (Dkt. No. 8) and their request for a hearing on the motion to dismiss (Dkt. No. 23). This case is remanded to the state court.

D.Nev.,2014.
Krause v. Nevada Mut. Ins. Co.
Slip Copy, 2014 WL 953567 (D.Nev.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2004 WL 2754862 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,046
**(Cite as: 2004 WL 2754862 (S.D.N.Y.))**

C

United States District Court,
S.D. New York.
**FINANCE** AND **TRADING,** LTD. and Lakonia
Mgt., Ltd., Plaintiffs,
v.
**RHODIA** S.A., Aventis S.A., Jean–Pierre Tirou-
flet, Pierre Prot, Vincent Calarco, Philippe Des-
marescaux, Pierre De Weck, Jean–René Fourtou,
Igor Landau, Patrick Langlois, René Penisson, Thi-
erry Breton and Martin Pinot, Defendants.

No. 04 Civ. 6083(MBM).
Nov. 30, 2004.

Howard Schiffman, James M. Wines, Jonathan M.
Goodman, Dickstein Shapiro Morin & Oshinsky
LLP, New York, NY, for plaintiffs.

Martin Flumenbaum, Maria T. Vullo, Paul, Weiss,
Rifkind, Wharton & Garrison, LLP, New York,
NY, for defendants Rhodia S.A., Jean–Pierre Tirou-
flet, Pierre Prot, Vincent Calarco, Pierre De Weck,
and Thierry Breton.

James M. Ringer, James M. Hosking, Andrea Gold-
barg, Clifford Chance U.S. LLP, New York, NY,
for defendants Aventis S.A., Philippe Desmares-
caux, Jean–René Fourtou, Igor Landau, Patrick
Langlois, and René Penisson.

Cheryl A. Whitney, Seyfarth Shaw LLP, New
York, NY, for defendant Martin Pinot.

OPINION & ORDER
MUKASEY, J.
   *1 This case was removed by defendants from
New York State Supreme Court, New York County,
on the ground that it raises a substantial federal
question because plaintiffs' complaint, although it
purports to raise claims only under state law, neces-
sarily engages the federal securities laws. Plaintiffs
have moved to remand, arguing that their complaint

raises no issue of federal law. For the reasons set
forth below, the motion to remand is granted.
Plaintiffs have moved also for attorney's fees; that
motion is denied.

I.

   The procedural history of this case is as fol-
lows. Plaintiffs Finance & Trading Limited and
Lakonia Management Limited brought suit on June
29, 2004 in New York State Supreme Court, New
York County, against Rhodia, S.A.; Rhodia's parent
corporation Aventis, S .A.; Jean Tirouflet, Rhodia's
Chairman of the Board of Directors and Chief Ex-
ecutive Officer; Pierre Prot, Rhodia's Chief Finan-
cial Officer and Chief Accounting Officer; Rhodia's
President Martin Pinot; and nine of Rhodia's Dir-
ectors. In their state court complaint, plaintiffs al-
lege that defendants committed common law fraud
and negligent misrepresentation by giving plaintiffs
false and misleading information about Rhodia,
S.A. Plaintiffs claim that they relied on this inform-
ation and invested in Rhodia, and suffered more
than €60 million in combined losses when Rhodia's
stock declined.

   Defendant Director Vincent Calarco removed
the action to this court on August 5, 2004, claiming
that a substantial federal question was involved, be-
cause defendants' alleged misrepresentations in-
volved the filing of a fraudulent prospectus with the
Securities and Exchange Commission (SEC). All
other defendants later consented to removal. (Def.
Opp. Mem. at 22) On September 7, 2004, plaintiffs
petitioned this court to remand the case to state
court, 28 U.S.C. § 1447(a) (2000), and for an award
of attorney's fees in connection with the remand
motion, *Id.* § 1447(c).

II.

   The underlying facts, as alleged in plaintiffs'
state court complaint, are as follows.

   In December 1998, the French company
Rhône–Poulenc was about to merge with the Ger-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Not Reported in F.Supp.2d, 2004 WL 2754862 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,046
(Cite as: 2004 WL 2754862 (S.D.N.Y.))

man company Hoechst. Rhône–Poulenc needed to maintain its value so as to allow the two companies to merge as equals. (*Id.* ¶¶ 36–37) However, the stock price of Rhodia, a subsidiary of Rhône–Poulenc, had been declining, which threatened Rhône–Poulenc's and Hoechst's value parity plan. (*Id.* ¶ 39) Plaintiffs allege that in or around March 1999, Rhône–Poulenc devised a fraudulent scheme to boost Rhodia's share value: A shell company controlled by Rhodia would buy one of Rhodia's competitors, Albright & Wilson ("Albright"), and then give Rhodia an option to buy Albright. If Rhodia exercised its option and bought Albright, it would gain a controlling share of the world phosphate market. (*Id.* ¶¶ 50–52)

To carry out this plan, Rhône–Poulenc's representative company in Austria, Donauchem, formed a subsidiary company, Danube, which bought Albright. (*Id.* ¶ 56) Danube had few assets of its own, and obtained 98 percent of the financing for this transaction from Rhodia, including £575 million in guaranteed bank debts, and another £475 million in loans. (*Id.* ¶¶ 58–61) Danube's presence permitted Rhodia to distance itself from the transaction, and allowed Rhodia to tell its potential shareholders that it could refrain from purchasing Albright if the deal turned out not to be advantageous.[FN1]

> FN1. Danube's presence also functioned to deflect any pre-merger attention from antitrust regulators that Rhodia's acquisition of Albright might have generated; the acquisition of Albright would have made Rhodia the world's largest producer of specialty phosphates. (Compl.¶ 46)

**\*2** The agreement between Rhodia and Danube initially specified that the Rhodia call option for Albright was exercisable at "fair market value" (*Id.* ¶ 77), which ostensibly left Danube bearing the risk of loss stemming from Albright's decline in value. However, a secret amendment to the agreement defined "fair market value" as a fixed sum, which was equal to Donauchem's original £15.9 million contribution to Danube, and any dividends received

by Danube during the period between its acquisition of Albright and Rhodia's exercise of its option. (*Id.* ¶ 86) If Albright's value sank, Rhodia would face the Hobson's choice of either exercising its fixed price call option on Albright, or allowing Danube to default on its enormous debt to Rhodia. (*Id.* ¶¶ 67, 69) Potential investors, however, were not told about the substantial risks Rhodia was facing. (*Id.* ¶ 83)

After Danube acquired Albright but before Rhodia exercised its call option, during the spring and fall of 1999, Jean–Pierre Tirouflet, Chief Executive Officer and Chairman of the Board of Rhodia, met with various institutional investor representatives in an attempt to encourage them to purchase Rhodia stock. (*Id.* ¶¶ 128–29) Tirouflet conducted these meetings on behalf of and with the knowledge and consent of both Rhodia and Rhône–Poulenc. (*Id.* ¶ 141) Several of these meetings were with Edouard Stern, Director of Finance and Trading Limited. (Compl.¶ 132) At these meetings, Tirouflet encouraged Stern to have Finance and Trading buy Rhodia shares on the public market. (*Id.* ¶ 135–36) Tirouflet also urged Stern to share this information with other potential investors. (*Id.* ¶ 137)

Tirouflet made numerous deliberate misrepresentations and omissions to Stern at these meetings, primarily in relation to Rhodia's option to purchase Albright. Specifically, Tirouflet told Stern that the option to buy Albright would not be exercised if "the deal was not good enough" (Compl.¶ 137.A) He neglected to tell Stern that Rhodia bore almost all the risk in the transaction, and that it would be effectively obligated to call its option at a sharply reduced price if Albright's stock declined, or else absorb Danube's default on its massive debt to Rhodia. (*Id.* at ¶¶ 137.A–C, E–G.) Tirouflet also failed to inform Stern that Albright was in a deteriorating financial condition, had a £94 million pension fund deficit, and was at risk for environmental damage liability. (*Id.* ¶ 139.H)

After he met with Tirouflet, Stern met with Kristen Van Riel, a director of Lakonia. Based on

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in F.Supp.2d, 2004 WL 2754862 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,046
**(Cite as: 2004 WL 2754862 (S.D.N.Y.))**

the strength of Tirouflet's recommendations, as conveyed by Stern, Van Riel instructed Lakonia to purchase shares of Rhodia (*Id.* ¶ 140), and between June 2, 1999 and August 24, 1999, Lakonia purchased nearly 1.5 million shares of Rhodia on the Paris Stock Exchange for nearly €29 million (*Id.* ¶ 146). Between June 16, 1999 and October 29, 1999, Finance and Trading purchased more than 2 million shares of Rhodia for more than € 39 million. (*Id.* ¶ 145)

**\*3** On September 15, 1999, Rhône–Poulenc filed a prospectus with the SEC relating to the sale of nearly 70 million of its Rhodia shares. (*Id.* ¶ 151) The prospectus extolled the supposed benefits to Rhodia from its option to purchase Albright. In the prospectus, Rhône–Poulenc stated that Rhodia's call option was at fair market value, and did not disclose the secret fixed-price definition of fair market value actually contained in the agreement. (*Id.* ¶¶ 156–57) The prospectus also falsely recited that Rhodia was under no pressure to exercise its call option for Albright, and that Danube had the option to purchase Rhodia's phosphate business if Rhodia did not exercise its own option. Neither of these statements was true, because Danube had no significant assets and no ability to purchase Rhodia's phosphate business, and Rhodia bore almost all the risk for the Albright transaction. (*Id.* ¶¶ 160–162).

Additionally, the prospectus described certain "synergies" that would result from Rhodia's acquisition of Albright, including cost reductions of up to €50 million and additional sales of up to €15 million. (*Id.* ¶ 163) These representations lacked any documented basis, and were made despite Rhodia's knowledge of Albright's deteriorating financial position, environmental liability, and large pension deficit. (*Id.* ¶ 164)

On October 13, 1999, Albright's Executive Chairman Daniel Lebard contacted Rhodia to point out several inaccuracies in the prospectus regarding Albright's status, and expressed surprise that he had not been consulted in writing before the prospectus

was filed. (*Id.* ¶¶ 172–77) Lebard's concerns were neither addressed nor shared with potential investors, and he was fired the day after he contacted Rhodia. (*Id.* ¶¶ 178–79)

The prospectus was signed and approved by Calarco, Philippe Desmarescaux, Pierre De Weck, Jean-René Fourtou, Igor Landau, Patrick Langlois, and René Penisson, all Rhodia directors, as well as by Tirouflet and Pierre Prot. Prot signed an amended prospectus on behalf of those who signed the first prospectus; the amended document was identical in all relevant respects to the first, and was filed with the SEC on October 14, 1999. (*Id.* ¶¶ 168–69)

After issuing the amended prospectus, Rhône–Poulenc obtained approximately €2 billion from the secondary offering of Rhodia shares (*Id.* ¶¶ 180–83), and successfully completed its merger with Hoechst on December 15, 1999 (*Id.* ¶ 184–87). On March 15, 2000, Rhodia exercised its call option for Albright. [FN2] (*Id.* ¶ 190) The price Rhodia paid was not disclosed at the time of the transaction, but Rhodia's annual report stated that it paid €925 million—a price plaintiffs allege to be "exorbitant," far above fair market value, and even above the fixed sum specified in the secret amendment to the option agreement. (*Id.* ¶¶ 194–200)

> FN2. Rhodia also bought Danube and IS-PG, another shell company involved in the original Albright acquisition. (*Id.* ¶ 196)

Plaintiffs allege that defendants' fraudulent and negligent misrepresentations both in the Tirouflet conversations and in the Rhodia prospectus induced them to buy Rhodia stock, and caused them to suffer combined losses of more than €60 million, due to a "severe decline" in Rhodia's stock price. (*Id.* ¶¶ 201–03) Plaintiffs assert that their claims are based solely in the common law of fraud and negligent misrepresentation, and thus need not be heard in federal court. Defendants counter that plaintiffs' claims necessitate the interpretation of federal securities laws, and thus belong exclusively in federal

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2754862 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,046
**(Cite as: 2004 WL 2754862 (S.D.N.Y.))**

court.

### III.

**\*4** By statute, a defendant may remove from state to federal court any civil action over which the federal courts have original jurisdiction. 28 U.S.C. § 1441(a). Absent diversity of citizenship, federal courts have original jurisdiction only over cases that present federal questions, *Fax Telecommunicaciones, Inc. v. AT & T,* 138 F.3d 479, 486 (2d. Cir.1998), and a federal question exists "only when the plaintiff's well-pleaded complaint raises issues of federal law." *Metro. Life Ins. Co. v. Taylor,* 481 U.S. 58, 63 (1987).

The plaintiff is the master of the complaint, and is "free to avoid federal jurisdiction by pleading only state claims even where a federal claim is also available." *Marcus v. AT & T Corp.,* 138 F .3d 46, 52 (2d Cir.1998); *Travelers Indem. Co. v. Sarkisian,* 794 F.2d 754, 758 (2d Cir.1986) ("[W]here plaintiff's claim involves both a federal ground and a state ground, the plaintiff is free to ignore the federal question and pitch his claim on the state ground to defeat removal.") (internal quotation marks omitted); *see also Caterpillar, Inc. v. Williams,* 482 U.S. 386, 392 & n. 7 (1987).

However, a plaintiff is not completely free to limit the complaint as he wishes. The doctrine of artful pleading, an "independent corollary" of the well-pleaded complaint rule, holds that "a plaintiff may not defeat removal by omitting to plead necessary federal questions in a complaint." *Franchise Tax Bd. v. Constr. Laborers Vacation Trust,* 463 U.S. 1, 22 (1983); *see also Rivet v. Regions Bank of Louisiana,* 522 U.S. 470, 475 (1998); *Marcus,* 138 F.3d at 55 (plaintiff may not avoid removal "by framing in terms of state law a complaint the real nature of [which] is federal, regardless of plaintiff's characterization, or by omitting to plead necessary federal questions in a complaint") (alteration in original); *Bellido–Sullivan v. Am. Int'l Group, Inc .,* 123 F.Supp.2d 161, 164 (S.D.N.Y.2000) ("[I]t is well settled that a federal claim may not be brought in state court, disguised in the clothing of a state

claim, merely for purposes of bringing it in that forum."). If a federal claim is artfully pleaded as a state claim, the defendant may remove it to federal court.

There appear to be two principal situations in which removal is justified even absent a federal claim on the face of the well-pleaded complaint: First, where federal law completely preempts state law in the field,[FN3] and second, where the plaintiff's state law claim necessarily turns on the resolution of a substantial federal question. *Marcus,* 138 F.3d at 53–56; *Lippitt v. Raymond James Fin. Servs.,* 340 F.3d 1033, 1041–42 (9th Cir.2003); *Bellido–Sullivan,* 123 F.Supp.2d at 164; *Donovan v. Rothman,* 106 F.Supp.2d 513, 517–18 (S.D.N.Y.2000).[FN4]

> FN3. Some courts describe complete preemption analysis as connected to but separate from the artful pleading doctrine, *Marcus,* 138 F .3d at 53–56; *Haggerty v. Wyeth Ayerst Pharms.,* 79 F.Supp.2d 182, 185 (E.D.N.Y.2000); others consider it a subpart of the doctrine, *Lippitt v. Raymond James Fin. Servs.,* 340 F.3d 1033, 1041–42 (9th Cir.2003); *Bellido–Sullivan,* 123 F.Supp.2d at 164. Some courts have stated that complete preemption is the "classic" element of an artful pleading claim, *see, e.g. Sarkisian,* 794 F.2d at 758, and the Supreme Court in *Rivet,* when discussing artful pleading, mentioned only the complete preemption part of the doctrine. *Rivet,* 522 U.S. at 475. However, "it is doubtful that the Court would abandon its precedent [that substantial federal questions also justify removal under the doctrine] in this area in such a subtle fashion." *Bellido–Sullivan,* 123 F.Supp.2d at 164 n. 2 (quoting C. Wright et al., *Federal Practice and Procedure* § 3722, p. 447 (3d ed.1998) . The specific category into which complete preemption falls is immaterial to the legal analysis involved in considering

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2754862 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,046
**(Cite as: 2004 WL 2754862 (S.D.N.Y.))**

whether preemption exists.

> FN4. In *Travelers Indem. Co. v. Sarkisian*, 794 F.2d 754, 760–61 (2d Cir.1986), this Circuit held that a federal claim had been artfully pleaded as a state claim if the elements of the state claim were virtually identical to those of a federal claim that the plaintiff had previously brought in federal court. In assessing questions of artful pleading, courts in this District have rarely used the *Sarkisian* standard, instead applying the complete preemption and necessary substantial question analysis utilized in this opinion. Regardless, plaintiffs' claims are not artfully pleaded under *Sarkisian*, because plaintiffs did not previously bring their claims in federal court.

### IV.

No federal issues are apparent from the face of plaintiffs' complaint. Therefore according to the well-pleaded complaint rule, this case was properly brought in state court unless plaintiffs engaged in artful pleading. That issue turns on (1) whether plaintiffs' claims are completely preempted by federal law, and (2) whether plaintiffs' claims necessarily present a substantial question of federal law.

A. Complete Preemption

**\*5** The complete preemption doctrine dictates that "[w]hen federal common or statutory law so utterly dominates a preempted field that all claims brought within that field necessarily arise under federal law, a complaint purporting to raise state law claims in that field actually raises federal claims." *Marcus*, 138 F.3d at 53. The Supreme Court recently explained:

> In the two categories of cases where this Court has found complete preemption—certain causes of action under the LMRA [Labor Relations Management Act] and ERISA—the federal statutes at issue provided the exclusive cause of action for the claim asserted and also set forth procedures and remedies governing that cause of ac-

tion.

> *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003) (footnote omitted). In *Beneficial*, the Supreme Court upheld the defendant's complete preemption claim because there was "no such thing as a state law claim of usury against a national bank," and therefore applicable federal statutes provided the only legal basis for the claim asserted. *Beneficial Nat'l Bank*, 539 U.S. at 11.

In this case, although defendants concede that they do not claim that plaintiffs' claims are completely preempted by federal law (Def. Opp. Mem. at 18–19), they do contend that there is exclusive federal jurisdiction over claims implicating the Securities and Exchange Act of 1934—an argument that, if accepted, would result in plaintiffs' claims essentially being preempted by federal law. (Def. Opp. Mem. at 10) Section 27 of the Exchange Act does indeed provide for exclusive federal jurisdiction for actions "brought to enforce any liability or duty created by [the Act] or the rules and regulations thereunder." 15 U.S.C. § 78aa. In this case, however, plaintiffs are alleging state law claims that can stand on their own regardless of the Exchange Act's provisions. This suit was not brought to enforce liabilities or duties created solely by the Exchange Act, and federal securities statutes do not provide the exclusive remedies for all securities fraud claims. *See* 15 U.S.C. § 77v; 15 U.S.C. § 78bb; *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 383 (1996) ("Congress plainly contemplated the possibility of dual litigation in state and federal courts relating to securities transactions."); *Lippitt*, 340 F.3d at 1042 (holding that the Exchange Act did not preempt state law false advertising claims against securities firms, despite the language of § 78aa).

Courts in this district that have allowed common law securities fraud claims to proceed in state court, have held explicitly that the Exchange Act "does not preempt state law." *Gold v. Blinder, Robinson & Co.*, 580 F.Supp. 50, 53 (S.D.N.Y.1984); *see also Spielman v. Merrill*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2754862 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,046
**(Cite as: 2004 WL 2754862 (S.D.N.Y.))**

*Lynch, Pierce, Fenner & Smith, Inc.,* 332 F.3d 116, 124 (2d Cir.2003) (noting that the Securities Litigation Uniform Standards Act, which preempts the field in securities cases involving more than 50 plaintiffs, "does not, however, preclude all state enforcement or private causes of action in securities fraud cases."). Plaintiffs' state law fraud and negligent misrepresentation claims are not created by the Exchange Act, and thus not subject to exclusive federal jurisdiction, nor are plaintiffs' claims in any way preempted by federal securities laws.

B. Substantial Federal Question
    **\*6** The court must also determine whether plaintiffs attempted to avoid removal "by framing in terms of state law a complaint the real nature of [which] is federal, regardless of plaintiff's characterization, or by omitting to plead necessary federal questions in a complaint." *Marcus,* 138 F.3d at 55 (alteration in original); *Fax Telecommunicaciones,* 138 F.3d at 486–87; *Derrico v. Sheehan Emergency Hosp.,* 844 F.2d 22, 27 (2d Cir.1988). A case may be removable if "some substantial, disputed question of federal law is a necessary element of one of the well-pleaded state claims, or that one or the other claim is 'really' one of federal law." *Franchise Tax Bd. v. Constr. Laborers Vacation Trust,* 463 U.S. 1, 13 (1983); FN5 *see also W. 14th St. Commercial Corp. v. 5 West 14th Owners Corp.,* 815 F.2d 188, 192–93 (2d Cir.1987) (holding that in assessing removal, the court will ask whether each state law cause of action in a well-pleaded complaint poses "a substantial federal question.").

> FN5. *Franchise Tax Bd.* also held that federal issues are present where the well-pleaded complaint "establishes ... that federal law creates the cause of action...." *Franchise Tax Bd.,* 463 U.S. at 27–28. This holding does not apply in this case because, as discussed in Section IV.A, plaintiffs' fraud and negligent misrepresentation claims are grounded in state common law, and not created by federal law.

"[I]n determining federal question jurisdiction,

courts must make principled, pragmatic decisions, engaging in a selective process which picks the substantial causes out of the web and lays the other ones aside." *Barbara v. New York Stock Exch., Inc.,* 99 F.3d 49, 54 (internal quotation marks omitted). Several principles guide this analysis. "[T]he mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction," *Merrell Dow Pharms., Inc. v. Thompson,* 478 U.S. 804, 813, and the court must examine the "*nature* of the federal interest at stake," *id.* at 814 n. 12, to determine whether that interest is sufficiently substantial to justify removal. The primary test that this Circuit has used to determine the substantiality of the federal interest is whether "the state action simply provides the vehicle for 'the vindication of rights and ... relationships created by federal law,' " in which case removal is justified. *Donovan,* 106 F.Supp.2d at 517 (quoting *W. 14th St. Commercial Corp.,* 815 F.2d at 193) (omission in original); *cf. Greenberg v. Bear, Stearns & Co.,* 220 F.3d 22, 25 (2d Cir.2000) ("[F]ederal jurisdiction may ... lie if the ultimate disposition of the matter by the federal court 'necessarily depends on resolution of a substantial question of federal law.' ") (quoting *Barbara,* 99 F.3d at 54).

    There is no substantial federal question necessarily presented in either of plaintiffs' claims in this case. Assessing whether defendants committed fraud and negligent misrepresentation that happened to occur during a sale of securities does not implicate any federal law. The elements of a fraud claim in New York are: Representation of a material fact, falsity, scienter, reliance, and injury. *Small v. Lorillard Tobacco Co.,* 94 N.Y.2d 43, 57, 698 N.Y.S.2d 615, 621 (1999); *see also Channel Master Corp. v. Aluminum Ltd. Sales, Inc.,* 4 N.Y.2d 403, 407, 176 N.Y.S.2d 259, 262 (1958) ("One who fraudulently makes a misrepresentation of ... intention ... for the purpose of inducing another to act or refrain from action in reliance thereon in a business transaction is liable for the harm caused by the other's justifiable reliance upon the misrepresentation.") (internal quotation marks

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2754862 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,046
**(Cite as: 2004 WL 2754862 (S.D.N.Y.))**

omitted) (omissions in original). The elements of a negligent misrepresentation claim in New York are similar: A plaintiff must allege a misrepresentation of fact and "(1) an awareness by the maker that the statement is to be used for a particular purpose, (2) reliance by a known party on the statement in furtherance of that purpose, and (3) some conduct by the maker of the statement linking it to the relying party and evincing its understanding of that reliance." *Ford v. Sivilli,* 2 A.D.3d 773, 774, 770 N.Y.S.2d 414, 415 (2d Dep't 2003). The right plaintiffs say they wish to vindicate is the right not to be lied to in a fashion that causes reliance and results in financial injury, a right possessed by all New York residents, not the narrower right not to be lied to in connection with a securities transaction regulated by federal law.

**\*7** Plaintiffs' claims may be assessed entirely by applying New York's common law standards to the facts in this case. Although certain of defendants' alleged misrepresentations certainly were contained in prospectuses filed with the SEC, plaintiffs' claims do not depend on any rights or causes of action created by federal law. They stand independently on state common law grounds.

Plaintiffs did have the option of bringing an action under Section 10(b) of the Exchange Act, which prohibits a person from using or employing "any manipulative or deceptive device" in connection with the sale of a security, 15 U.S.C. § 78j(b). Plaintiffs also could have filed a claim based upon Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, which establishes a civil cause of action against those who have issued, signed, or underwritten documents that either omit or distort the significance of material facts; also available to plaintiffs was a claim under Section 12(2) of the 1933 Act, providing civil remedies as recourse for misleading prospectuses, 15 U.S.C. § 77*l*. That these statutes provide remedies, however, does not mean that plaintiffs were obligated to base their claims upon them. No federal interest is compromised by the availability of a parallel state-law action, as federal securities laws generally do not preempt similar state law causes of action. [FN6] The plaintiff is the master of the complaint, and may choose to proceed under state law alone unless the complaint alleges charges necessitating the construction of federal law.

FN6. *See supra,* Section IV.A.

Defendants cite *D'Alessio v. N.Y. Stock Exch., Inc.,* 258 F.3d 93 (2d Cir.2001), as support for their argument that "the federal issues underlying the state law claims, including the interpretation and application of the federal securities laws, are sufficiently substantial to confer federal-question jurisdiction." (Def. Opp. Mem. at 9) In *D'Alessio,* the Second Circuit affirmed removal of plaintiff's state law claim that defendants had conspired to violate federal securities laws, holding that there was a substantial federal issue because vindication of plaintiff's claim would depend on the court's construction of the federal securities laws. *Id.* at 102–03. The *D'Alessio* Court's conclusion was inescapable, because the claim being alleged in that case involved an act that could be interpreted only in relation to federal securities laws. As the facts were alleged in that complaint, D'Alessio would have had no state law cause of action if no federal law had been violated, thus his case rested substantially upon federal law and was justifiably removed.

The same holds true for *Sparta Surgical,* the other case upon which defendants principally rely. *Sparta Surgical Corp. v. NASD,* 159 F.3d 1209 (9th Cir.1998). In that case, plaintiffs' common law claims were based on the NASD's alleged violation of de-listing rules created by the Exchange Act; were it not for federal law, plaintiffs' claims would not have existed, and removal was justified in that case. *See id.* at 1212 ("The viability of any cause of action founded upon NASD's conduct in de-listing a stock or suspending trading depends on whether the association's rules were violated.")

**\*8** In this case, plaintiffs' claims are not predicated on whether federal law was violated, and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2754862 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,046
**(Cite as: 2004 WL 2754862 (S.D.N.Y.))**

therefore the claims are not governed by federal law. This case differs from *D'Alessio* and *Sparta Surgical* because, although federal securities laws do indeed relate to the subject matter of plaintiffs' case, plaintiffs' claims do not rest upon violation of federal laws. Again, plaintiffs allege that defendants' oral and written misrepresentations induced them to invest in Rhodia stock. No federal statute or rule creates or exclusively governs such a claim. Defendants claim that federal securities laws will necessarily be implicated in plaintiffs' case because, in order to determine whether the prospectuses are misleading, the reviewing court must look to the federal securities laws for the applicable standards. (Def. Opp. Mem. At 12) Not so. There is no reason why the New York state common law standards for determining fraud and negligent misrepresentation cannot form the sole basis for assessing the prospectus. Moreover, our Court of Appeals has held that "the borrowing of ... federal law as a standard of conduct in a state created action is not sufficiently substantial to confer federal question jurisdiction." *West 14th Street Comm. Corp.,* 815 F.2d at 193 (citing *Merrell Dow,* 478 U .S. 804, 814 n. 12 (1987)). Even if a court did decide to take use a federal standard as a guide to assess defendants' liability, federal question jurisdiction still would not be mandatory.

Plaintiffs' case poses no "substantial federal question," because it concerns solely the nature and consequences of certain oral and written misrepresentations made by defendants to plaintiffs. New York common law is fully capable of resolving plaintiffs' claims. New York courts have considered common law claims involving fraudulent prospectuses before, *see, e.g., Finkel v. D.H. Blair & Co.,* 213 A.D.2d 588, 589, 623 N.Y.S.2d 930, 931 (2d Dep't 1995), and federal courts have exercised supplemental jurisdiction and applied state law in such cases, *see, e.g., Kaplan v. Lazard Freres & Co.,* No. 99–3428, 2000 U.S. Dist. LEXIS 1244, at *8 (S.D.N.Y. Feb. 3, 2000). Federal law need not be construed or even consulted in the resolution of plaintiffs' common law claims.

Therefore no substantial question of federal law underlies plaintiffs' complaint. Plaintiffs did not engage in artful pleading, and their action belongs in state court, the forum in which they originally chose to proceed.

V.

Plaintiffs request attorney's fees incurred as a result of defendants' removal, under 28 U.S.C. § 1447(c). The motion is denied. The decision to grant attorney's fees "requires application of a test of overall fairness given the nature of the case, the circumstances of the remand, and the effect on the parties." *Morgan Guar. Trust Co. v. Republic of Palau,* 971 F.2d 917, 924 (2d Cir.1992) (internal quotation marks omitted). As one court in this Circuit has held when declining to grant costs in a case involving artful pleading, "[t]his area of the law is extremely complicated and the related jurisdictional issues are difficult to navigate." *Foschi v. United States Swimming, Inc.,* 916 F.Supp. 232, 242 (E.D.N.Y.1996). Although the law is in plaintiffs' favor, the basis for removal was "at least colorable, and not improper," *Haggerty,* 79 F.Supp.2d at 190, therefore a grant of attorney's fees is inappropriate here.

**\*9** For the reasons set forth above, plaintiffs' motion to remand this case to Supreme Court, New York County, is granted, and plaintiffs' motion for attorney's fees is denied.

SO ORDERED:

S.D.N.Y.,2004.
Finance and Trading, Ltd. v. Rhodia S.A.
Not Reported in F.Supp.2d, 2004 WL 2754862 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,046

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.